IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LQD BUSINESS FINANCE, LLC, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 19 C 4416 |
| FUNDKITE, LLC, AKF, INC., and AZIZUDDIN ROSE, | ) |
| Defendants. | ) |
| AZIZUDDIN ROSE, | ) |
| Counterclaimant, | ) |
| vs. | ) |
| LQD BUSINESS FINANCE, LLC and GEORGE SOURI, | ) |
| Counterclaim defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

LQD Business Finance, LLC has sued two of its competitors, Fundkite, LLC, and AKF, Inc., and a former employee, Azizuddin Rose, alleging that they misappropriated LQD's trade secrets. Rose has counterclaimed against LQD and its Chief Executive Officer, George Souri, alleging that they failed to pay him and prevented him from receiving a commission for securing a deal for Fundkite. Fundkite and AKF have

moved to dismiss all of LQD's claims against them, and LQD and Souri have moved to dismiss Rose's counterclaims.

## Background

**A.     Alleged misconduct by Rose, Fundkite, and AKF**

For the purposes of the motion to dismiss LQD's claims against Fundkite and AKF, the Court accepts as true the following allegations in LQD's complaint. *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 299 (7th Cir. 2018).

LQD is a finance company that offers loans to commercial borrowers, and it develops and maintains files for its current and prospective clients. These files contain information such as a borrower's cash flow, balance sheets, and income statements. Additionally, LQD's client files include borrowers' confidential business information, such as business development plans, pricing and marketing strategies, and market research. LQD uses what it contends are proprietary analytical methods to process all of the information in a borrower's file to determine its creditworthiness and the terms of any loan LQD might offer. These determinations are also part of LQD's client files.

LQD uses several measures to protect its client files. It requires employees to sign confidentiality agreements. Client files are encrypted and password protected. Additionally, LQD stores its client files and associated data on proprietary computer platforms and software, which require company-issued usernames and passwords for access. Logging on to LQD's computers also requires authorized usernames and passwords.

LQD hires business development officers to identify prospective lenders. Rose, a business development officer, initially worked for LQD as an independent contractor.

In 2015, he signed an independent contractor agreement, which set forth the terms of his work for LQD from August 2015 to November 2015.[1] The agreement included a confidentiality provision, prohibiting Rose from disclosing LQD's client files and data to any third party. Another provision of the agreement prohibited Rose from engaging in any work "competitive to, or incompatible with" his obligations to LQD. 2d Am. Compl., dkt. no. 48 ¶ 40. After the independent contractor agreement terminated, Rose continued to work for LQD until June 2019. Between 2015 and June 2019, Rose allegedly had access to all of LQD's client files and data.

LQD alleges that in May 2018, Fundkite and AKF—which LQD says are its competitors— started paying Rose to obtain LQD client files and data. Fundkite and AKF would then use this information to market and offer loans to LQD's clients and prospective clients. This scheme, LQD alleges, continued through June 2019, and Fundkite and AKF closed several loans with borrowers allegedly diverted from LQD. In addition, LQD alleges, one of its clients, Today's Growth Consultant, Inc. (TGC), contacted Rose in June 2019 seeking additional financing. Instead of informing LQD of the loan opportunity, Rose offered it to Fundkite and AKF. Rose also shared LQD's file on TGC with Fundkite and AKF. Fundkite and AKF financed TGC's loan.

In July 2019, LQD sued Fundkite, Rose, and AKF for misappropriating LQD's client files, which it alleges are protected as trade secrets. LQD's second amended complaint, filed in November 2019, includes claims against Fundkite and AKF for

---

[1] Although the Court is generally limited to the complaint in deciding this motion, it may consider the contractor agreement because it was attached to the complaint and is central to several of LQD's claims. *See Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019).

3

violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b) (count 1); the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/4 (count 2); and the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030 (count 9). The complaint also includes common law claims against Fundkite and AKF for: unfair competition (count 3); tortious interference with business relations (count 4); aiding and abetting breach of fiduciary duty (count 11); aiding and abetting conversion (count 12); inducement of a breach of fiduciary duty (count 14); and civil conspiracy (count 15).

