**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LQD BUSINESS FINANCE, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 4416** |
| | ) | |
| **AZIZUDDIN ROSE, FUNDKITE LLC,** | ) | |
| **AKF, INC. d/b/a FUNDKITE,** | ) | |
| **WORLD GLOBAL CAPITAL, LLC, and** | ) | |
| **YELLOWSTONE CAPITAL, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| -------------------------------------------------------- | ) | |
| | ) | |
| **AZIZUDDIN ROSE,** | ) | |
| | ) | |
| **Counterclaimant,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **LQD BUSINESS FINANCE, LLC,** | ) | |
| **LQD FINANCIAL CORP., and** | ) | |
| **GEORGE SOURI,** | ) | |
| | ) | |
| **Counterclaim defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

LQD Business Finance LLC, AKF Inc., Fundkite LLC, World Global Capital LLC, and Yellowstone Capital LLC all fund commercial businesses in need of alternative financing through what are called merchant cash advances. Like many peers in the industry, these companies find some of their deals through applications from independent sales organizations (ISOs)—entities or individuals who submit applications

to the funder in exchange for a commission if the submission leads to a successful deal. These applications usually detail the potential borrower's needs and financial information.

Azizuddin Rose worked for LQD from 2015 to 2019, and during that time he had access to LQD files containing proprietary information about potential borrowers. While working for LQD, Rose submitted sixty-three applications as an ISO to AKF and the Yellowstone entities.[1] Whether Rose had the authority to do so is the subject of dispute.

After learning that Rose had submitted these applications, LQD sued Rose, AKF, and Fundkite LLC, alleging that they had misappropriated LQD's trade secrets. Rose counterclaimed against LQD and its Chief Executive Officer, George Souri, alleging that they failed to pay him and prevented him from receiving a commission for securing a deal for AKF. LQD later added World Global Capital and Yellowstone Capital as defendants, and Rose added LQD Financial as a counterclaim defendant.

The corporate defendants have moved for summary judgment on LQD's claims against them. For the reasons set forth below, the Court grants the corporate defendants' motion in part. LQD has also filed a cross-motion for summary judgment on its claims against Rose and the corporate defendants. The Court denies this motion. Additionally, the counterclaim defendants have moved for summary judgment on Rose's counterclaims. The Court grants this motion in part. Finally, both LQD and the corporate defendants have moved to exclude their opponents' expert witnesses. The

---

[1] The Court will follow the lead of the parties and collectively refer to Fundkite LLC, World Global Capital, and Yellowstone Capital as the "Yellowstone entities." The Court will refer to AKF and the Yellowstone entities together as the "corporate defendants."

Court denies these motions as explained below.

## Background

The following facts are undisputed except where otherwise noted. LQD provides merchant cash advances to commercial businesses in need of alternative financing. LQD develops and maintains files for its current and prospective clients, which contain information such as a borrower's cash flow, balance sheets, and income statements. LQD uses several measures to protect its client files, including file encryption and password-protected access.

In the merchant cash advance industry, funders primarily acquire customer intelligence in two ways. The first method, which is not relevant to this lawsuit, is through internal sales channels, such as the purchase of lead lists and internet scraping. The second way, which is central to this lawsuit, is through ISOs. An ISO, which may be an individual or an entity, cultivates relationships with potential borrowers for the purpose of brokering financing for those borrowers. Funders like LQD and the corporate defendants then contract with ISOs to ultimately provide loans to these borrowers. Funders also hire ISO representatives to manage the ISO relationship. When a funder executes a loan that an ISO submitted, both the ISO and the ISO representative are paid commissions for the business.

Rose worked for LQD from September 2015 to June 2019. At some point in early 2017, he transitioned into an ISO representative capacity in which he had access to LQD's client files and data. The parties dispute whether Rose had authority to submit applications to external funders, such as AKF and the Yellowstone entities. The parties also dispute whether Rose agreed to certain privacy policies as set forth in LQD's

3

employee handbook and Proprietary Information and Inventions Agreement.  LQD paid Rose tens of thousands of dollars each year as compensation.

In June 2018, Rose and AKF entered into a contract under which Rose would serve as an ISO for AKF, and AKF would pay him commission in exchange for completed deals.  This contract identified Rose as a sole proprietor.  Throughout his business relationship with the corporate defendants, Rose used multiple e-mail addresses, including his LQD address and various personal addresses.

Rose ultimately submitted sixty-three potential borrowers to AKF.  In its internal customer relationship management system, AKF "assigned" the proposed deals to LQD.  An agent from LQD explained that the "assigned" designation is automated and refers to the entity that sent the deal.  The applications that Rose submitted contained straightforward information about the potential borrower, such as the contact information and basic financial information.  The parties dispute how many of these sixty-three applications were sent to the Yellowstone entities and whether Rose presented these deals to LQD as well.  At least two of these applications—Life Enhancement Services (LES) and Today's Growth Consultant (TGC)—led to funded deals.  AKF paid Rose a commission for the LES deal, but Rose has not been paid a commission for the TGC deal.

In June 2019, LQD terminated Rose.  In July 2019, LQD sued Rose, AKF, and Fundkite LLC for misappropriating LQD's client files, which it alleges are protected as trade secrets.  Rose counterclaimed, alleging that LQD failed to pay him and prevented him from receiving his commission on the TGC deal.  The defendants and the counterdefendants both filed motions to dismiss, which the Court granted in part.  *See*

*LQD Bus. Fin., LLC v. Fundkite, LLC*, No. 19 C 4416, 2020 WL 635906 (N.D. Ill. Feb. 11, 2020).

