**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LQD BUSINESS FINANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-4416 |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | Hon. Matthew F. Kennelly |
| AZIZUDDIN ROSE, FUNDKITE, LLC, | ) | |
| AKF, INC. d/b/a FUNDKITE, | ) | |
| WORLD GLOBAL CAPITAL, LLC, and | ) | |
| YELLOWSTONE CAPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## LQD BUSINESS FINANCE LLC'S MOTION FOR LEAVE TO FILE MEMORANDUM OF LAW IN EXCESS OF 15 PAGES IN OPPOSITION OF DEFENDANTS' MOTION IN LIMINE

Plaintiff LQD Business Finance LLC ("LQD"), through its counsel, for its motion for leave to file a memorandum of law in excess of 15 pages in opposition to Defendants' Motion in Limine, states as follows:

1. This is a complex matter with many parties, facts, allegations, and relevant legal authority.

2. Defendants' Motion in Limine [D.E. 414] contains ten separate Motion in Limine topics, referencing numerous deposition transcripts, expert reports, and other correspondence attached as exhibits thereto.

3. As a result, adhering to the 15-page limit for a memorandum in opposition to Defendants' Motion in Limine is extremely difficult.

4. LQD seeks leave to file the attached 18-page memorandum in opposition Defendants' Motion in Limine.

WHEREFORE Plaintiff LQD Business Finance, LLC requests that this court grant it leave to file the attached oversized brief, and for any other relief the court seeks just and equitable.

Dated: February 20, 2022

Respectfully Submitted,

LQD Business Finance, LLC, *Plaintiff/Counter-Defendant and George Souri Counter-Defendant*

/s/ Zane D. Smith
Zane D. Smith, one of its Attorneys
Zane D. Smith – ARDC #6184814
ZANE D. SMITH & ASSOCIATES, LTD.
221 North LaSalle Street – Suite 1320
Chicago, Illinois 60601
(312) 245-0031
zane@zanesmith.com

David Graff, Esq.-Admitted *Pro Hac Vice*
Matthew Silverstein, Esq.-Admitted *Pro Hac Vice*
Graff Silverstein LLP
3 Middle Patent Road
Armonk, New York 10504
(212)-381-6055
dgraff@graffsilversteinllp.com

*Attorneys for Plaintiff/Counter-Defendant LQD Business Finance, LLC and Counter-Defendant George Souri*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LQD BUSINESS FINANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-4416 |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | Hon. Matthew F. Kennelly |
| AZIZUDDIN ROSE, FUNDKITE, LLC, | ) | |
| AKF, INC. d/b/a FUNDKITE, | ) | |
| WORLD GLOBAL CAPITAL, LLC, and | ) | |
| YELLOWSTONE CAPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE

Dated: February 20, 2023

Zane D. Smith
ZANE D. SMITH & ASSOCIATES, LTD.
221 North LaSalle Street – Suite 1320
Chicago, Illinois 60601
(312) 245-0031
zane@zanesmith.com

David Graff, Esq.-Admitted *Pro Hac Vice*
Matthew Silverstein, Esq.-Admitted *Pro Hac Vice*
Graff Silverstein LLP
3 Middle Patent Road
Armonk, New York 10504
(212)-381-6055
dgraff@graffsilversteinllp.com


*Attorneys for Plaintiff/Counter-Defendant LQD
Business Finance, LLC and Counter-Defendant
George Souri*

Plaintiff LQD Business Finance, LLC ("LQD" or "Plaintiff") hereby submits its Opposition to Defendants' Motion in Limine.[1]

**MOTION *IN LIMINE* #1:**

### 1. Impermissible Narratives

Defendants invite this court to prohibit an industry expert, testifying to the standards and practices in the alternative or non-bank commercial finance industry, from explaining to the jury that which constitutes the non-bank commercial finance industry. None of Defendants' caselaw preclude an industry expert from explaining the industry in which he is opining upon. Without an explanation of the structure of the non-bank commercial finance industry, the jury will not be able to understand the rationale for norms, standards, and practices in that industry. Further, Defendants have consistently characterized the industry as a "cowboy industry" and therefore, purportedly, Defendants' conversion of customer intelligence from LQD for the benefit of themselves is ordinary practice in that industry. Defendants cannot, on the one hand, try to mischaracterize the industry, and on the other hand, try to prohibit LQD from using its own expert to rebut Defendant's theories regarding that industry. Moreover, Defendants intend to attack LQD's experts industry knowledge because, as they state even in this motion, he has only been the general counsel for one of the largest non-bank commercial finance or "merchant cash advance" companies in the United States for six years, with significant additional 15 years' prior experience as a regulator, investigator, and litigator in the financial services industry, as well as a professor at Georgetown University's law school teaching professional responsibility for the last 7 years. LQD's expert,