**B.     Alleged misconduct by LQD and Souri**

Rose alleges the following facts in support of his counterclaim, which the Court accepts as true for the purposes of the motion to dismiss the counterclaim. *See United Cent. Bank v. Davenport Estate LLC*, 815 F.3d 315, 318 (7th Cir. 2016). Starting in August 2015, Rose worked for LQD under an independent contractor agreement that terminated in November 2015. In September 2016, Rose alleges, LQD rehired him as an employee. The company required Rose to work in its office from 8:30 am to 6:30 pm, Monday through Friday. Additionally, Rose had to work remotely for several additional hours each week. Rose typically worked between fifty and seventy hours each week for LQD. He says that he successfully helped LQD secure numerous loans between September 2015 and June 2019.

Rose and LQD never executed a written contract formalizing their relationship after the termination of the independent contractor agreement. LQD would sporadically pay Rose, but between October 2017 and July 2018, he did not receive any compensation. During his employment at LQD, Rose would periodically e-mail Souri requesting overdue wages.

4

In 2017, Rose says, LQD began experiencing financial difficulties and instructed its business development officers to offer loan opportunities to other lenders. In August 2017, Souri held a company-wide meeting announcing that LQD could no longer fund loans and that employees should start looking for other employment. After this announcement, Souri told Rose that LQD was working to secure more funding and asked him to stay with the company. Souri offered to pay Rose when LQD secured additional funding. Rose agreed.

In May 2019, TGC contacted Rose seeking, within a week of its request, a $1.7 million loan. Rose says that because the TGC request did not meet LQD's lending requirements, he sent TGC's request to Fundkite. In June 2019, Fundkite approved and funded TGC's loan request. Under the terms of Fundkite's contract with Rose regarding this deal, Fundkite was to pay Rose a commission of $78,000. When LQD learned of the TGC deal, it fired Rose and contacted Fundkite, asserting that LQD—not Rose— was entitled to the commission. Fundkite did not pay Rose the commission.

In October 2019, Rose filed a counterclaim against LQD and Souri, alleging violations of the following: the minimum wage provision of the Illinois Minimum Wage Law (IMWL), 820 ILCS 105/4(a)(1) (count 4); the overtime wage provision of the Federal Labor Standards Act (FLSA), 29 U.S.C. § 207(a)(1) (count 1); the overtime wage provision of the IMWL, 820 ILCS 105/4a (count 3); the FLSA's retaliatory termination prohibition, 29 U.S.C.§ 215(a)(3) (count 2); the pay-period requirements of the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/3 (count 5); the IWPCA's retaliatory termination prohibition, 820 ILCS 115/14(c) (count 6); and recordkeeping requirements of the ICWPCA, 820 ICLS 115/10 (count 7). Rose has also

5

asserted a claim for tortious interference with a contractual relationship (count 8).

## Discussion

Fundkite and AKF have moved to dismiss all of LQD's claims against them for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). And LQD and Souri have likewise moved to dismiss all of Rose's claims under Rule 12(b)(6).[2] "To survive a motion to dismiss the complaint must 'state a claim for relief that is plausible on its face.'" *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The suggestion of Fundkite and AKF that LQD must plead its trade secrets "with particularity" is inconsistent with the Federal Rule of Civil Procedure 8, which requires only notice pleading. *See Twombly*, 550 U.S. at 555. In ruling on this motion, the Court accepts as true all well-pleaded facts and draw all reasonable inferences in favor of the non-moving party. *See Columbia Coll. Chi.*, 933 F.3d at 854.

### A. Motion to dismiss Fundkite

Preliminarily, Fundkite and AKF argue that Fundkite should be dismissed from all claims because the complaint lacks any specific allegations regarding its actions as an

---

[2] LQD and Souri have moved to dismiss Rose's IWCPA recordkeeping claim (count 7) under Rule 12(b)(1), for lack of standing. They argue that the IWCPA does not provide a private right of action to enforce its recordkeeping requirements. But this argument is not a standing challenge, implicating this Court's jurisdiction—it challenges whether Rose has a cause of action under the statute. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 & n.4 (2014). This is properly construed as a motion under Rule 12(b)(6) for failure to state a claim. *See CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011); *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73 (3d Cir. 2011); *Vaughn v. Bay Envtl. Mgmt., Inc.*, 567 F.3d 1021, 1024 (9th Cir.2009); *see also United States v. Funds in the Amount of $239,400*, 795 F.3d 639, 645 (7th Cir. 2015) (noting that "statutory standing" is a misleading term and should be avoided).

entity separate from AKF. But defendants do not point to any authority requiring LQD to allege, for any of its claims, that Fundkite acted independently of AKF. And because LQD has named Fundkite specifically in the allegations of misconduct supporting each of the claims against it, the Court denies the motion to dismiss Fundkite.