In May 2020, LQD filed a third amended complaint and added World Global Capital and Yellowstone Capital as defendants. This is the operative version of LQD's complaint. It includes claims against all defendants for violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b) (count 1); violation of the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/4 (count 2); and unjust enrichment (count 3). The complaint also includes claims against Rose for breach of fiduciary duty (count 5); violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (count 6); breach of contract (count 7); and breach of the covenant of good faith and fair dealing (count 8). Finally, the complaint includes a claim against the corporate defendants for tortious inducement of a breach of fiduciary duty (count 9) and a request for injunctive relief (count 4).

In October 2020, Rose filed a second amended counterclaim and added LQD Financial as a defendant. This operative counterclaim includes claims against the counterdefendants for violation of the Fair Labor Standards Act, 29 U.S.C. § 1215 (count 1); violations of the Illinois Minimum Wage Law, 820 ILCS 105/1 (counts 2 and 3); violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 (counts 4, 5, and 6); and tortious interference with contract (count 7).

The counterdefendants have now moved for summary judgment on all of Rose's counterclaims. The corporate defendants have filed for summary judgment on all of LQD's claims, and LQD has filed a cross-motion for summary judgment on these claims. LQD's cross-motion also seeks summary judgment on its claims against Rose. Lastly,

both LQD and the corporate defendants have moved to exclude the opposing parties' expert witnesses. Rose also filed a motion for summary judgment, but he never filed anything in support of it aside from a bare-bones request to file materials under seal. The Court granted that request, but Rose never filed anything in support of his own summary judgment motion or in opposition to LQD's motion, despite being given extensions on each.

## Discussion

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When parties file cross-motions for summary judgment, courts "construe all inferences in favor of the party against whom the motion under consideration is made." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (quoting *Rupcich v. UFCW Int'l Union, Local 881*, 833 F.3d 847, 853 (7th Cir. 2016)). The non-moving party must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

A.      **Corporate defendants' summary judgment motion**

1.      **Trade secrets**

The corporate defendants have moved for summary judgment on LQD's trade secrets claims under the DTSA and the ITSA.  Both of these statutes create civil liability for the "misappropriation" of trade secrets.  *See* 18 U.S.C. § 1836(b); 765 ILCS 1065/4(a).  The statutes are, in relevant part, virtually identical, so the Court will reference only the ITSA.  *See NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, No. 17 C 8829, 2020 WL 2836778, at *10 n.5 (N.D. Ill. May 31, 2020).

The ITSA defines a trade secret as information that is "sufficiently secret to derive economic value" and "the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  765 ILCS 1065/2(d); *see also* 18 U.S.C § 1839(3).  Illinois courts look to a number of factors to determine whether information qualifies as a trade secret, including "the extent to which the information in question is known outside of the plaintiff's business" and "the ease or difficulty with which the information can be properly acquired or duplicated by others."  *Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017).  A "compilation" of information can qualify for trade secret protection.  765 ILCS 1065/2(d); *see also* 18 U.S.C § 1839(3).  Illinois courts, however, are hesitant to deem "readily available" customer information as a trade secret. *Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *4 (N.D. Ill. Dec. 15, 2014) (listing cases).

Whether information is a trade secret "ordinarily is a question of fact," *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003).  But a "plaintiff must offer enough specificity to get to a jury in the first place."  *NEXT Payment*

7

*Sols., Inc.*, 2020 WL 2836778, at *15. Once a plaintiff has demonstrated that the information qualifies as a trade secret, it must further establish that the information was misappropriated, meaning it was stolen rather than developed independently, and it was used in the defendant's business. *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022).

LQD premises its trade secrets claims on two general categories of information: 1) the sixty-three funding applications; and 2) LQD's client output files. The Court concludes that the applications are not protected as a trade secret; no reasonable jury could find otherwise. A review of a sample funding application shows that it contains general information about the business and basic financial information, such as the business mailing address, telephone number, e-mail, date established, owner name, age, title, business lease or mortgage payment amount, average monthly sales, and desired financing amount. The application does not contain any proprietary information, such as an analysis about the creditworthiness of the potential borrower or even a "unique combination" of information that might otherwise qualify the application as a trade secret. *Comput. Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992). Even when viewing the evidence in the light most favorable to LQD, a reasonable jury could only conclude that this information would be "readily available" to industry lenders. *Fleetwood Packaging*, 2014 WL 7146439, at *4. In other words, no reasonable jury could conclude that the funding applications qualify as a trade secret.

Regarding LQD's client output files, the corporate defendants first contend that LQD has not defined with sufficient specificity what it means by "output files." This argument lacks merit. In its statement of facts, LQD explains that the output files

8

"include customer lists, potential customer names and contact information, existing customer names and contact information, and such existing customers' and potential customers' needs and requirements for financing." Pl.'s Resp. Mem. at 13 (dkt. no. 366) (emphasis removed). These files also detail the "type of financing sought, the amount of financing sought, the pricing of the financing sought, and that the customer had either been previously approved, or rejected, by LQD and/or others." *Id.* LQD then supports these descriptions by referencing exhibits associated with its statement of facts. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶¶ 3–4 (dkt. no. 382). Viewing the evidence in the light most favorable to LQD, a reasonable jury could conclude that exhibit A—an example of an LQD output file—qualifies as a protected trade secret, as it contains hundreds of pages of detailed financial information that a reasonable jury could find required substantial time and effort to create. *Cf. NEXT Payment Sols., Inc.*, 2020 WL 2836778, at *15 (dismissing a trade secrets claim when the plaintiff did not offer "computer printouts" or "any other tangible technical data"); *Master Tech Prod., Inc. v. Prism Enters., Inc.*, No. 00 C 4599, 2002 WL 475192, at *5 (N.D. Ill. Mar. 27, 2002) (explaining that whether information qualifies as a trade secret is based in part on "how easily information can be duplicated without involving substantial time, effort, or expense").