---

[1] LQD uses record cites to PX.__ and to deposition transcripts. LQD has provided the court with deposition transcripts cited from herein as well as the exhibits marked PX.__ on a thumb drive. The PX.__ designated exhibits, similarly, are identified on the exhibit list on file with the court. Accordingly, for the avoidance of burdening the court with additional filings and paper, LQD respectfully refers the court to the Exhibit List (D.E. 411-3), Deposition Designations (D.E. 411-1) and attendant thumb drive with all exhibits and deposition transcripts for ease of reference. Last, LQD quotes certain Interrogatories as well as Initial Disclosures, herein, and upon the court request, can provide such documents by hand delivery, appropriate filing, or, at the upcoming pre-trial conference.

therefore, should be permitted to demonstrate his actual understanding of the alternative or non-bank commercial finance industry by describing it to the jury.

Defendants criticize LQD's expert for reviewing the evidence, and the manner in which the evidence informed his opinion. LQD's expert review of the facts is not unsubstantiated, but based on cites to the record and such record cites expressly form the basis for his opinion. LQD's expert decision to do so, unlike Defendants' expert, is the reason that his testimony is appropriate, and Defendants' expert's testimony is not. The expert's testimony must "assist the trier of fact." *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (quoting *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 788 (7th Cir. 2000)); Fed. R. Civ. P. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) To do so, the testimony must "fit the issue to which the expert is testifying and be tied to the facts of the case." *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 819 (7th Cir. 2014) (quoting *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes. In other words, an expert witness cannot merely present his qualifications alongside his opinion; he must explain why the application of his prior experience to the facts at hand compel his final conclusions. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010).

## 2. Intent / State of Mind

Defendants' confuse an opinion on state of mind – *i.e.*, what Defendants' expert concedes to have proffered – with facts that demonstrate that which AKF knew at the time that it contracted with Rose in his personal capacity, and how such facts, when considered by an expert, impacted

that expert's opinion on the norms, and ordinary responses, that would have occurred in the alternative finance industry. As noted, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes. In other words, an expert witness cannot merely present his qualifications alongside his opinion; he must explain why the application of his prior experience to the facts at hand compel his final conclusions. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010).

Specifically, LQD's expert considered the following facts:

- AKF contracted with Rose to pay Rose personally for customer intelligence that AKF had previously, and consistently, "assigned to" LQD.

- AKF testified: "Q. What does, "Assigned to LQD Business Finance" mean? A. It's the company that sent us the deal. It's automated in the system. Q. Would the company that sent you the deal, be the company that gets the commission that gets the commission in the event the deal closed? A. Yes. Q. That's what "Assigned to," means? A. Yes" Andreyeva Dep. Trans. 55:9-19.

- AKF testified: "Q. Let's go through a few things. The LES deal, we indicated earlier, was assigned to LQD, right? A. Yes. Q. Dean Rose has an LQD e-mail address and footer on his emails, right? A. Right. Q. Dean Rose was the one corresponding with you about LES, a deal that was assigned to LQD, right? A. Right. Q. You knew at this point that Dean Rose was acting on behalf of LQD, right? A. That's what it looks like, yes." *Id.* 71:11-25.

- Rose, testified prior to executing June 8, 2018 contract in his personal capacity, he would have told AKF he worked for LQD: "Q. So you would have told them that you work for

3

LQD, and that you were signed up in your personal capacity, right? A. Correct." Rose Dep.

Trans. 112:8-11.[2]

Based upon those facts, and others in the record, LQD's expert properly opined "standard risk mitigation practices at a Funder presented with the inconsistencies in Rose's application and statements would have included verification with LQD of Rose's authority to act on behalf of LQD. In simpler terms, a Funder would have verified Rose's relationship with LQD, and the sourcing of the potential customers and attendant information that Rose submitted by contacting LQD prior to processing submissions or providing financing to customers referred by Rose." *See,* Exhibit A to Defendants' Motion in Limine, at pp.16-17.

Faced with the same facts, Defendants' expert testified:

> Q. Okay. So let me ask you this question very specifically. I'm not assuming anything. I showed you a set of circumstances where someone -- there was a deal assigned to AKF. AKF was not only assigned the deal, but I showed you testimony that said, in AKF's parlance, "assigned to" means that it was sourced from and to be paid to LQD. And then I showed you that LQD was listed as the account specialist. Then I showed you that on the same day the commission was coming in, there was a contract with Mr. Rose in his personal capacity; right? Under those circumstances, you said that you personally would have called LQD then; right? A. I would have had a conversation with Dean Rose, and depending upon that answer, then LQD – Q. Okay. A. -- yes. Q. And I'm just confirming with you, if AKF chose not to have a conversation with Dean Rose, they should have called LQD; meaning – A. Yes." Sheinbaum Dep. Trans. 81:3-24.[3]

Based on such facts, LQD's expert similarly testified: "However, a Funder's accounting department, when presented with a bank account that did not match the ISO as credited with the

---

[2] Defendant criticizes LQD's expert for commenting that "Fundkite and Yellowstone knew that Rose was associated with LQD." *See,* Exhibit A to Defendants' Motion in Limine. But, AKF (*i.e.,* Fundkite) concedes to that knowledge and, as stated, an expert is permitted to assess a set of facts and apply his expertise to them in reaching his conclusion. That is precisely what LQD's expert did, here.