**B.     Motion to dismiss LQD's claims**

Fundkite and AKF have moved to dismiss the trade secret misappropriation claims (counts 1 and 2), the common law claims (counts 3, 4, 7, 11, 12, 14, and 15), and the CFAA claim. Fundkite and AKF have also moved to dismiss LQD's claims for injunctive relief (count 5) and unjust enrichment (count 6), which are requests for remedies and not separate causes of action. *See Knutson v. Village of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019) (injunctive relief); *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 739-40 (7th Cir. 2019) (unjust enrichment). The fate of counts 5 and 6 is therefore "tied to" that of LQD's statutory and common law claims against Fundkite and AKF. *See Vanzant*, 934 F.3d at 740. The Court will now address the motion to dismiss LQD's statutory and common law claims against Fundkite and AKF.

**1.     DTSA and ITSA claims (counts 1 and 2)**

Fundkite and AKF have moved to dismiss the DTSA claim (count 1) and ITSA (count 2), arguing that LQD has failed to plausibly allege that its client information is a trade secret under either statute or that Fundkite and AKF misappropriated the information.

The DTSA and ITSA both create civil liability for the "misappropriation" of trade secrets. *See* 18 U.S.C. § 1836(b); 765 ILCS 1065/4(a). The statutes are, in relevant part, virtually identical, so the Court will reference only the DTSA. The DTSA defines a

trade secret as information that an owner has taken reasonable measures to keep secret and that has independent economic value based on not being generally known or ascertainable by others. 18 U.S.C § 1839(3); *see also* 765 ILCS 1065/2(d). Compilations of information qualify for trade secret protection. *See* 18 U.S.C § 1839(3); *see also* 765 ILCS 1065/2(d). Whether information is a trade secret "ordinarily is a question of fact," *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003), and therefore a Rule 12(b)(6) dismissal on that issue is appropriate only if there is "no set of facts consistent with the pleadings under which the plaintiff[] could obtain relief," *see Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 812 (7th Cir. 2016).

Fundkite and AKF contend that LQD has failed to plausibly allege that its client files were trade secrets, arguing that they contain generally available information: clients' contact information and funding requests. This argument lacks merit. LQD has alleged that its client files included substantial compilations of financial and operational information—not just contact information and funding requests—and data such as balance sheets, inventory records, pricing and marketing strategies, business development plans, market research compilations, and income statements. Even if each particular item of data that went into LQD's client files was generally known or ascertainable, compilations of such information can be trade secrets. *See* 18 U.S.C § 1839(3); 765 ILCS 1065/2(d); *see also Comput. Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992) (a "unique combination" of public information can be protected as a trade secret); *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 897 (N.D. Ill. 2019).

That aside, LQD has alleged that much of the information in its client files was not generally known—it was confidential information of LQD's clients. LQD contends that it obtained this information only after committing, via nondisclosure agreements, to keep it confidential. LQD has also alleged that its client files included its own determinations regarding a client's creditworthiness and that these determinations were products of LQD's proprietary analytical methods. In sum, LQD has plausibly alleged that the information that it contends was a trade secret was not generally available.

LQD has also sufficiently alleged that it made reasonable efforts to keep its client files secret, as required for trade secret protection under both the DTSA and ITSA. *See* 18 U.S.C § 1839(3)(A); 765 ILCS 1065/2(d)(2). LQD alleges that it encrypted and password protected its client files; its proprietary software had to be used to access client files and data; and this software required an LQD-issued username and password. Access to LQD's computers was similarly restricted through use of usernames and passwords. Finally, LQD required its employees to sign confidentiality agreements. These allegations support a plausible inference that LQD employed reasonable efforts to keep its client files secret.