The corporate defendants argue next that there is no evidence that they misappropriated these files because there is no evidence that they ever possessed them. *See REXA, Inc.*, 42 F.4th at 662. The Court agrees. LQD speculates that Rose sent these files to the corporate defendants, but it has not pointed to any evidence in the record that would permit a reasonable jury to find that Rose sent them or that the

corporate defendants possess them.

Perhaps recognizing the thin nature of this speculation, LQD contends that the corporate defendants engaged in a "cover-up" by intentionally "conceal[ing] transmission of customer intelligence," such that a reasonable jury could infer that the corporate defendants actually possessed the output files. Pl.'s Resp. Mem. at 67–68 (dkt. no. 366). LQD consequently asks that the Court sanction the defendants with a spoliation instruction. In making this request, LQD bears a significant burden. An adverse inference requires the party alleging spoliation to show that the other party "intentionally destroyed [the evidence] in bad faith." *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 569 (7th Cir. 2022). The facts to which LQD points, including the simple lack of phone call evidence or the fact that Rose maintained multiple e-mail addresses, do not come close to meeting the necessary threshold. The Court therefore declines to grant an adverse inference. Without this inference, no reasonable jury could find that the corporate defendants possess the output files, and thus no reasonable jury could find that they misappropriated these trade secrets.

For this reason, the corporate defendants are entitled to summary judgment on both of LQD's trade secret claims.

### 2. Tortious inducement

The corporate defendants have moved for summary judgment on LQD's claim for tortious inducement of a fiduciary breach.[2] This common law claim requires the plaintiff

---

[2] LQD discusses a claim for aiding and abetting a fiduciary breach in conjunction with its tortious inducement claim. Although LQD did not specifically use the terms "aiding and abetting" in its complaint, the Court disagrees with the corporate defendants' contention that LQD cannot pursue such a claim, seeing as how it is barely distinguishable from the tortious inducement claim, and thus the defendants could not possibly be unfairly

to prove that the defendant: 1) colluded with a fiduciary in committing a breach; 2) knowingly participated in or induced the breach of duty; and 3) knowingly accepted the benefits resulting from that breach. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). Illinois courts have specified that the term "'knowingly' implies that the act was performed consciously, intelligently, and with actual knowledge of the facts." *Praither v. Northbrook Bank & Tr. Co.*, 2021 IL App (1st) 201192, ¶ 48 (quoting *People v. Edge*, 406 Ill. 490, 494, 94 N.E.2d 359, 361 (1950)).

As a preliminary matter, there is a genuine factual dispute over whether Rose breached a fiduciary duty owed to LQD. LQD contends that Rose had a fiduciary duty to LQD based on his status as an employee, which the corporate defendants do not dispute. *See Gross v. Town of Cicero*, 619 F.3d 697, 712–13 (7th Cir. 2010) (describing an employee's fiduciary duty to an employer). To support the proposition that Rose breached this duty, LQD points to evidence, such as its employee handbook and Proprietary Information and Inventions Agreement, indicating that Rose could not refer financing applications to third parties without written approval, which he did not have. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶¶ 29–32 (dkt. no. 382). Conversely, the defendants point to Rose's deposition testimony where he explained that he had the permission of Souri to submit potential transactions to external funders, which, according to Rose, also explains why he used his LQD business e-mail at times. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 49 (dkt. no. 382). Viewing the evidence

---

prejudiced. *See Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023 (7th Cir. 2018) (explaining how defendants must have "fair notice of what [the] suit is about" to permit an unpleaded claim); s*ee also Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (discussing when plaintiffs can amend legal theories on summary judgment).

in the light most favorable to LQD, this dispute is sufficient to demonstrate the underlying breach for LQD's tortious inducement claim at summary judgment.

Turning back to the tortious inducement elements set out above, the corporate defendants argue that LQD cannot meet any of them: there was no collusion, they did not have actual knowledge of a potential breach, and they did not receive any benefit.[3] Regarding the first two points, the Court finds the contractual relationship between AKF and Rose in conjunction with the application "assignments" dispositive for summary judgment purposes. There is evidence, including admissions by AKF, that permits a finding that it knew, before entering into a formal contract with Rose, that he worked for LQD in some capacity. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 40 (dkt. no. 382) (admitting that "AKF knew that Mr. Rose represented himself as [a] business finance consultant to LQD prior [to] June 8, 2018"); *id.* ¶ 60 (admitting that "AKF corresponded with Mr. Rose almost exclusively using his LQD e-mail address"). Yet despite that knowledge, LQD's contract with Rose, which was signed on June 8, 2018, specified that he was a "sole proprietor" as opposed to affiliated with LQD in some capacity. *Id.* ¶ 50. Viewing the evidence in the light most favorable to LQD, a reasonable jury could infer that AKF's decision to enter into this contract—wrongly

---

[3] It is not clear how much daylight actually exists between the issues of collusion and actual knowledge. As relevant to a tortious inducement claim, Black's Law Dictionary defines collusion as "[a]n agreement to defraud another." *Collusion, Black's Law Dictionary* (11th ed. 2019). This definition suggests that the parties must share an intention—and thus have knowledge—that the fiduciary will breach his duty. *See also Borsellino*, 477 F.3d at 509 (explaining that a plaintiff must allege "active misbehavior" for a tortious inducement of a breach of fiduciary duty claim to survive a motion to dismiss). To this point, the corporate defendants' arguments about the lack of collusion also map on to their arguments about the lack of knowledge. *See* Corp. Defs.' Reply Mem. in Supp. of Summ. J. at 36–38 (dkt. no. 387).

indicating Rose's employment status—shows it knew Rose did not have LQD's blessing to work with AKF, meaning he was acting adversely to his employer's interests.