[3] Defendants did not object to this particular deposition designation, rendering even stranger their motion to exclude LQD's expert testimony whereby LQD's expert testified, based on the same facts, to, in essence, the same opinion, as LQD's expert.

commission in the Funder's system, would have questioned Rose's entitlement to the commission and inquired as to the correct party to be credited with the commission payment." *See,* Exhibit A to Defendants' Motion in Limine, at pg.21. AKF's cherry-picked criticism of that opinion critically omits the next sentence in LQD's expert report: "Yellowstone confirmed that its accounting department would review who the funding specialist was in Yellowstone's language on the one hand to determine if that person is matched to the bank account that the commission is going into, and that this was consistent with ordinary compliance procedures in the industry." *Id., citing, Zelazny Dep. Trans.* 17-18. Because, legally, LQD's expert's application of his expertise to the facts is legally required, and Defendants' experts, and industry witnesses, agreed with those opinions, Defendants' criticism is misplaced.

Defendants criticize LQD's Expert for opining that the record demonstrates a failure to comply with that industry standard – which, all experts, and industry witnesses, agree applies. But, There is nothing impermissible about an expert relying on experience or applying his experience to the facts of the case as his methodology. Again, "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes. In other words, an expert witness cannot merely present his qualifications alongside his opinion; he must explain why the application of his prior experience to the facts at hand compel his final conclusions. *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010). No dispute exists that testimony as to whether a certain set of facts comports with industry standards in finance and/or banking is appropriate testimony for an expert. *In re Ocean Bank*, 481 F. Supp. 2d 892, 904 (N.D. Ill 2007):

> This… Section consists of permissible expert testimony. While most
> of the material merely rehashes facts that Ms. Pool received

> from Ocean Bank, she uses her experience in the banking industry to conclude that assuming the facts are true, Ocean Bank's compliance program and subscription to certain business and legal publications is consistent with banking industry standards… she provides information on the quality of Ocean Bank's compliance program, which may help the jury make their willfulness determination.

*In re Ocean Bank*, 481 F. Supp. 2d 892, 904 (N.D. Ill 2007).

Similarly, Corporate Defendants' failure to follow the industry standards (*i.e.*, duty to inquire of LQD), as agreed upon by Mr. Carlson and Defendants' Rebuttal Expert, is demonstrative of Corporate Defendants' actual knowledge. *See United States v. O'Brien*, 119 F.3d 523, 533 (7th Cir. 1997) (relying in part on non-compliance with industry custom to affirm finding of intent); *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, No. 09 C 6141, 2011 U.S. Dist. LEXIS 2085, 2011 WL 87444, at *2 (N.D. Ill. Jan. 10, 2011) ("The court will also allow [the expert] to testify concerning franchise industry practices or procedures to the extent that testimony will inform the trier of fact on issues or evidence relating to Plaintiffs' fraud and negligent misrepresentation claims."); *Needham v. Innerpac, Inc.*, No. 04-CV-393, 2006 U.S. Dist. LEXIS 70607, 2006 WL 2710617 (N.D. Ind. Sept. 19, 2006) ("Evidence of industry custom may, in fact, be relevant to aid the factfinder in determining the intent of the parties."); *Int'l Ins. Co. v. Certain Underwriters at Lloyd's London*, No. 88 C 9838, 1991 U.S. Dist. LEXIS 12937, 1991 WL 693319, at *11 (N.D. Ill. Sept. 16, 1991) ("[Industry] customs and practices may well be material to the question of whether the reinsurers were defrauded, i.e., what IIC's agent's representations would reasonably have meant to one in the reinsurers' position and whether IIC's behavior was so contrary to customary practices that fraud could be inferred."); *Hill v. PS Ill. Trust*, 368 Ill. App. 3d 310, 320, 305 Ill. Dec. 755, 856 N.E.2d. 560 (Ill. Ct. App. 2006) (finding allegation that business practice "was contrary to well-establish industry practices" relevant to claim under the Consumer

Fraud Act). LQD's expert's application of the record to the agreed-to industry standard is well-founded:

> Q. Do you see Mr. Rose indicates on June 8, 2018, at 10:36, that he still hadn't received the commission for the LES transaction? A.Yes. Q.Going to the first page, do you see it says at 8:47 that on June 8, you were asking, "Also, just as a verification, is your company still LQD Cap or not?" A.I see that. Q.Did Mr. Rose ever respond to that? A.I'm not sure. Q.Did you ever receive an e-mail responding to this from Mr. Rose? A.I don't recall that. Q.Did you ever have a phone call with Mr. Rose about this? A.I don't recall that. Andreyeva Dep. Trans. 78:25-79:19.