Fundkite and AKF argue that even if LQD's client files contained trade secrets, it has failed to plausibly allege that they acquired the files through improper means. Misappropriation of a trade secret, under the DTSA and ITSA, includes the use of a trade secret that was acquired through "improper means." *See* 18 U.S.C.§ 1839(5); 765 ILCS 1065/2(b). Breach of a duty to maintain secrecy is one example of "improper means." *See* 18 U.S.C.§ 1839(6)(A); 765 ILCS 1065/2(a).

First, LQD has alleged that the confidentiality provision of the independent

9

contractor agreement with Rose created a duty to maintain secrecy. Fundkite and AKF argue that the confidentiality provision of Rose's contractor agreement did not impose a duty of secrecy because it was an overbroad and therefore an unenforceable restrictive covenant. Under Illinois law, a restrictive covenant in an employment agreement is enforceable if it imposes a "reasonable restraint," such as limitations on geographic scope or duration. *See Reliable Fire Equip. Co. v. Arredondo*, 2011 IL 111871, ¶¶ 16, 17, 965 N.E.2d 393, 396. Reasonableness is determined by the particular facts of each case, and a restrictive covenant may be "reasonable and valid under one set of circumstances, and unreasonable and invalid under another set." *Id.* ¶ 42; 965 N.E.2d at 403. Fundkite and AKF argue that the confidentiality provision was unreasonable because it contained no durational limit. But because the reasonableness of a restrictive covenant is a fact-intensive question, ruling on this issue at the pleading stage—before the facts are developed through discovery—would be premature. *See Marquez*, 836 F.3d at 812; *cf. Arjo, Inc. v. Handicare USA, Inc.*, No. 18 C 2554, 2018 WL 5298527, at *7 (N.D. Ill. Oct. 25, 2018) (declining to decide, in ruling on a preliminary injunction motion, if restrictive covenant was reasonable). LQD has plausibly alleged that the confidentiality provision imposed upon Rose a duty to maintain secrecy.

On the question of misappropriation, Fundkite and AKF argue that LQD's allegations are insufficient because it improperly relies on a theory of "inevitable disclosure." Inevitable disclosure is an indirect means of alleging misappropriation; it applies when a defendant's new employment will "inevitably lead him to rely on the plaintiff's trade secrets." *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir.

1995); *see also Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1070, 740 N.E.2d 1166, 1178 (2000) (endorsing the Seventh Circuit's interpretation of Illinois law in *PepsiCo*). But LQD has not alleged misappropriation indirectly; it has alleged that Fundkite and AKF directly misappropriated its client files by paying Rose to share them. This allegation is sufficient to support a plausible inference of misappropriation.

For these reasons, the Court denies the defendants' motion to dismiss the DTSA and ITSA claims.

### 2. Common law claims

Fundkite and AKF argue that several of LQD's common law claims—unfair competition (count 3), tortious interference with business relations (count 4), conversion (count 7), aiding and abetting breach of fiduciary duty (count 11), aiding and abetting conversion (count 12), tortious inducement of breach of fiduciary duty (count 14), and civil conspiracy (count 15)—should be dismissed because they are all based on misappropriation of LQD's client files and are therefore preempted by the ITSA.

The ITSA displaces all common law claims based on misappropriation of a trade secret. 765 ILCS 1065/8(a); *see also Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005). All of LQD's common law claims against Fundkite and AKF—except the inducement of breach of fiduciary duty claim (count 14)—are based on misappropriation of LQD's client information and are therefore preempted. Count 14, by contrast, is based on Rose's misconduct of offering funding opportunities to Fundkite and AKF without first presenting them to LQD and thereby breaching his duty of loyalty. Because this claim does not depend on misappropriation of trade secrets, it is not preempted under the ITSA.

LQD argues, however, that its other common law claims are not preempted because they are based on misappropriation of information that would not be protected as trade secrets, such as client contact information and payment histories. But the Seventh Circuit's reading of Illinois case law is that "the preemptive language in the ITSA . . . cover[s] claims that are essentially claims of trade secret misappropriation, even when the alleged 'trade secret' does not fall within the Act's definition." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014) (citing *Pope v. Alberto–Culver Co.*, 296 Ill. App. 3d 512, 519, 694 N.E.2d 615, 619 (1998)). Seventh Circuit interpretations of Illinois law are binding on this Court, unless and until the Illinois Supreme Court makes a contrary ruling. *See Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

For these reasons, the Court dismisses counts 3, 4, 7, 11, 12, and 15 but declines to dismiss count 14.