This is buttressed by the evidence concerning the way in which AKF "assigned" applications. Some funding application confirmation e-mails and funding pre-qualification letters from AKF list LQD as the assignee or account specialist—which, again, inferentially indicates awareness on AKF's part of Rose's employment by or affiliation with LQD. *Id.* ¶¶ 41–42. When asked what this designation entails, a representative of AKF stated that the "assigned to" line indicates the company that sent AKF the deal, which is also the entity that should be paid the commission in the event the deal closes. *Id.* ¶ 43. In these cases that would be LQD. Despite this, AKF never paid LQD and only ever paid Rose a commission. Viewing the evidence in the light most favorable to LQD, a reasonable jury could conclude that this mismatch is further evidence that AKF both colluded with Rose and had actual knowledge that he did not have the authority to submit funding applications. This conclusion would also permit a reasonable jury to infer that AKF knew that Rose was breaching his fiduciary duty to LQD by acting in a manner adverse to the interests of his employer. *See Gross*, 619 F.3d at 712. As such, the Court overrules these bases as grounds for summary judgment against AKF.

This evidence, however, would not permit a reasonable jury to find that the Yellowstone entities colluded with Rose or had knowledge of Rose's fiduciary status. The evidence discussed above regarding knowledge of Rose's status involves only AKF and does not assist LQD in establishing a claim against the Yellowstone entities. LQD argues that the Yellowstone entities should not be differentiated from AKF because they

are a "component part" of AKF, such that "any effort to distinguish [the two] is not legally cognizable." Pl.'s Resp. Mem. at 43 (dkt. no. 366). This argument lacks merit. LQD does not cite a single case to support this theory, and more importantly, it offers no explanation of what evidence supports the proposition that one should consider the Yellowstone entities as an alter ego of AKF. It is not enough to show that AKF and the Yellowstone entities had a close relationship; LQD must also show how a reasonable factfinder could conclude that "adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances," which it has not done. *Angell v. Santefort Fam. Holdings LLC*, 2020 IL App (3d) 180724, ¶ 22, 179 N.E.3d 255, 260. For these reasons, the Yellowstone entities are entitled to summary judgment on the claim for tortious inducement of a fiduciary breach.

Turning back to AKF and the third element, the corporate defendants contend that they did not receive any benefit for the deals they did not fund because they did not make any money from these applications, and thus LQD cannot prove the third element of its tortious inducement claim. It is true the corporate defendants did not receive any benefit on sixty-one of the sixty-three applications, as they did not ultimately fund those borrowers. But AKF admits that it funded two of the sixty-three potential deals that Rose submitted, meaning there is evidence that AKF "received some benefits for taking the risk." Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 62 (dkt. no. 382). In addition, AKF paid Rose a commission for the Life Enhancement Services transaction, which involved one of the companies to which AKF sent a funding pre-qualification letter that listed LQD as the account specialist. This is also indicative of AKF's receipt of a benefit. AKF is not entitled to summary judgment on this basis.

Finally, in a related vein, the corporate defendants argue that summary judgment is warranted because LQD has no admissible evidence of damages. The Court disagrees. The corporate defendants are correct to point out that LQD did not specifically plead a disgorgement theory of damages, but that is not dispositive. Federal Rule of Civil Procedure 54 explains that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). In other words, a party is not required to plead a specific theory of damages—in this case disgorgement—to recover under that theory. On the record before the Court, LQD could present evidence of AKF's and Rose's profits on the LES and TGC deals the AKF funded and seek to recover those amounts.

That said, the corporate defendants' argument about the infirmity of a claim for recovery of *LQD*'s lost profits has merit. Illinois law holds that "damages cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can damages be based on speculation and conjecture." *Antrim Pharms. LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 432 (7th Cir. 2020); *see also TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007) (collecting Illinois cases). LQD contends that of the sixty-three applications, it would have funded loans for eight specific borrowers, including LES and TGC, with rates between sixteen and twenty-four percent per annum, depending on certain risk factors. *See* Pl.'s Resp. Mem. at 88–92 (dkt. no. 366) (detailing the hypothetical loans). As evidence to support these hypothetical loans, LQD points to testimony from its CEO, George Souri, who LQD says should be permitted as a corporate officer to testify from his personal knowledge of the business.

15

Although true that Souri could, in fact, testify about the terms and fees of the loans that LQD might have offered, that is not sufficient for LQD to establish how the potential borrowers would have responded.[4]  The bare fact that LQD would have "offered the better financial opportunity" does not remove the propositions that a borrower would have accepted the offer and then repaid the loan from the realm of speculation.  *Id.* at 90; *see also Clutch Auto Ltd. v. Navistar, Inc.*, No. 12 C 9564, 2015 WL 1299281, at *6 (N.D. Ill. Mar. 19, 2015) (rejecting the affidavit of a company chairman as sufficient to establish what the company would have sold); *Pagoda Enterprizes v. DHL Express*, No. 04 C 6497, 2006 WL 8461428, at *3 (N.D. Ill. Nov. 20, 2006) (rejecting a damages calculation based on future sales as speculative when the projections assumed that customers would stay with the plaintiff).