Last, Defendants seek preclusion of LQD's expert testimony as to the peculiarity of Rose constraining himself to submitting LQD customer intelligence to a "one stop shop." Rose Dep. Trans. 74:21 – 75:18. LQD's expert, applying industry knowledge to the facts (*i.e.*, "one stop shop"), can opine that such conduct is "out of step" with ordinary industry practices by an individual seeking to earn commissions by marketing customer intelligence.[4]

### 3. **Irrelevant Confessions of Judgment**

Confessions of judgment are not ordinary, and not understood by ordinary members of the public (*i.e.*, the jury). Nonetheless, confessions of judgment are part of all contracts between Defendants and their borrowers, or potential borrowers. Those contracts, of course, are part of the evidentiary record in this case; part of exhibit lists without objections to them. It is highly appropriate for an expert to provide a description of confessions of judgment and the manner in which they are used. Absent that explanation, the jury will be left with an incomplete understanding of evidence that it is supposed to deliberate upon.

### 4. **Whether Applications Are "Confidential" or "Have Value."**

---

[4] LQD does not address value and confidentiality points, here, because they are within Motion in Limine # 1, 4, of Defendants motion in limine, and therefore, LQD address them, there.

At the outset, LQD maintains a claim for misappropriation of trade secrets against Rose, and therefore, the confidentiality, independent economic value of the information, as well as the manner in which the nature had been maintained (*i.e.*, collected and organized in a database and/or customer management system and/or compiled into LQD forms) are relevant, as well as whether it had been understood as a compilation of data (as opposed to a simple "application" as AKF mischaracterizes it). Similarly, that evidence is salient to as to the claim of tortious inducement (or, otherwise known as aiding and abetting) Rose's breach of fiduciary duty, as stated against AKF. Because AKF colluded with Rose, a fiduciary in committing a breach of his duty; knowingly participated in or induced the breach of duty; and knowingly accepted the benefits resulting from that breach, AKF is liable for tortious inducement (or, aiding and abetting) breach of fiduciary duty. *See, e.g.*, *Borsellino v. Goldman Sachs Group, Inc*., 477 F.3d 502, 508 (7th Cir. 2007). Whereas here, aiding and abetting is at issue, AKF's intent to aid and abet Rose in his breach of duty to LQD must be demonstrated; and, therefore, evidence of motivation is not only salient, but critical to LQD's case. *United States ex rel. Evans v. Detella*, 1999 U.S. Dist. LEXIS 16176 (N.D. Ill. 1999) (holding knowledge and motivation admissible to prove criminal intent to convict criminal defendant for aiding and abetting murder). *Id.* If the jury is not permitted to understand the reasons (*i.e.*, motivation) that AKF *intended and/or knowingly* caused Rose to violate his fiduciary duty to LQD (*i.e.*, not to share LQD's valuable, expensive, and confidential customer information), the jury will be unduly confused, and worse, subject to being misled that the information had been readily available, cheaply obtained, not organized into compilations of data in LQD forms and systems, and not valuable. Said another way, preclusion of such information would permit AKF to mislead the jury into the wrongheaded belief that AKF had no reason to engage in its collusive efforts to obtain LQD customer intelligence.

8

**MOTION IN LIMINE #2.** The two exclusive witnesses that AKF chooses to bring are its CEO, a felon, and its expert, a former lawyer, who has been disbarred, and also a felon. Defendants invite the court to exclude reference to such convictions, and disbarments. But, neither the law, nor the facts, support that position.