### 3. CFAA

Fundkite and AKF have moved to dismiss the CFAA claim (count 9) against them, arguing that LQD has not alleged that they engaged in any conduct that violated the statute. The CFAA creates civil liability for obtaining information by "intentionally access[ing] a computer without authorization." 18 U.S.C. § 1030(a)(2),(g). There are no allegations in the complaint that Fundkite or AKF accessed any LQD computer, and LQD concedes this point. The Court dismisses Fundkite and AKF from count 9.

### C. Motion to dismiss Rose's counterclaims

LQD and Souri have moved to dismiss Rose's claims for failure to pay him overtime and minimum wages, retaliatory discharge, violations of the IWPCA, and

12

tortious interference with a contractual relationship.

### 1. Failure to pay overtime and minimum wages

Rose has asserted claims for violations of the overtime wage provisions of the FLSA and IMWL and the minimum wage requirement of the IMWL. Because the IMWL and FLSA are substantially similar, Illinois courts apply interpretations of the FLSA and its implementing regulations to analyze IMWL claims. *See Kerbes v. Raceway Assocs., LLC*, 2011 IL App (1st) 110318, ¶ 25, 961 N.E.2d 865, 870-71; *see also Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010).

The FLSA and IMWL have parallel overtime provisions: both set a standard workweek at forty hours and require employers to pay employees at 1.5 times their regular rate for hours worked in excess of forty. *See* 29 U.S.C. § 207(a)(1); 820 ILCS 105/4a. To plausibly plead an overtime claim, a plaintiff must allege facts supporting a reasonable inference that there was at least one workweek in which he worked more than forty hours and did not receive overtime wages. *See Hirst v. Skywest, Inc.*, 910 F.3d 961, 966 (7th Cir. 2018) (endorsing "one workweek" pleading standard from other circuits).

Rose has met this standard. He has alleged that he worked between fifty and seventy hours each week for LQD and that between October 2017 and July 2018, he received no pay. Based on these allegations, Rose has plausibly alleged that there was at least one week between October 2017 and July 2018 in which he did not receive overtime wages. The Court therefore denies the motion to dismiss Rose's overtime claims under the FLSA (count 1) and IMWL (count 3).

A plaintiff bringing a minimum wage claim must allege facts sufficient to support

an inference that there was at least one workweek in which he received less than Illinois's minimum wage, which was $8.25 per hour during Rose's employment with LQD. *See Hirst*, 910 F.3d at 966; 820 ILCS 105/4(a)(1). Rose has raised a plausible minimum-wage claim because, as just noted, he has alleged that between October 2017 and July 2018, he worked between fifty and seventy hours per week for LQD and received no pay. The Court denies the motion to dismiss Rose's minimum wage claim (count 4).

### 2. Retaliatory discharge under FLSA

Rose has asserted a FLSA retaliatory discharge claim (count 2), alleging that LQD terminated him for making requests for overdue pay. The FLSA makes it unlawful for an employer to terminate an employee because that employee has filed a complaint or started a proceeding related to a FLSA violation. 29 U.S.C. § 215(a)(3); *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 894 (7th Cir. 2018). "To state a retaliation claim under this provision, a plaintiff must plausibly allege that he engaged in activity protected under the Act, his employer took an adverse employment action against him, and a causal link exists between the two." *Sloan*, 901 F.3d at 894. A "protected activity" for the purposes of a retaliation claim is conduct that gives an employer "fair notice" that an employee is asserting his FLSA rights. *Id.*

Rose has not sufficiently alleged that his pay requests gave LQD and Souri "fair notice" that he was asserting his FLSA rights. Rose has alleged only that he would periodically contact Souri to ask about unpaid wages. He has not alleged that his complaints made any mention of FLSA requirements or that he otherwise gave Souri and LQD notice that he was asserting his FLSA rights. *See Sloan*, 901 F.3d at 895 (a

former employee's assertion to an employer that its conduct was "against federal law" was too vague to give the employer fair notice that she was asserting her FLSA rights). For this reason, the Court dismisses Rose's retaliatory discharge claim (count 2).