This same sort of impermissible speculation also forecloses LQD's alternative theory for recovery of its lost profits: the profits it contends it would have earned from submitting these transactions to other funders in the industry.  LQD's expert witness Jason Bishop provides the evidence supporting this theory, which the corporate defendants have asked this Court to exclude.  But even if Bishop's opinions are admissible, none of his four opinions are sufficient to establish the hypothetical funders that would have provided an offer, what terms the merchant would have accepted, whether the merchant would have repaid the hypothetical loan, and what commission would have been paid to LQD.  Instead, Bishop opines that the sixty-three applications

---

[4] As an initial matter, LQD argues that the corporate defendants are judicially estopped from arguing that LQD's CEO cannot testify as a lay person about the potential borrowers it might have funded.  The Court need not resolve the question of estoppel because even if Souri's testimony is admissible, he cannot demonstrate lost profits with the requisite certainty.

"were of high quality" and "poorly marketed," which even if true, does not establish the hypothetical lost commissions. In sum, LQD has not pointed to evidence in the record that would enable a reasonable jury to find lost profits in a way that meets the threshold of reasonable certainty that Illinois law demands.

The Court grants summary judgment in favor of the Yellowstone defendants on the tortious inducement claim and denies AKF's motion for summary judgment on that claim, with the damages limitations discussed above.

### 3. Remaining claims

The corporate defendants' final argument on their motion for summary judgment is that LQD's claims for unjust enrichment and injunctive relief are deficient. Regarding unjust enrichment, the corporate defendants point to this Court's previous order that in this case, the claim for unjust enrichment depends on the viability of other claims. *See LQD Bus. Fin., LLC*, 2020 WL 635906, at *3 (explaining the "fate" of LQD's unjust enrichment counts are "'tied to' that of LQD's statutory and common law claims against Fundkite and AKF"). Because there are no remaining claims against the Yellowstone defendants, they are also entitled to summary judgment on the unjust enrichment claim. AKF is not, given the continued pendency of the tortious inducement claim.

Regarding the request for injunctive relief, the corporate defendants contend, in part, that there is no evidence of any ongoing, irreparable harm by the submission of applications that are now years old. In response, LQD contends that its customer databases "will become widely available," thereby undermining its "competitive advantage in the alternative finance marketplace." Pl.'s Resp. Mem. at 82 (dkt. no. 366). Because LQD has not pointed to evidence indicating that the corporate

17

defendants possess its customer databases, the Court concludes that an injunction would not address an irreparable harm. *See Lacy v. Cook County*, 897 F.3d 847, 867 (7th Cir. 2018) (listing "irreparable harm" as a required showing for permanent injunctive relief). The corporate defendants are accordingly entitled to summary judgment on LQD's request for injunctive relief.

### B. LQD's summary judgment motion

#### 1. Rose's counterclaims

LQD has moved for summary judgment on all of Rose's counterclaims. Although Rose has not filed a response, "[f]ailure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party." *Kerr v. Pieschek*, 77 F.3d 484, at *3 (7th Cir. 1996). In such a situation, LQD "must still demonstrate that it is entitled to judgment as a matter of law." *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). Typically, the Court would deem LQD's local rule 56.1 statement as admitted to the extent that evidence in the record supports those facts. *See id.* However, LQD's local rule 56.1 statement supporting its motion for summary judgment against Rose is identical to its local rule 56.1 statement responding to the corporate defendant's motion for summary judgment. Because they are the same, the Court will rely on the corporate defendants' response to LQD's local rule 56.1 statement to the extent that it shows genuine disputes regarding material facts relevant to Rose's counterclaims and will deem the facts pertinent to the counterclaims otherwise admitted. *See generally* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. (dkt. no. 382).

#### a. Breach of fiduciary duty

LQD argues first that Rose breached a fiduciary duty and thus his claims for

minimum wage, commissions, and overtime pay must be dismissed. As discussed above, there is a genuine dispute of fact regarding whether Rose breached a fiduciary duty. *See id.* ¶¶ 29–32, 49. The Court accordingly overrules this argument as a basis to grant summary judgment on those counterclaims.

### b. Overtime pay violation

LQD argues next that Rose is not entitled to overtime pay under the Fair Labor Standards Act (FLSA) and the Illinois Minimum Wage Law. LQD contends that it paid Rose more than twice the annualized minimum wage, which would exempt it from overtime pay based on section 7(i) of the FLSA. *See* 29 U.S.C. § 207(i) (exempting employers that pay employees more than one and one-half times the minimum hourly rate and more than half the employee compensation represents commissions). The undisputed facts indicate that LQD paid Rose well above 150 percent of the applicable minimum wage. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 33 (dkt. no. 382). Thus, LQD is entitled to summary judgment on the claim for overtime pay under the FLSA, which means that Rose's parallel claim under the Illinois Minimum Wage Law also fails. *See Urnikis-Negro v. Am. Fam. Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010).

### c. Withheld commission

Regarding Rose's claim under the Illinois Wage and Payment Collection Act, LQD argues that Rose has not provided evidence of the transactions he facilitated that supposedly would entitle him to be paid commissions, or that he was the procuring cause of those transactions. Paragraph thirty of Rose's second amended counterclaim lists a series of loans that he alleges he generated for LQD. *See* Rose's 2d Am.