Sheinbaum's disbarment is admissible. "[T]he fact that a witness has been disbarred from the practice of law may be used to impeach the witness." *Whitlow v. Martin*, 2010 U.S. Dist. LEXIS 157887, *8-11 (C.D. Ill. 2010); *Janopoulos v. Harvey L. Walner & Associates, Ltd.*, 1994 U.S. Dist. LEXIS 1758, 1994 WL 61801 at *3 (N.D. Ill. Feb. 17, 1994); *United States v. Weichert*, 783 F.2d 23, 25-26 (2d Cir. 1986); *United States v. Whitehead*, 618 F.2d 523, 529 (4th Cir. 1980). Sheinbaum, Defendants' proposed expert witness, pled guilty to federal charges of conspiracy to commit wire fraud, and consequently was disbarred from the practice of law in New York. Specifically, Sheinbaum admitted to conspiring with others to defraud his employer of commissions of almost $80,000 and the Bangladesh Minstry of money and property in excess of the statutory requirements by making materially false and fraudulent representations and promises. *Whitlow*, 2010 U.S. Dist. LEXIS 157887 at *8-11 ("Carroll was disbarred from the practice of law as a result of complaints brought against him including that he made false statements in various cases and misappropriated client funds. Such conduct is certainly probative of his character for truthfulness or untruthfulness. Because Mr. Carroll's disbarment and reasons for that disbarment are probative of his character for truthfulness, and because his testimony may go to a central issue in this case, his disbarment and the reasons for it may be inquired into during his cross-examination."). Sheinbaum is proffed as an expert witness to testify to industry standards relating to commissions, and therefore, his history relative to dishonesty in order to obtain commissions is not only critical to his credibility, and central issues in this case, but similarly to whether his

9

opinions concerning norms and standards are reliable as to commissions, whereas here, he had been disbarred (and, pled guily to criminal conduct) because of dishonest action to receive commissions himself.

Moreover, AKF's CEO (Alex Shvarts) and its chosen expert's criminal convictions for securities fraud and conspiracy to commit securities fraud, on the one hand, and wire fraud, and conspiracy to commit wire fraud, on the other hand, are admissible. There exists no absolute bar to admitting a conviction over ten years old, and the Seventh Circuit upholds the district court's decision doing so "as long as the record shows that the district court thoughtfully analyzed the facts and properly weighed the probative value of the evidence against its prejudicial effect." *Redditt*, 381 F.3d at 601. The Seventh Circuit has identified five considerations for weighing probative value against prejudicial effect: "the impeachment value of the the prior crime; the point in time of the conviction and the defendant's subsequent history; the similarity between the past crime and the charged crime; the importance of the defendant's testimony; and the centraility of the credibility issue." *United States v. Montgomery,* 390 F.3d 1013, 1015 (7th Cir. 2004). "While not all of those factors will apply in civil cases, the same general concerns may illuminate the court's analysis. *Buchanan,* 2021 U.S. Dist. LEXIS 76597 at *1. Shvarts, the CEO of AKF, and only fact witness made available by AKF – despite request by LQD – pled guilty to securities fraud and conspiracy to commit securities fraud. Fraud, by its very nature, is a crime of dishonesty with inherit impeachment value, and, in this instance, had been committed in the financial services sector. In this case, like his pled-to criminal conviction, Shvarts participated in a concerted effort to, without permission, convert the assets of others for his own benefit. Shvarts is the only fact witness AKF has agreed to bring to trial *(i.e.,* the others, albeit under their custody, and control, are out-of-state and AKF has chosen not to bring them as live witnesses), and

therefore, Shvarts' testimony, and the credibility thereof, is of central importance to the case. As discussed, Sheinbaum, Defendants' proposed expert, engaged in criminality broadly similar to the very issues on which he intends to opine. As the only expert for Defendant, the veracity of his opinions are critical – and his prior convictions for dishonest behavior and conspiracy in relation to obtaining commissions cannot reasonably be withheld from a finder of fact asked to assess the credibility of his opinions in a case addressing nearly identical issues. Therefore, the disbarment and convictions should be admitted.

**MOTION IN LIMINE #3.** Yellowstone is either the "high risk" department for AKF, or, alternatively, maintains an exclusive referral relationship with AKF – *i.e.*, Yellowstone receives all referrals from AKF rejects and/or partially rejects and/or chooses not to fund itself. Andreyeva Dep. Trans. 138:13-19; Gagarin Dep. Trans. 36:19-37:4; Kahmi Dep. Trans. 17:4-12. In return, Yellowstone pays AKF a commission. PX.46.

Yellowstone submitted two witnesses to deposition. Without objection, one such witness had been offered as a Rule30(b)(6) witness to discuss industry standards. Yellowstone's Objections and Responses to Notice of Rule 30(b)(6) Deposition Served by LQD ("**Topic No. 12.** Commercially common practices and norms prevalent in the financial industry for sharing information and leads among funders, ISOs, or ISOs represenatives. **Response**. Yellowstone designates Leah Zelazny to testify to this topic"). She did testify as to industry standards. Yellowstone confirmed that its "accounting department would review who the funding specialist was in Yellowstone's language on the one hand to determine if that person is matched to the bank account that the commission is going into," and that this was "consistent with ordinary compliance procedures in the industry." *Zelazny Dep. Trans.* 17-18. Yellowstone, a prominent industry

11

participant, submitted a corporate representative on norms, and standards, and therefore, whether a witness, or a party, it is salient to norms, and practices, in the industry.