### 3. IWPCA claims

Souri and LQD have moved to dismiss all of Rose's IWPCA claims (counts 5, 6, and 7), arguing that he has failed to plausibly allege that he had an employment contract with LQD. To state a claim under the IWPCA, a plaintiff must plead that "he had an employment agreement with the employer that required the payment of wages or final compensation." *Watts v. ADDO Mgmt., LLC*, 2018 IL App (1st) 170201, ¶ 14, 97 N.E.3d 75, 80. A formal, written employment contract is not required—a plaintiff need only allege facts sufficient to support a plausible inference of mutual assent to an employment relationship. *See Schultze v. ABN AMRO, Inc.*, 2017 IL App (1st) 162140, ¶ 23, 83 N.E.3d 1053, 1059. Allegations regarding the parties' conduct can support an inference of mutual assent to an employment agreement. *See id.*

Rose has sufficiently alleged that there was mutual assent to an employment agreement with LQD. LQD hired Rose to identify financing opportunities and gave him an LQD e-mail address and access to its computer systems. Rose presented numerous loan requests to LQD, and LQD funded many of them. Additionally, LQD required Rose to work in its office between 8:30 am and 6:30 pm on weekdays, and he worked those hours. Based on these allegations, Rose has plausibly asserted that he had an employment agreement with LQD.

Souri and LQD argue that even if Rose has sufficiently alleged he had an employment agreement, the Court should dismiss his IWPCA recordkeeping claim

15

(count 7). They rely on *Williams v. Merle Pharmacy, Inc.*, No. 15 cv 1262, 2015 WL 6143897 (C.D. Ill. Oct. 19, 2015), to argue that the IWPCA allows private actions only for recovery of wages and not for violations of the Act's recordkeeping requirements. Section 11 of the IWPCA provides that "[a]ny employee aggrieved by a violation of this Act may file suit in circuit court of Illinois [sic]." 820 ILCS 115/11. This section also delegates enforcement authority to the Illinois Department of Labor and notes that "[n]othing herein shall be construed to prevent any employee from making complaint [sic] or prosecuting his or her own claim for wages." *See id.* Considering these two parts of section 11 together, the district court in *Williams* reasoned that the IWPCA explicitly authorizes private claims only for wages. *See Williams*, 2015 WL 6143897, at *3-4.

The Seventh Circuit and Illinois Supreme Court have not yet addressed whether section 11 authorizes private actions broadly for any IWPCA violation. The Court does not find *Williams* persuasive. Section 11 references private "claim[s] for wages" to clarify that these are independent of the Department of Labor's enforcement actions, *see Miller v. Kiefer Specialty Flooring, Inc.*, 317 Ill. App. 3d 370, 374, 739 N.E.2d 982, 986 (2000), not to define the scope of IWPCA's private rights of action. Indeed, section 11 authorizes private actions without limitation, permitting suits by "[a]ny employee aggrieved by a violation of this Act." The Court concludes that section 11 authorizes Rose to sue LQD and Souri for violating the IWPCA's recordkeeping requirements.

For these reasons, the Court declines to dismiss Rose's IWPCA claims (counts 5, 6, and 7).

### 4. Tortious interference with a contractual relationship

Rose has asserted a tortious interference claim against LQD and Souri, alleging that they prevented his receipt of commissions from Fundkite for facilitating the TGC deal. "To state a claim for tortious interference with contract, a plaintiff must allege facts sufficient to establish: (1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (applying Illinois law). LQD and Souri have moved to dismiss this claim, arguing that Rose failed to plausibly allege the existence of a contract. But Rose has alleged that he had a contract with Fundkite related to the TGC deal that entitled him to payment of a $78,000 commission if Fundkite financed the loan. At this stage, these allegations are sufficient to support a plausible inference that Rose had a valid contract with Fundkite. The Court therefore denies Fundkite's motion to dismiss this claim (count 8).

### Conclusion

For the foregoing reasons, the Court dismisses counts 3, 4, 7, 11, 12, and 15 of LQD's second amended complaint and dismisses Fundkite and AKF from count 9 but otherwise denies the defendants' motion to dismiss [58]. In addition, the Court dismisses count 2 of Rose's counterclaim but otherwise denies LQD and Souri's motion to dismiss [49]. Each party is directed to answer the remaining claims within 21 days after entry of this order.

                                                                                                          _____
                                                                                                          MATTHEW F. KENNELLY
Date: February 11, 2020                                                         United States District Judge