Countercl. ¶ 30 (dkt. no. 202). But there is no further evidence in the record on summary judgment regarding the details of those loans or Rose's claimed role in facilitating the alleged transactions. This lack of evidence is dispositive. *See Rico Indus., Inc. v. TLC Grp., Inc.*, 2018 IL App (1st) 172279, ¶ 60, 123 N.E.3d 567, 587 (rejecting a withheld commission claim when the plaintiff did not provide evidence of the plaintiff's role in the relevant transactions). LQD is entitled to summary judgment on this claim.

### d.     Retaliatory discharge

LQD argues that Rose cannot sustain his claim of retaliatory discharge under the Illinois Wage Payment and Collection Act because his termination in June 2019 cannot reasonably be related to his complaint about his salary in August 2017. *See Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill. 2d 526, 532, 519 N.E.2d 909, 912 (1988) (requiring a "casual relationship" between the employee's activity and the discharge). Notably, during his deposition, Rose admitted that the August 2017 complaint was the only instance when he discussed his compensation, and he could not remember ever making any other requests in writing. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 76 (dkt. no. 382). Even viewing the evidence in the light most favorable to Rose, no reasonable juror could conclude that LQD discharged Rose because of a compensation complaint he says he made nearly two years earlier. The Court concludes that summary judgment is warranted on this claim.

### e.     Tortious interference with contract

In count seven of his counterclaim, Rose alleges that LQD tortiously interfered with his contract with AKF and that this caused AKF to breach the contract and withhold

Rose's commission on the TGC transaction. LQD contends that it could not have interfered with the contract for three reasons: 1) it only learned of the contract on June 20, 2020, and Rose claims the interference occurred the day before, on June 19, when Souri e-mailed AKF; 2) LQD, not Rose, was owed the TGC commission, meaning LQD was protecting a legitimate right to the benefit; and 3) Rose executed the contract with AKF within the scope of his employment with LQD, meaning that it was effectively LQD's contract such that LQD, by definition, cannot be liable for interference.

On the timing issue, the record does not support LQD's contention. The e-mail that LQD references is just one in a chain, and it is readily apparent that there are prior missing e-mails indicating that LQD already believed that it was owed the TGC commission at some point earlier than June 20. *See id.* ¶ 77. Viewing this evidence in the light most favorable to Rose, a reasonable jury could conclude that LQD knew about Rose's contract with AKF prior to June 20, 2020.

On the question of who was owed the commission, LQD admits in its briefing that this issue involves a genuine dispute of fact when it says, "Rose, for his part, expressed his views of an entitlement to the commission to AKF and Yellowstone." Counterdefs.' Mot. for Summ. J. at 39 (dkt. no. 340). The dispute over who should receive the TGC deal commission is for the jury to decide.

Lastly, LQD misconstrues the law that it cites to support the proposition that it legally cannot interfere with the contract. *See Douglas Theater Corp. v. Chi. Title & Tr. Co.*, 288 Ill. App. 3d 880, 884, 681 N.E.2d 564 (1997). *Douglas Theater* explains that "a party cannot tortiously interfere with his own contract; the tortfeasor must be a third party to the contractual relationship." *Id.* at 884, 681 N.E.2d at 567. Accordingly, for

this bar to apply, LQD would need to demonstrate that it was not a third party to the contract at issue. LQD contends that because Rose was an employee, "any contract he execute[d] within the scope of his employment. . . [was] executed for, and on behalf, of LQD." Counterdefs.' Mot. for Summ. J. at 40 (dkt. no. 340). But LQD does not cite any law or evidence to support this proposition, so it has forfeited the point for summary judgment purposes. And it is not apparent, at least from the current record and briefing, that LQD would be a direct party to the contract simply because Rose and AKF entered into a contract while LQD employed Rose. The Court accordingly overrules this argument as a basis for summary judgment.

In sum, the Court concludes that LQD is not entitled to summary judgment on Rose's tortious interference with contract claim.

### f. Minimum wage violation

LQD argues next that Rose has not set forth with sufficient specificity the basis for his minimum wage violation claim under the Illinois Minimum Wage Law. LQD cites *Evans v. Newcastle Home Loans, LLC*, 2017 IL App (1st) 160080-U, to support its position. In *Evans*, the court affirmed the denial of a minimum wage claim when the plaintiff only provided a "generic description" of his work and hours. *Id.* ¶ 25. The plaintiff's "testimony that he 'probably' worked 55 hours per week" and that "he 'usually' worked three out [of] four Saturdays per month" did not provide enough specificity to sustain the claim. *Id.* In short, "mere estimates of hours of work performed" was not "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* ¶ 26 (quoting *Gilbert v. Old Ben Coal Corp.*, 85 Ill. App. 3d 488, 495, 407 N.E.2d 170, 175 (1980)).

As in *Evans*, Rose's claim is premised solely on estimates of his hours worked, and at his deposition, Rose could not provide further clarity, such as whether he worked through lunch or took vacations.  *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶¶ 73–74 (dkt. no. 382).  Given the lack of concrete evidence, the Court concludes that LQD is entitled to summary judgment on Rose's minimum wage violation claim.

### g.     Pay rate notice

Finally, LQD argues that Rose has not identified a change in his payment structure or the timing of such a change, meaning he cannot sustain a claim under the Illinois Wage Payment and Collection Act for a notice and recordkeeping violation.  LQD points to the absence of a necessary element on this claim—a change in payment structure—and the record supports LQD's contention.  *See id.* ¶ 80.  The Court accordingly grants summary judgment on Rose's claim for a violation of the recordkeeping requirement under the Illinois Wage Payment and Collection Act.