John Bouskila is the primary contact between AKF and Yellowstone. AKF shared millions of dollars' worth of financing transactions converted by Rose, at the behest of AKF, with Yellowstone (particularly, but not limited to, the Today's Growth Consultant and Life Enhancement Services, LLC financing transactions), along with the customer intelligence Rose converted related to such customers. He provided testimony to industry standards applicable to AKF, and its own standards, as well as critical testimony on financing transactions and pre-qualification correspondence. Bouskila Dep. Trans. 65:8-12; 115:2-14; 76:3-21; 103:19-104:14. He is the signatory ISO agreement between AKF and Yellowstone, by which AKF had been paid commission subject to disgorgement in this case. That agreement, which he executed, required Yellowstone to review all AKF materials prior to transmission to merchants and/or ISOs, including, the pre-qualification correspondence to which this question relates. PX.46. Within Fundkite, LLC's Amended Rule 26(a)(1) Disclosures, dated February 17, 2021, it states Bouskila can testify to industry standards and norms: "Mr. Bouskila also will have information, experience and knowledge concerning commercially common practices and norms prevalent in the financial industry for sharing information and leads among funders, ISOs, or ISO representatives." He testified extensively concerning commissions, the amount that Yellowstone pays to AKF in commissions for various transactions (*i.e.*, critical in ascertaining disgorgement damages on transactions, such as LES and TGC), and the industry norms for commissions, including the appropriate recipient thereof. Bouskila Dep. Trans. 81-82; 65:8-12; 99:22-100:14. He communicated daily with the Head of ISO Relations for AKF concerning deal flow (including, in relation to customer intelligence converted by Rose). Bouskila Dep. Trans. 24:7-10.

Accordingly, LQD should be permitted to introduce designations from the two Yellowstone witnesses concerning its relationship to AKF, the financing transactions in which it participated with AKF to the extent such financing transactions had been the product of Rose's usurpation of LQD's corporate opportunities, its own standards and practices as salient to industry standards, the documentation generated in relation to the financing transactions (including, but not limited to, the pre-qualification correspondence), as well as commission the ISO Agreement between Yellowstone and AKF, whereby Yellowstone paid commission pursuant to AKF in relation to, at least, the LES and TGC transactions.

**MOTION IN LIMINE #4.** LQD incorporates by reference its response to Motion In Limine #1, subsection 3, entitled "Irrelevant Confessions of Judgment."

**MOTION IN LIMINE #5.** That which constitutes a trade secret is defined by statute, and therefore, the request to cause LQD to further define that which constitutes a trade secret, in its estimation, is inappropriate, as that, with guidance from the statutory language constitutes a classical question for the jury. "Whether something is a trade secret is 'one of the most elusive and difficult concepts in the law to define,' so 'the question of whether certain information constitutes a trade secret ordinarily is best resolved by a fact finder after full presentation of evidence from each side.'" *PolyOne Corp. v. Lu*, No. 14 C 10369, 2018 U.S. Dist. LEXIS 167482, 2018 WL 4679577, at *10 (N.D. Ill. Sept. 28, 2018) (internal quotation marks and citation omitted). *See also, Liion, LLC v. Vertiv Grp. Corp.*, 2019 U.S. Dist. LEXIS 45707, at *5 (N.D. Ill. 2019).

Moreover, to the extent that the court requires further information provided to the jury about trade secrets, LQD contends that its output files, information derived from its searchable databases, as well as information compiled into LQD format for its use in ordinary course of its

13

business constitute trade secrets, as well as its confidential customer and potential customer information (as agreed to by multiple AKF witnesses, and demonstrated in ordinary industry contractual provisions characterizing such information as confidential in the alternative finance industry). *See, e.g.,* PX.018-020; PX.046-47; Andreyeva Dep. Trans. 111:12-112:7 ("all information concerning merchants, merchant agreements, prospective merchant's agreements, prospective merchants, or other clients" constitutes "confidential information" as "it relates to any lender"); Sheinbaum Dep. Trans. 42:8-43:2; 44:8-45:5; 127:25 – 128:8; Kahmi Dep. Trans. 59:17-22 (referencing LQD materials in **all** Defendants possession as "compilations"); Gagarin Dep. Trans. 127:6-8 (same as to "compilations"); Andreyeva Dep. Trans. 123:8-12 (same as to "compilations"); Bouskila Dep. Trans. 91:20-22 (same as to "compilations").