***

In sum, the Court grants LQD summary judgment on counts one through six of Rose's second amended counterclaim but denies LQD's motion for summary judgment on count seven (tortious interference with contract).

### 2.     Claims against defendants

LQD has also moved for summary judgment on its claims against the defendants.  Because the corporate defendants are entitled to summary judgment on the trade secret claims, the Court denies LQD's motion with respect to those claims.  The Court also denies LQD's motion for summary judgment on its tortious inducement and unjust enrichment claims against the Yellowstone defendants for the same reason.

The Court further denies summary judgment in LQD's favor with respect to its tortious inducement and unjust enrichment claims against AKF. As discussed above, there is a dispute of fact regarding whether Rose had authority to submit applications to external funders, meaning a reasonable jury could conclude that he did not breach a fiduciary duty—a finding that is necessary to these claims against AKF. *See id.* ¶¶ 32, 49.

In addition, this dispute of fact provides the basis for denying summary judgment in LQD's favor on its trade secret and breach of fiduciary duty claims against Rose. To the extent that Rose might have used the output files (the only cognizable trade secret in this case) in furtherance of submitting applications to external funders, Rose cannot be considered to have misappropriated these files if he had the authority to submit the applications in the first place. *See REXA, Inc.*, 42 F.4th at 662 (explaining that misappropriation consists of "disclosure or use of a trade secret of a person without express or implied consent" (quoting 765 ILCS 1065/2(b))).

In a similar vein, LQD's motion for summary judgment on its claims for breach of contract and breach of the covenant of good faith and fair dealing also turns on genuinely disputed facts. LQD premises both of these claims on the contention that Rose entered into a contract with LQD when he agreed to the company's Proprietary Information and Inventions Agreement and the employee handbook. At his deposition, however, Rose denied that he ever signed the Agreement or that he read or signed anything related to the handbook. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶¶ 29–31 (dkt. no. 382). It is not clear that Rose's simple failure to read the handbook would absolve him from compliance, but if he did not sign the Agreement, that may be a

24

different matter. Viewing the evidence in the light most favorable to Rose, a reasonable jury could credit his version of events and conclude that he never agreed to the terms of the claimed contracts, meaning he could not have breached them. The Court therefore denies LQD's motion for summary judgment on these claims.

That leaves LQD's request for injunctive relief and its claim under the Computer Fraud and Abuse Act. As to the former, the Court denies LQD's motion against the corporate defendants for the same reasons set forth above: because there is no evidence that these defendants possess LQD's customer databases, an injunction would not address irreparable harm. Injunctive relief against Rose, on the other hand, may be warranted, as there is evidence suggesting he has access to LQD's proprietary data. *See id.* ¶¶ 24–26. But absent a finding of liability, there is no basis for injunctive relief at this point; in this regard, injunctive relief is not a separate claim but rather a form of relief that may be obtained in connection with a claim or "cause of action" (such as a claim under the DTSA or the ITSA). Again, there is a dispute of fact regarding whether LQD has suffered a trade secret injury at all, and the need for injunctive relief will hinge in part on that determination. *See Lacy*, 897 F.3d at 867.

Finally, the Court denies LQD's motion for summary judgment with regard to its claim against Rose for a violation of the Consumer Fraud and Abuse Act. For one, LQD has not specified the subparagraph under which it is alleging a violation. *Cf.* 18 U.S.C § 1030(a)(1)–(7) (listing different violations). Regardless, based on LQD's cursory argument, there is still a genuine dispute of fact that precludes summary judgment. Viewing the evidence in the light most favorable to Rose, a reasonable jury could conclude that Rose did not exceed his computer access authority and did not access

information with an intent to defraud LQD.

In sum, the Court denies LQD's cross-motion for summary judgment in its entirety.

## C. Daubert motions

Both LQD and the corporate defendants have also moved to exclude their opponents' experts based on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) (explaining it is "entirely proper" for a court to decide a motion for summary judgment at the same time as the admissibility of expert testimony). Expert testimony is admissible if the witness is qualified, applies reliable methodology, and offers testimony that will assist the trier of fact. *See Daubert*, 509 U.S. at 597. The purpose of *Daubert*'s gatekeeping requirement "is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "It is to make certain that an expert, with testimony based upon professional studies and personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* The party seeking to introduce expert witness testimony bears the burden of demonstrating, by a preponderance of the evidence, that it satisfies the *Daubert* standard. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017).

### 1. Stephen Sheinbaum

LQD challenges the testimony of the defendants' expert, Stephen Sheinbaum, on the grounds that his opinions do not fit the facts of the case, he is not qualified, and his testimony exceeds the appropriate scope of a rebuttal opinion. All of these arguments

lack merit.

Regarding fit, the corporate defendants correctly point out that LQD's points are more appropriately addressed during cross-examination and not by exclusion. For example, to the extent that LQD is concerned that Sheinbaum testified that he has not reviewed each and every one of the sixty-three transactions at issue, that is a topic they may explore on cross-examination. *See Awalt v. Marketti*, No. 11 C 6142, 2015 WL 4338048, at *4 (N.D. Ill. July 15, 2015) (discussing how the parties "can explore any ['fit'] deficiencies on cross-examination"). This is not a case where the facts do not match the expert's analytical framework, which might merit exclusion. *Cf. Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018). Additionally, to the extent that any of Sheinbaum's opinions might impermissibly discuss intent, such concerns can be addressed through a motion in limine to excuse such testimony, rather than by wholesale exclusion of Sheinbaum.