Any notion that a trade secret should be constrained <u>not</u> to include compilations of data, and information culled and collected into searchable databases by LQD runs afoul of applicable Seventh Circuit law. Multiple courts have concluded that "customer-specific information" warrants trade secret protection. *See, e.g., Mickey's Linen v. Fischer*, 2017 U.S. Dist. LEXIS 145513, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017) ("customer-specific information warrants trade secret protection so long as it was maintained in confidence"); *First Financial Bank v. Bauknecht*, 71 F. Supp.3d. 819 (C.D. Ill. 2014) (holding banking "customers and their financial needs are economically valuable to [a banking institutions'] competitors, not generally known to its competitors, were protected by its confidentiality policy and other procedures" constituted protectable trade secrets); *APC Filtration, Inc.*, 646 F. Supp. 2d, 1000,1010 (N.D. Ill. 2009) (concluding that "customer-specific information, such as product preferences and deviated pricing" was protectable under the ITSA; *Abrasic, 90 Inc.*, 364 F. Supp. 3d 888, 897-98 (N.D. Ill. 2019) (concluding that information was protectable, even though the vast majority of it was

publicly available, as it had been compiled into one place after substantial effort). Moreover, a compilation of data, even if the component parts are in the public domain, may be protectable as a trade secret if it would require substantial time, effort, and expense to recreate the compilation. *Computer Care v. Serv. Systems Enterprises, Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992). *United States Gypsum Co. v. Large North America, Inc.*, 508 F. Supp. 601, 624 (N.D. Ill. 2007) (Information that is derived from public sources but requires laborious accumulation, culling, and/or analysis of the public information can, however, still qualify as a trade secret); *PrimeSource Bldg. Prods. V. Huttig Bldg. Prods.*, 2017 U.S. Dist. LEXIS 202748, *40-41 (N.D. Ill. Dec. 9, 2017) (trade secrets include financial methods, techniques, processes, procedures, programs, codes, formula, compilations, methods, processes, financial data, or list of actual or potential customers or suppliers.); *Hamer Holding Group, Inc. v. Elmore*, 202 Ill. App. 3d 994, 560 N.E.2d 907, 918, 148 Ill. Dec. 310 (Ill. App. Ct. 1990) ("[I]nformation which can be duplicated only by an expensive and time-consuming method of reverse engineering . . . could be secret, and the ability to duplicate it would not constitute a defense.").

*American Family Mutual Insurance Co. v. Roth* considered whether defendants, former brokers of the plaintiff, insurance company, must be enjoined from using for any reason any information obtained from plaintiff's database, including the customer and potential customer names and from servicing plaintiff's customers. *Am. Family Mut. Ins. Co. v. Roth,* 485 F. 3d 930 (7th Cir. 2007). In upholding the injunction, the Seventh Circuit wrote "the customer information in the database is a trade secret," "the names in the plaintiff's database are filtered for their suitability to buy insurance, resulting… in a defined manageable and economically viable universe of uniquely receptive customers," and "the omission of a limitation on duration of the nondisclosure [rendering it likely unenforceable] is not fatal to the plaintiff's claim. The customer

information in the plaintiff's database is a trade secret…" *Id*. At 933. *See also, GoHealth, LLC v. Simpson*, 2013 U.S. Dist. LEXIS 167416, 2013 WL 6183024, at *12 (N.D. Ill. Nov. 26, 2013) (identifying trade secrets as "valuable and proprietary trade secret processes, systems, and technology" that allows a call center "to generate more and quicker responses" and higher sales); *Shield Techs. Corp. v. Paradigm Positioning, LLC*, 908 F. Supp. 2d 914, 918 (N.D. Ill. Oct. 23, 2012) (identifying trade secrets as "aspects of the specifications and manufacture of [a product] and all aspects of the business relationship between [the plaintiff and its customer], including but not limited to the orders placed by" the customer with the plaintiff, the plaintiff's contacts at the customer, the pricing of orders, and "other proprietary and confidential know-how developed by [the plaintiff] pertaining to the creation, development, manufacture, and marketing" of a product); *Lincoln Park Sav. Bank v. Binetti*, No. 10 CV 5083, 2011 U.S. Dist. LEXIS 7320, 2011 WL 249461, at *2 (N.D. Ill. Jan. 26, 2011) (allegations identifying "confidential customer and other information" contained in a "loan origination system" sufficient); *Papa John's Int'l, Inc. v. Rezko*, 446 F. Supp. 2d 801, 811 (N.D. Ill. 2006) (identifying trade secrets as "information, formulae, patterns, compilations, programs, data, devices, methods, techniques, and processes"). *Primesource Bldg. Prods. V. Huttig Bldg. Prods*., 2017 U.S. Dist. LEXIS 234200, *41.

Decisions from other courts have also held that customer information within a sales database, such as LQD Central and Box, is a form of tangible information worthy of trade secret protection. *See, e.g., Furmanite America, Inc. v. T.D. Williams, Inc.*, 506 F. Supp.2d 1134, 1140-1141 (M.D. Fla. 2007) (an ACT database); *Mai Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520-521 (9th Cir. 1993).