On the question of Sheinbaum's qualifications, LQD contends that he has no experience related to ISO monitoring and that he has not worked in ISO onboarding in the past fifteen years. The lack of experience related to ISO monitoring is not an issue, as Sheinbaum does not offer any opinion on the subject. With regard to onboarding, the record indicates that LQD's contention that he lacks experience is only correct to the extent that he has not personally facilitated onboarding since 2007 or 2008; but for the last four years, Sheinbaum has served as the CEO of an ISO that funds more than 100 deals per month. That experience qualifies him to offer opinions about standard ISO onboarding practices. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (explaining that a "court should consider a proposed expert's full range of practical

experience . . . when determining whether that expert is qualified to render an opinion in a given area").

Lastly, the Court agrees with the corporate defendants that Sheinbaum was not a rebuttal expert witness. The corporate defendants submitted Sheinbaum's report to directly support their case and did so within the set schedule for expert disclosures. This means that the proper scope of his report was not limited to rebutting the opinions of LQD's expert witnesses.

For these reasons, the Court overrules LQD's motion to exclude Sheinbaum's testimony.

### 2. Jesse Carlson

The corporate defendants move to exclude the testimony of LQD's expert, Jesse Carlson, on the grounds that he is not qualified and he has not employed any specific methodology. Both of these arguments lack merit.

Carlson is the general counsel of a small business lender called Kapitus, where he has developed and implemented that company's ISO policies. On the issue of his qualifications, the corporate defendants point to Carlson's deposition testimony that he "did not base [his] opinion on any individual circumstance that [he] encountered during the last four years at Kapitus." Corp. Defs.' Mem. in Supp. of Summ. J. at 35 (dkt. no. 347). According to the defendants, this statement, combined with other commentary supposedly suggesting that Carlson is not familiar with the policies of other merchant cash advance companies, demonstrates that he is not qualified to speak about general industry practices.

The Court disagrees and views Carlson in a similar light as Sheinbaum. Both of

these experts have served as high-level executives for companies in the industry for multiple years—Carlson, in particular, has been the general counsel at Kapitus since 2017, and in that role, he has reviewed ISO applications, onboarded new ISOs, monitored ISOs, and determined when to terminate ISO relationships. This position provides relevant experience and knowledge such that he is sufficiently qualified to testify about ISO practices, even if he may not be as familiar with the broader industry. *See Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). Furthermore, like Sheinbaum, any gaps or weaknesses in Carlson's industry knowledge can be tested on cross-examination. *See Marketti*, 2015 WL 4338048, at *4.

The corporate defendants argue next that Carlson has not employed any specific methodology and thus his opinion is not reliable. According to the defendants, he relies on his experience with Kapitus "with no explanation of how that applies" to the facts in this case. Corp. Defs.' Mem. in Supp. of Summ. J. at 37 (dkt. no. 347). The advisory committee notes to Federal Rule of Evidence 702 detail when an expert can rely on personal experience: "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. Carlson's report satisfies that requirement. His opinions describing how funders establish and monitor ISO relationships directly connect to his role in managing

29

Kapitus' compliance functions, including his focus on mitigating third-party risk. *Cf.*
*Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (permitting a power
company engineer "responsible for ensuring the safety of its facilities from lightning" to
serve as an expert on the issue of electrical safety). To the extent that the corporate
defendants anticipate Carlson's testimony will stray beyond his experience or will delve
into impermissible topics like intent, like LQD with regard to Sheinbaum, they may
address this via a motion in limine if appropriate.

For these reasons, the Court overrules the corporate defendants' request to
preclude Carlson's testimony.

### 3. Jason Bishop

Jason Bishop is an expert for LQD who has written a report about its potential
damages—specifically, the profits it could have earned if it had referred the sixty-three
potential transactions to the rest of the industry. Like Carlson, the corporate defendants
challenge Bishop's testimony on reliability and qualification grounds. As discussed
above, however, the Court has concluded that LQD can recover only under a theory of
disgorgement, because its theory of lost profits relies on evidence that is too
speculative. Because Bishop's report has no apparent bearing on disgorgement, the
import of the Court's lost profits ruling, it appears, is that Bishop will not be able to
testify. The corporate defendants' motion to exclude this testimony is therefore
effectively moot.

### Conclusion

For the foregoing reasons, the Court grants the corporate defendants' motion for
summary judgment [dkt. no. 343] on all of plaintiff's claims except for its claims against

defendant AKF for tortious inducement of a breach of fiduciary duty and unjust enrichment—counts nine and three, respectively, of the third amended complaint.  The Court denies LQD's motion for summary judgment on its claims against the defendants [dkt. no. 357].  The Court grants LQD's motion for summary judgment [dkt. no. 352] on all of the claims in Rose's counterclaim except for the claim for tortious interference with contract—count seven.  The Court denies LQD's motion to exclude the defendant's expert [dkt. no. 357] and the corporate defendant's motion to exclude LQD's experts [dkt. no. 343].  Finally, the Court denies Rose's motion for summary judgment [dkt. no. 351], which consists only of a bare-bones motion and nothing filed in support of it despite an extension.  The case is set for a telephonic status hearing on September 14, 2022 at 9:10 a.m. to set a trial date and discuss the possibility of settlement.  The following call-in number will be used:  888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  September 8, 2022