**MOTION IN LIMINE #6.** Defendants seek to exclude reference to channel partners. But Defendants have been granted the right to call Ryan Heckman as a witness. LQD amended its exhibit list to include "PX.223" and "PX.220." PX.223 constitutes an employment contract between LQD and Heckman stating "The initial job title of the Employee will be the following: ***Channel Partnership Manager***" and "the initial job duties the Employee will be expected to perform will be the following… Managing deal flow from ***channel partners and converting leads in opportunities***." PX.220 constitutes a LinkedIn page prepared by Heckman stating "As a partnership leader, LQD offers its ***channel partners*** an enticing stimulus structure based on quality referrals and program participation." Rose, similarly, testified he succeeded to that position, after Heckman left in 2017: "***I took over [LQD's] ISO/Partners account***. So I was in charge of all affiliates, all brokers, stuff like that." Rose Dep. Trans., dated April 29, 2021, 27:7-11. Using that access to channel partners, Rose embarked on an effort to convert LQD customer intelligence received from its channel partners (*i.e.*, ISOs). LQD's CEO testified to channel partner relationships in response to AKF's questioning about channel partners. Souri Dep. Trans., November 20, 2020, 157:16-159:9. Channel partners have been part of this case from inception, and Rose's access – and the opportunity that access presented Rose – to such channel partners is so integral to LQD's theory of the case that preclusion of it shall irreparably prejudice LQD's ability to explain parts of its theory to the jury.

**MOTION IN LIMINE #7.** Defendants attempt to prohibit the following testimony:

> Q. Is there a policy with regard to recording conversations? A. I think they are all recorded. Q. All conversations are recorded? A. That's what it states… when you call in. Q. Any ISO that calls into AKF is on a recorded phone call? A. To my knowledge. Q. That would apply to all conversations between ISO representatives and the ISO. Q. Anna Andreyeva is an ISO representative? A. She was. Q. That policy would apply to her? A. Yes. Kahmi Dep. Trans. 50:14-51:8.

17

Because there is testimony from AKF's Head of ISOs that the recording policy applies to Ms. Andreyeva, argumentation that it does not apply to her because of some unknown document retention policy should not be accepted. Moreover, AKF produced certain calls from, and to, Rose by, and with, certain AKF personnel, such as Egor Gagarin, Steve Kahmi and Alex Shvarts. But, AKF did not produce such calls in relation to Anna Andreyeva, the principal point of contact for Defendant Rose during the salient timeframe, as his ISO Representative at AKF. The jury is entitled to understand why LQD plays them recordings from Egor Gagarin, Steve Kahmi and Alex Shvarts, but not Andreyeva. Alternatively, the jury might draw an inference calls from Andreyeva are adverse to LQD's position. For the avoidance of doubt, LQD does not seek an adverse inference, or other instruction to the jury. Rather, LQD seeks to mitigate against incorrect conclusions that LQD is not playing calls from Andreyeva because their substance is advserse to LQD's position.

**MOTION IN LIMINE #8.** Defendants seek to prohibit introduction of litigation by the SEC, and/or Receivers against AKF relative to the TGC transaction. That litigation alleges a net profit of $151,686.14 in relation to their financing TGC. [PX.123]. Yet, AKF's responses to Interrogatories state "$117,000 in gross profit from the TGC Transaction." [PX.118], at ¶19.

**MOTION IN LIMINE #9.** LQD does not intend on characterizing the transactions as usurious. Rather, LQD will explain the nature of the contracts, and the estimated APR on the contracts, at most. LQD may, at most, note that, under New York law, if such transactions had been loans rather than the purchase and sale of receivables, the contracts would be considered usurious under New York law. The jury should be permitted to understand the contract terms, the nature of the products offered by AKF, and reasoning for language in these particular contracts. Alternatively, the jury will be left with an incomplete understanding of the evidence.

18

## **CONCLUSION**

For the foregoing reasons, Defendants' motion in limine should be denied in all respects.


Dated: February 20, 2023

LQD Business Finance, LLC, *Plaintiff/Counter-Defendant and George Souri Counter-Defendant*

/s/ Zane D. Smith
Zane D. Smith, one of its Attorneys
Zane D. Smith – ARDC #6184814
ZANE D. SMITH & ASSOCIATES, LTD.
221 North LaSalle Street – Suite 1320
Chicago, Illinois 60601
(312) 245-0031
zane@zanesmith.com

David Graff, Esq.-Admitted *Pro Hac Vice*
Matthew Silverstein, Esq.-Admitted *Pro Hac Vice*
Graff Silverstein LLP
3 Middle Patent Road
Armonk, New York 10504
(212)-381-6055
dgraff@graffsilversteinllp.com
*Attorneys for Plaintiff/Counter-Defendant LQD Business Finance, LLC and Counter-Defendant George Souri*