## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LQD BUSINESS FINANCE, LLC, | |
| Plaintiff, | |
| v. | Case No. 19-cv-04416 |
| | Hon. Matthew F. Kennelly |
| AZIZUDDIN ROSE, | |
| Defendant, | |
| and | |
| FUNDKITE LLC, YELLOWSTONE CAPITAL, LLC, WORLD GLOBAL CAPITAL, LLC and AKF, INC., d/b/a FUNDKITE, | |
| Defendants. | |
| AZIZUDDIN ROSE, | |
| Counter-Plaintiff, | |
| v. | |
| LQD BUSNESS FINANCE, LLC, LQD FINANCIAL CORP. and | |
| GEORGE SOURI | |
| Counter-Defendants. | |

## <u>NOTICE OF APPEAL</u>

Plaintiff, LQD BUSINESS FIANNCE, LLC, by and through their undersigned counsel, hereby respectfully appeal to the United States Court of Appeals for the Seventh Circuit from (1) Memorandum Opinion and Order (Doc #388) entered September 8, 2022, (2) the Findings of Fact and Conclusions of Law (DOC # No. 444) entered June 21, 2023, and (3) the Judgment Order (DOC # No. 445) entered June 21, 2023.

Dated: July 10, 2023


Respectfully submitted,


Zane D. Smith

ZANE D. SMITH & ASSOCIATES, LTD.
111 W. Washington St.,
Suite 1750
Chicago, Illinois 60602
(312) 245-0031
zane@zanesmith.com

(Pending Admission in 7th Federal Circuit Court of Appeals)
David Graff, Esq.-Admitted Pro Hac Vice
Matthew Silverstein, Esq.-Admitted Pro Hac Vice
Case: 1:19-cv-04416
Graff Silverstein LLP
3 Middle Patent Road Armonk, New York 10504
(212)-381-6055
dgraff@graffsilversteinllp.com
msilverstein@graffsilversteinllp.com
          *Attorneys for Plaintiff/Appellant*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LQD BUSINESS FINANCE, LLC,
Plaintiff,

v.

AZIZUDDIN ROSE,
Defendant,

 and

FUNDKITE LLC, YELLOWSTONE CAPITAL,
LLC, WORLD GLOBAL CAPITAL, LLC and
AKF, INC., d/b/a FUNDKITE,
        Defendants.

Case No. 19-cv-04416

Hon. Matthew F. Kennelly

AZIZUDDIN ROSE,
        Counter-Plaintiff,
v.
LQD BUSNESS FINANCE, LLC, LQD
FINANCIAL CORP. and
GEORGE SOURI

        Counter-Defendants.

## EXHIBIT A TO NOTICE OF APPEAL

Plaintiff LQD Business Finance, LLC ("LQD") submits this Exhibit in relation to the issues

on which it intends to appeal the findings of the lower court in the above-captioned matter. LQD

appeals on several issues from the Summary Judgment Opinion and Order, Decision and Order of,

and Judgment entered by, the Court. D.E. 388, 444 and 445.

At the trial court, LQD brought claims under the Federal Defense of Trade Secrets Act; the Illinois Trade Secrets Act (Count II); Unjust Enrichment; Permanent Injunction as against all Defendants. Below, LQD brought claims pursuant to Breach of Fiduciary Duty; Breach of Contract; Breach of the Covenant of Good Faith and Fair Dealing; and the Computer Fraud and Abuse Act; and, as against Corporate Defendants, exclusively, LQD brought claims under its Counts brought pursuant Tortious Inducement of Breach of Fiduciary Duty. Rose, for his part, brought an 8 Count Counterclaim against LQD alleging myriad wage and hour claims under state and federal law, including, failure to pay overtime and failure to pay minimum wage; recordkeeping claims; retaliatory termination claims; failure to pay commission claims; as well as claims for tortious interference with contract.

After summary judgment motions all LQD claims against Rose survived; only the claims for aiding and abetting (or tortious inducement of) breach of fiduciary duty and unjust enrichment survived against AKF; all claims against the other Corporate Defendants had been dismissed; and all Rose's Counterclaims except for Rose's claim for tortious interference with contract had been dismissed. At the summary judgment stage, the Court similarly precluded LQD's damage model on lost profits, leaving LQD, exclusively, with the damage remedy of disgorgement of profits against the remaining Defendants (*i.e.*, Rose and AKF, Inc.). (D.E. 388).

Ultimately, at trial, the Court ruled that Defendant Rose breached his fiduciary duty as to LQD by entering an illicit contract, and receiving commissions under that illicit contract, with Defendant AKF, Inc. The Court further ruled that LQD did not tortiously interfere with contract and had no liability to any party. The Court, therefore, disgorged Rose of <u>all</u> commissions and salary he made during the period that he breached his fiduciary duty, and imposed a constructive trust for the benefit of LQD on certain monies held by AKF. Nevertheless, the Court did not rule

1

in LQD's favor on its state and federal trade secret claims against any Defendant or its claims for tortious inducement of breach of fiduciary duty as against AKF. Against that backdrop, LQD appeals the summary judgment decision and order, as well as the decision and order following trial on myriad grounds.

At the outset, it is important to understand the parties, and their relationship to one another. AKF and LQD are participants in the non-banking / alternative finance marketplace of financiers. In certain respects, AKF and LQD are direct competitors for potential customers in that marketplace. From, at least, 2017 through June 19, 2019, Rose had been an LQD agent that located and developed customer relationships with potential borrowers in the alternative finance marketplace. The illicit contract between Rose and AKF purportedly entitled Rose to receive 100 percent of the commissions from customers and potential customers that Rose sent to AKF to receive alternative financing from AKF. Under that contract, it is undisputed that Rose sent, and AKF received, 63 different referrals of potential customers for its alternative finance products; similar potential customers in nature and kind to that which LQD offers that same marketplace.

**First,** LQD appeals a crucial determination of the lower court's summary judgment opinion and order related to the scope of trade secrets permitted at trial (D.E. 388). The Court wrongfully ruled that customer intelligence (particularly, but not limited to, information concerning alternative finance customers' and potential customers' needs and requirements) did not constitute a trade secret.

"To establish a protectable trade secret under either statute, the party seeking protection must show that the information: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances

to maintain its secrecy or confidentiality." *PrimeSource Bldg. Prods., Inc. v. Huttig Bldg. Prods., Inc.*, 2017 U.S. Dist. LEXIS 202748, 2017 WL 7795125, at *13 (N.D. Ill. Dec. 9, 2017) (citing 765 ILCS 1065/2(d) and 18 U.S.C. § 1839(3)). Regardless of exactly what type of information or what form it exists in, to be a trade secret the information must be (1) "sufficiently secret to impart economic value because of its relative secrecy" and (2) the Plaintiff must make "reasonable efforts to maintain the secrecy of the information." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003). "The existence of a trade secret ordinarily is a question of fact." *Id.* The Seventh Circuit has noted that a trade secret is one of the most elusive and difficult concepts in the law to define. Id. at 727 (quoting *Lear Siegler, Inc. v. Ark-Ell Springs, Inc*., 569 F.2d 286, 288 (5th Cir. 1978)).

The Court determined that "output files" created and maintained by LQD constituted a trade secret under both Federal and Illinois statutes, as interpreted by the common law, at trial. D.E. 444; D.E. 445. The Court determined that LQD properly maintained and safeguarded its information, including, but not limited to, its customer needs and requirements. Nevertheless, at the summary judgment stage and prior to trial, the Court ruled that customer needs and requirements in the alternative finance industry did not constitute a trade secret. That determination on summary judgment precluded LQD from bringing an appropriately broad claim for trade secrets against Defendant Rose, and prevented, in part, LQD from bringing an appropriately broad claim for trade secrets against the other Corporate Defendants.

The evidence at trial and presented with LQD's summary judgment motion demonstrates the experts and fact witnesses in this case **agreed** that information concerning whether a potential customer had been seeking alternative financing at a certain point in time had been extremely valuable information; it had similarly been agreed upon by all experts that the terms of that

3

financing sought had been extremely valuable. Moreover, the undisputed evidence, including terms of contracts among the Defendants themselves, all experts agreed-upon testimony, and party admissions from AKF had been that whether a potential customer had been seeking alternative financing at a certain point in time and the terms of the financing sought had been confidential within the industry. The Court, itself, in ruling in LQD's favor in relation to its breach of fiduciary duty claim, and dismissing all Defendant Rose's Counterclaims, found that such information about which customers had been actively seeking financing in the alternative finance marketplace as well as the terms on which such customers sought financing (as well as operational and financial information related to such customers) had been gathered at great cost and expense to LQD (*i.e.*, it would be nonsensical that Rose could use such expensive and valuable information to profit himself to the exclusion of LQD). D.E. 444; D.E. 445. The undisputed evidence further demonstrated that LQD developed from the marketplace and its customers and potential customers sensitive financial and operational information; and culled and organized that information into its systems, including, but not limited to, LQD Central and Box. Therefore, LQD demonstrated, not only that the "output files" constituted a trade secret, but that the customer needs and requirements (including, but not limited to, that which LQD gathered and maintained in its databases and that potential customers had been in the process of searching for products that LQD sold, particularly alternative non-bank financing) constituted trade secrets under the law.

Against that backdrop, the Court found that only the "output files" constituted trade secrets. But multiple courts have concluded that "customer-specific information" warrants trade secret protection. See, e.g., *Mickey's Linen v. Fischer*, 2017 U.S. Dist. LEXIS 145513, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017) ("customer-specific information warrants trade secret protection so long as it was maintained in confidence"); *First Financial Bank v. Bauknecht*, 71 F.

4

Supp.3d. 819 (C.D. Ill. 2014) (holding banking "customers and their financial needs are economically valuable to [a banking institutions'] competitors, not generally known to its competitors, were protected by its confidentiality policy and other procedures" constituted protectable trade secrets); *APC Filtration, Inc.*, 646 F. Supp. 2d, 1000,1010 (N.D. Ill. 2009) (concluding that "customer-specific information, such as product preferences and deviated pricing" was protectable under the ITSA); *Abrasic, 90 Inc.*, 364 F. Supp. 3d 888, 897-98 (N.D. Ill. 2019) (concluding that information was protectable, even though the vast majority of it was publicly available, as it had been compiled into one place after substantial effort).

Moreover, a compilation of data, even if the component parts are in the public domain, may be protectable as a trade secret if it would require substantial time, effort, and expense to recreate the compilation. *Computer Care v. Serv. Systems Enterprises, Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992). *United States Gypsum Co. v. Large North America, Inc.*, 508 F. Supp. 601, 624 (N.D. Ill. 2007) (Information that is derived from public sources but requires laborious accumulation, culling, and/or analysis of the public information can, however, still qualify as a trade secret; *PrimeSource Bldg. Prods. v. Huttig Bldg. Prods.*, 2017 U.S. Dist. LEXIS 202748, *40-41 (N.D. Ill. Dec. 9, 2017) (trade secrets include financial methods, techniques, processes, procedures, programs, codes, formula, compilations, methods, processes, financial data, or list of actual or potential customers or suppliers.); *Hamer Holding Group, Inc. v. Elmore*, 202 Ill. App. 3d 994, 560 N.E.2d 907, 918, 148 Ill. Dec. 310 (Ill. App. Ct. 1990) ("[I]nformation which can be duplicated only by an expensive and time-consuming method of reverse engineering . . . could be secret, and the ability to duplicate it would not constitute a defense.").

*American Family Mutual Insurance Co. v. Roth* considered whether defendants, former brokers of the plaintiff, insurance company, must be enjoined from using for any reason any

information obtained from plaintiff's database, including the customer and potential customer names and from servicing plaintiff's customers. *Am. Family Mut. Ins. Co. v. Roth,* 485 F. 3d 930 (7th Cir. 2007). In upholding the injunction, the Seventh Circuit wrote "the customer information in the database is a trade secret," "the names in the plaintiff's database are filtered for their suitability to buy insurance, resulting… in a defined manageable and economically viable universe of uniquely receptive customers," and "the omission of a limitation on duration of the nondisclosure [rendering it likely unenforceable] is not fatal to the plaintiff's claim. The customer information in the plaintiff's database is a trade secret…" *Id.* at 933. *See also, GoHealth, LLC v. Simpson*, 2013 U.S. Dist. LEXIS 167416, 2013 WL 6183024, at *12 (N.D. Ill. Nov. 26, 2013) (identifying trade secrets as "valuable and proprietary trade secret processes, systems, and technology" that allows a call center "to generate more and quicker responses" and higher sales); *Shield Techs. Corp. v. Paradigm Positioning, LLC*, 908 F. Supp. 2d 914, 918 (N.D. Ill. Oct. 23, 2012) (identifying trade secrets as "aspects of the specifications and manufacture of [a product] and all aspects of the business relationship between [the plaintiff and its customer], including but not limited to the orders placed by" the customer with the plaintiff, the plaintiff's contacts at the customer, the pricing of orders, and "other proprietary and confidential know-how developed by [the plaintiff] pertaining to the creation, development, manufacture, and marketing" of a product); *Lincoln Park Sav. Bank v. Binetti*, No. 10 CV 5083, 2011 U.S. Dist. LEXIS 7320, 2011 WL 249461, at *2 (N.D. Ill. Jan. 26, 2011) (allegations identifying "confidential customer and other information" contained in a "loan origination system" sufficient); *Papa John's Int'l, Inc. v. Rezko*, 446 F. Supp. 2d 801, 811 (N.D. Ill. 2006) (identifying trade secrets as "information, formulae, patterns, compilations, programs, data, devices, methods, techniques, and processes"). *Primesource Bldg. Prods. v. Huttig Bldg. Prods.*, 2017 U.S. Dist. LEXIS 234200, *41. Decisions

6

from other courts have also held that customer information within a sales database, such as LQD Central and Box, is a form of tangible information worthy of trade secret protection. *See, e.g., Furmanite America, Inc. v. T.D. Williams, Inc.*, 506 F. Supp.2d 1134, 1140-1141 (M.D. Fla. 2007) (an ACT database); *Mai Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520-521 (9th Cir. 1993). Accordingly, the lower court erred in restraining the definition of trade secrets to "output files" precluded LQD from presenting its trade secret case against the non-Rose Defendants and, similarly, precluded LQD from presenting an appropriate trade secret claim against Rose, at trial. That is particularly troubling as the evidence is undisputed that Rose sourced 63 potential customers of alternative financing from LQD channels – developed at great cost and expense to AKF – and shared them with the other Defendants for Defendants profit to the exclusion of LQD, and, as discussed below, the Court found that AKF had, at a minimum, constructive knowledge that Rose had exceeded his authorities and breached his fiduciary obligations in relation to LQD in so sharing that information with AKF. *C&F Packing Co., Inc. v. IBP, Inc.*, No. 93 C 1601, 1998 U.S. Dist. LEXIS 3221, 1998 WL 1147139, at *6-7 (N.D. Ill. Mar. 16, 1998) (holding that a third-party had constructive knowledge when it obtained information that is ordinarily kept confidential and that it should have realized originated with a competitor). Said another way, had the Court determined, appropriately, the scope of trade secrets in this case extended to customer needs and requirements in the alternative finance industry, LQD would have succeeded on its trade secret claim against each Defendant.

**Second,** the Court erred in its determination on summary judgment that a reasonable jury, or finder of fact, could not determine that the "output files" had not been misappropriated by Defendants. In its Order and Decision after trial, the Court determined:

- Rose had been in possession of LQD "output files" (*i.e.*, that found to be trade secrets).

7

- Rose breached his fiduciary duty to LQD in its contractual relationship with AKF.

- Rose sourced 63 potential customers of alternative financing from LQD channels – developed at great cost and expense to AKF – and shared them with AKF.

But the Court found that because there had not been a document produced with any Corporate Defendant bates designation upon it demonstrating that the output file had been transferred from Rose to a corporate defendant, that no reasonable jury could have determined it was more likely than not that Rose sent "output files" to Corporate Defendants. That determination is inconsistent with well-settled case law.

Direct evidence is **not** required for a finding of misappropriation. Courts have "repeatedly recognized that plaintiffs in trade secret cases can rarely prove misappropriation by convincing direct evidence." *Lumenate Techs., LP v. Integrated Data Storage, LLC*, No. 13 C 3767, 2013 U.S. Dist. LEXIS 160414, 2013 WL 5974731, at *5 (N.D. Ill. Nov. 11, 2013). Because direct evidence of theft and use of trade secrets is often unavailable, plaintiffs may prove misappropriation by the drawing of inferences from circumstantial evidence. *PepsiCo, Inc. v. Redmond*, No. 94 C 6838, 1995 U.S. Dist. LEXIS 19380, 1996 WL 3965, at *15 (N.D. Ill. Jan. 2, 1996). "**In most cases, plaintiffs . . . must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege did in fact take place.**" *Id.* (emphasis added). Indeed, "**circumstantial evidence is acceptable, indeed even expected, in trade secret misappropriation cases.**" *PolyOne Corp. v. Lu*, No. 14 CV 10369, 2018 U.S. Dist. LEXIS 167482, 2018 WL 4679577, at *11 (N.D. Ill. Sept. 28, 2018) (emphasis added). Moreover, **theft of physical documents is not required to prove theft of a trade secret**. *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 590, 651 N.E.2d 209, 216–17 (1st Dist. 1995), *as*

*modified (June 14, 1995)* ("Stampede argues that the ITSA does not require a plaintiff to prove actual theft or conversion of physical documents embodying the trade secret information. We agree."); *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115, 1138–39 (N.D. Ill. 2019) ("Likewise, the prohibition against using the trade secrets of one's former employer applies regardless of whether the information is stored in electronic or physical form, or simply resides in one's head."). LQD should have been entitled to prove that the "output files" had been transferred to AKF by evidence developed at trial.

**Third**, the Court erred in its determination after trial that AKF did not possess the requisite knowledge for a finding against it (*i.e.*, that LQD did not meet its burden of proof) in relation to the claim for tortious inducement of breach of fiduciary duty. In Illinois, a defendant is liable for tortious inducement of breach of fiduciary duty, or, alternatively known as, aiding and abetting a breach of fiduciary breach when: (1) the defendant aided a party who performed a wrongful, injury-causing act; (2) the defendant was aware of their role when providing this assistance; and (3) the defendant knowingly and substantially assisted in the violation. *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Thornwood, Inc. v. Jenner & Block*, 344 Ill.App.3d 15, 799 N.E.2d 756, 767, 278 Ill. Dec. 891 (2003)); *Time Savers, Inc. v. LaSalle Bank, N.A.*, 371 Ill.App.3d 759, 772, 863 N.E.2d 1156, 309 Ill. Dec. 259 (2d Dist. 2007) (citation omitted).

The Court, after trial, determined the experts agreed that under the circumstances (*i.e.*, particularly, that AKF knew Rose worked for LQD; AKF knew Rose sourced his information from LQD; AKF accepted that information; and AKF was paying Rose, personally) AKF should have called LQD to confirm the scope of Rose's authority to accept such payment. D.E. 444; 445. But the that, absent more, that a failure to adhere to best practices and constructive knowledge had been insufficient to meet LQD's burden of proof (*i.e.*, actual knowledge). *Id.*

That finding is incorrect for two critical reasons. First, there was "more" evidence – undisputed evidence – developed at trial. The undisputed testimony had been that because the internal AKF systems assigned the 63 referrals from Rose to "LQD," that AKF <u>knew</u> LQD had been the source of the information and AKF <u>knew</u> that LQD had been entitled to the commission. *See,* Andreyeva Dep. Trans. 55:9-16 submitted at trial by designation: ("Q. What does, 'Assigned to LQD business finance' mean? A. It's the company that sent us the deal. It's automated in the system. Q. Would the company that sent you the deal be the company that gets the commission in the event the deal closed? A. Yes."). Yet, AKF still paid Rose 100 percent of commissions; and contracted with him to pay 100 percent of commissions as a sole proprietor. The Court failed to consider that additional evidence. That evidence coupled with that the experts' agreement that AKF should have called LQD to confirm the scope of Rose's authority to accept such payment but did not is sufficient to demonstrate actual knowledge. LQD met its burden and the Court erred in finding otherwise.

But perhaps more obviously, the Court erred in its interpretation of the burden as actual knowledge. The appropriate burden is presently unsettled in this jurisdiction and is ripe for a determination on appeal. *T.S. v. Twentieth Century Fox TV,* 548 F. Supp. 3d 749, 788 (N.D. Ill. 2021) ("The court need not decide whether constructive knowledge suffices, however, for the record lacks sufficient evidence to support a finding that Fox even had constructive knowledge."). The appropriate burden should, at least, prevent companies such as AKF from engaging in a conscious disregard (and/or intentionally evading) the truth, as the evidence demonstrated here.

**Fourth,** the lower court erred in its determination on summary judgment in its determination that LQD lost profits, consisting of lost opportunities to fund potential borrowers

and/or lost opportunities to refer those borrowers for commissions, had been too speculative under the applicable case law.

LQD presented sound expert opinions by an indisputably qualified expert in relation to the commissions that would have been available but for Rose's failure to present the opportunity to LQD. That testimony should have been permitted at trial and evaluated by a jury.

LQD presented sound evidence from its CEO concerning customers that it would have funded, and the precise terms on which it would have funded those customers, but for Defendants scheme not to present such customers to LQD for the benefit of Rose and the other corporate defendants. LQD demonstrated that the customer had come to Rose for a funding opportunity with LQD; that LQD did not receive the funding opportunity, but instead Rose sent the opportunity to fund to AKF; the Court found, in so doing pursuant to the illicit contract with AKF, Rose had breached his fiduciary obligation; LQD presented the terms and timing at which it would have funded the transaction; and LQD demonstrated that, in each instance, the terms on which the customer closed a funding transaction with a non-LQD alternative financier had been on worse terms than those that LQD would have presented. However, the Court found, in such circumstances, it was too speculative to argue that the customer would have done business with LQD. That would require that in each instance where a plaintiff seeks lost sales or lost profits in the finance space, it would need to bring in each customer or potential customer. That is too high a burden. Rather, assuming rational market participants is an appropriate metric, and rational market participants would have accepted a deal from LQD in each instance submitted by LQD. In that, in instances, whereas here, LQD lost the opportunity to fund and LQD would have offered better terms than that which the customer ultimately settled upon in the marketplace had Defendants not misappropriated the opportunity to fund.

**Fifth,** the Court erred by depriving LQD of a jury on all its claims. Most obviously, LQD had been entitled to pursue its lost profits (as discussed above) and therefore, LQD had been entitled to a jury on all issues. Secondly, even if not, the court determined that the existence of punitive damages coupled with disgorgement is insufficient to support the right to a jury trial. However, that is <u>not</u> appropriate. Punitive damages are particularly appropriate for determination by a jury, and not a judge. Therefore, the issue of punitive damages, alone, should have entitled LQD to a jury trial on all claims.

**Last,** the Court erred in its determination that a claim for unjust enrichment cannot constitute an independent cause of action in the Seventh Circuit, particularly, whereas here, the Court imposed a constructive trust on behalf of LQD on substantial monies retained wrongfully by AKF.

LQD Business Finance, LLC, *Plaintiff/Counter-Defendant and George Souri Counter-Defendant*

/s/ Zane D. Smith
Zane D. Smith, one of its Attorneys
Zane D. Smith – ARDC #6184814
ZANE D. SMITH & ASSOCIATES, LTD.
221 North LaSalle Street – Suite 1320
Chicago, Illinois 60601
(312) 245-0031
zane@zanesmith.com

David Graff, Esq.-Admitted *Pro Hac Vice*
Matthew Silverstein, Esq.-Admitted *Pro Hac Vice*
Graff Silverstein LLP
3 Middle Patent Road
Armonk, New York 10504

(212)-381-6055
dgraff@graffsilversteinllp.com
*Attorneys for Plaintiff/Counter-Defendant LQD*
*Business Finance, LLC and Counter-Defendant*
*George Souri*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LQD BUSINESS FINANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19 C 4416 |
| | ) | |
| AZIZUDDIN ROSE, FUNDKITE LLC, | ) | |
| AKF, INC. d/b/a FUNDKITE, | ) | |
| WORLD GLOBAL CAPITAL, LLC, and | ) | |
| YELLOWSTONE CAPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------------------------------------- | ) | |
| | ) | |
| AZIZUDDIN ROSE, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LQD BUSINESS FINANCE, LLC, | ) | |
| LQD FINANCIAL CORP., and | ) | |
| GEORGE SOURI, | ) | |
| | ) | |
| Counterclaim defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

LQD Business Finance LLC, AKF Inc., Fundkite LLC, World Global Capital LLC, and Yellowstone Capital LLC all fund commercial businesses in need of alternative financing through what are called merchant cash advances. Like many peers in the industry, these companies find some of their deals through applications from independent sales organizations (ISOs)—entities or individuals who submit applications

to the funder in exchange for a commission if the submission leads to a successful deal. These applications usually detail the potential borrower's needs and financial information.

Azizuddin Rose worked for LQD from 2015 to 2019, and during that time he had access to LQD files containing proprietary information about potential borrowers. While working for LQD, Rose submitted sixty-three applications as an ISO to AKF and the Yellowstone entities.[1] Whether Rose had the authority to do so is the subject of dispute.

After learning that Rose had submitted these applications, LQD sued Rose, AKF, and Fundkite LLC, alleging that they had misappropriated LQD's trade secrets. Rose counterclaimed against LQD and its Chief Executive Officer, George Souri, alleging that they failed to pay him and prevented him from receiving a commission for securing a deal for AKF. LQD later added World Global Capital and Yellowstone Capital as defendants, and Rose added LQD Financial as a counterclaim defendant.

The corporate defendants have moved for summary judgment on LQD's claims against them. For the reasons set forth below, the Court grants the corporate defendants' motion in part. LQD has also filed a cross-motion for summary judgment on its claims against Rose and the corporate defendants. The Court denies this motion. Additionally, the counterclaim defendants have moved for summary judgment on Rose's counterclaims. The Court grants this motion in part. Finally, both LQD and the corporate defendants have moved to exclude their opponents' expert witnesses. The

---

[1] The Court will follow the lead of the parties and collectively refer to Fundkite LLC, World Global Capital, and Yellowstone Capital as the "Yellowstone entities." The Court will refer to AKF and the Yellowstone entities together as the "corporate defendants."

Court denies these motions as explained below.

## Background

The following facts are undisputed except where otherwise noted.  LQD provides merchant cash advances to commercial businesses in need of alternative financing. LQD develops and maintains files for its current and prospective clients, which contain information such as a borrower's cash flow, balance sheets, and income statements. LQD uses several measures to protect its client files, including file encryption and password-protected access.

In the merchant cash advance industry, funders primarily acquire customer intelligence in two ways.  The first method, which is not relevant to this lawsuit, is through internal sales channels, such as the purchase of lead lists and internet scraping.  The second way, which is central to this lawsuit, is through ISOs.  An ISO, which may be an individual or an entity, cultivates relationships with potential borrowers for the purpose of brokering financing for those borrowers.  Funders like LQD and the corporate defendants then contract with ISOs to ultimately provide loans to these borrowers.  Funders also hire ISO representatives to manage the ISO relationship. When a funder executes a loan that an ISO submitted, both the ISO and the ISO representative are paid commissions for the business.

Rose worked for LQD from September 2015 to June 2019.  At some point in early 2017, he transitioned into an ISO representative capacity in which he had access to LQD's client files and data.  The parties dispute whether Rose had authority to submit applications to external funders, such as AKF and the Yellowstone entities.  The parties also dispute whether Rose agreed to certain privacy policies as set forth in LQD's

3

employee handbook and Proprietary Information and Inventions Agreement. LQD paid Rose tens of thousands of dollars each year as compensation.

In June 2018, Rose and AKF entered into a contract under which Rose would serve as an ISO for AKF, and AKF would pay him commission in exchange for completed deals. This contract identified Rose as a sole proprietor. Throughout his business relationship with the corporate defendants, Rose used multiple e-mail addresses, including his LQD address and various personal addresses.

Rose ultimately submitted sixty-three potential borrowers to AKF. In its internal customer relationship management system, AKF "assigned" the proposed deals to LQD. An agent from LQD explained that the "assigned" designation is automated and refers to the entity that sent the deal. The applications that Rose submitted contained straightforward information about the potential borrower, such as the contact information and basic financial information. The parties dispute how many of these sixty-three applications were sent to the Yellowstone entities and whether Rose presented these deals to LQD as well. At least two of these applications—Life Enhancement Services (LES) and Today's Growth Consultant (TGC)—led to funded deals. AKF paid Rose a commission for the LES deal, but Rose has not been paid a commission for the TGC deal.

In June 2019, LQD terminated Rose. In July 2019, LQD sued Rose, AKF, and Fundkite LLC for misappropriating LQD's client files, which it alleges are protected as trade secrets. Rose counterclaimed, alleging that LQD failed to pay him and prevented him from receiving his commission on the TGC deal. The defendants and the counterdefendants both filed motions to dismiss, which the Court granted in part. *See*

4

*LQD Bus. Fin., LLC v. Fundkite, LLC*, No. 19 C 4416, 2020 WL 635906 (N.D. Ill. Feb. 11, 2020).

In May 2020, LQD filed a third amended complaint and added World Global Capital and Yellowstone Capital as defendants. This is the operative version of LQD's complaint. It includes claims against all defendants for violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b) (count 1); violation of the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/4 (count 2); and unjust enrichment (count 3). The complaint also includes claims against Rose for breach of fiduciary duty (count 5); violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (count 6); breach of contract (count 7); and breach of the covenant of good faith and fair dealing (count 8). Finally, the complaint includes a claim against the corporate defendants for tortious inducement of a breach of fiduciary duty (count 9) and a request for injunctive relief (count 4).

In October 2020, Rose filed a second amended counterclaim and added LQD Financial as a defendant. This operative counterclaim includes claims against the counterdefendants for violation of the Fair Labor Standards Act, 29 U.S.C. § 1215 (count 1); violations of the Illinois Minimum Wage Law, 820 ILCS 105/1 (counts 2 and 3); violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 (counts 4, 5, and 6); and tortious interference with contract (count 7).

The counterdefendants have now moved for summary judgment on all of Rose's counterclaims. The corporate defendants have filed for summary judgment on all of LQD's claims, and LQD has filed a cross-motion for summary judgment on these claims. LQD's cross-motion also seeks summary judgment on its claims against Rose. Lastly,

both LQD and the corporate defendants have moved to exclude the opposing parties' expert witnesses. Rose also filed a motion for summary judgment, but he never filed anything in support of it aside from a bare-bones request to file materials under seal. The Court granted that request, but Rose never filed anything in support of his own summary judgment motion or in opposition to LQD's motion, despite being given extensions on each.

## Discussion

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When parties file cross-motions for summary judgment, courts "construe all inferences in favor of the party against whom the motion under consideration is made." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Local 727*, 869 F.3d 610, 616 (7th Cir. 2017) (quoting *Rupcich v. UFCW Int'l Union, Local 881*, 833 F.3d 847, 853 (7th Cir. 2016)). The non-moving party must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

## A.     Corporate defendants' summary judgment motion

### 1.     Trade secrets

The corporate defendants have moved for summary judgment on LQD's trade

secrets claims under the DTSA and the ITSA.  Both of these statutes create civil liability

for the "misappropriation" of trade secrets.  *See* 18 U.S.C. § 1836(b); 765 ILCS

1065/4(a).  The statutes are, in relevant part, virtually identical, so the Court will

reference only the ITSA.  *See NEXT Payment Sols., Inc. v. CLEAResult Consulting,*

*Inc.*, No. 17 C 8829, 2020 WL 2836778, at *10 n.5 (N.D. Ill. May 31, 2020).

The ITSA defines a trade secret as information that is "sufficiently secret to

derive economic value" and "the subject of efforts that are reasonable under the

circumstances to maintain its secrecy."  765 ILCS 1065/2(d); *see also* 18 U.S.C

§ 1839(3).  Illinois courts look to a number of factors to determine whether information

qualifies as a trade secret, including "the extent to which the information in question is

known outside of the plaintiff's business" and "the ease or difficulty with which the

information can be properly acquired or duplicated by others."  *Mickey's Linen v.*

*Fischer*, No. 17 C 2154, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017).  A

"compilation" of information can qualify for trade secret protection.  765 ILCS 1065/2(d);

*see also* 18 U.S.C § 1839(3).  Illinois courts, however, are hesitant to deem "readily

available" customer information as a trade secret. *Fleetwood Packaging v. Hein*, No. 14

C 9670, 2014 WL 7146439, at *4 (N.D. Ill. Dec. 15, 2014) (listing cases).

Whether information is a trade secret "ordinarily is a question of fact," *Learning*

*Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 723 (7th Cir. 2003).  But a

"plaintiff must offer enough specificity to get to a jury in the first place."  *NEXT Payment*

*Sols., Inc.*, 2020 WL 2836778, at *15.  Once a plaintiff has demonstrated that the information qualifies as a trade secret, it must further establish that the information was misappropriated, meaning it was stolen rather than developed independently, and it was used in the defendant's business.  *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022).

LQD premises its trade secrets claims on two general categories of information: 1) the sixty-three funding applications; and 2) LQD's client output files.  The Court concludes that the applications are not protected as a trade secret; no reasonable jury could find otherwise.  A review of a sample funding application shows that it contains general information about the business and basic financial information, such as the business mailing address, telephone number, e-mail, date established, owner name, age, title, business lease or mortgage payment amount, average monthly sales, and desired financing amount.  The application does not contain any proprietary information, such as an analysis about the creditworthiness of the potential borrower or even a "unique combination" of information that might otherwise qualify the application as a trade secret.  *Comput. Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1074 (7th Cir. 1992).  Even when viewing the evidence in the light most favorable to LQD, a reasonable jury could only conclude that this information would be "readily available" to industry lenders.  *Fleetwood Packaging*, 2014 WL 7146439, at *4.  In other words, no reasonable jury could conclude that the funding applications qualify as a trade secret.

Regarding LQD's client output files, the corporate defendants first contend that LQD has not defined with sufficient specificity what it means by "output files."  This argument lacks merit.  In its statement of facts, LQD explains that the output files

8

"include customer lists, potential customer names and contact information, existing customer names and contact information, and such existing customers' and potential customers' needs and requirements for financing." Pl.'s Resp. Mem. at 13 (dkt. no. 366) (emphasis removed). These files also detail the "type of financing sought, the amount of financing sought, the pricing of the financing sought, and that the customer had either been previously approved, or rejected, by LQD and/or others." *Id.* LQD then supports these descriptions by referencing exhibits associated with its statement of facts. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶¶ 3–4 (dkt. no. 382). Viewing the evidence in the light most favorable to LQD, a reasonable jury could conclude that exhibit A—an example of an LQD output file—qualifies as a protected trade secret, as it contains hundreds of pages of detailed financial information that a reasonable jury could find required substantial time and effort to create. *Cf. NEXT Payment Sols., Inc.*, 2020 WL 2836778, at *15 (dismissing a trade secrets claim when the plaintiff did not offer "computer printouts" or "any other tangible technical data"); *Master Tech Prod., Inc. v. Prism Enters., Inc.*, No. 00 C 4599, 2002 WL 475192, at *5 (N.D. Ill. Mar. 27, 2002) (explaining that whether information qualifies as a trade secret is based in part on "how easily information can be duplicated without involving substantial time, effort, or expense").

The corporate defendants argue next that there is no evidence that they misappropriated these files because there is no evidence that they ever possessed them. *See REXA, Inc.*, 42 F.4th at 662. The Court agrees. LQD speculates that Rose sent these files to the corporate defendants, but it has not pointed to any evidence in the record that would permit a reasonable jury to find that Rose sent them or that the

9

corporate defendants possess them.

Perhaps recognizing the thin nature of this speculation, LQD contends that the corporate defendants engaged in a "cover-up" by intentionally "conceal[ing] transmission of customer intelligence," such that a reasonable jury could infer that the corporate defendants actually possessed the output files. Pl.'s Resp. Mem. at 67–68 (dkt. no. 366). LQD consequently asks that the Court sanction the defendants with a spoliation instruction. In making this request, LQD bears a significant burden. An adverse inference requires the party alleging spoliation to show that the other party "intentionally destroyed [the evidence] in bad faith." *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 569 (7th Cir. 2022). The facts to which LQD points, including the simple lack of phone call evidence or the fact that Rose maintained multiple e-mail addresses, do not come close to meeting the necessary threshold. The Court therefore declines to grant an adverse inference. Without this inference, no reasonable jury could find that the corporate defendants possess the output files, and thus no reasonable jury could find that they misappropriated these trade secrets.

For this reason, the corporate defendants are entitled to summary judgment on both of LQD's trade secret claims.

### 2.    Tortious inducement

The corporate defendants have moved for summary judgment on LQD's claim for tortious inducement of a fiduciary breach.[2] This common law claim requires the plaintiff

---

[2] LQD discusses a claim for aiding and abetting a fiduciary breach in conjunction with its tortious inducement claim. Although LQD did not specifically use the terms "aiding and abetting" in its complaint, the Court disagrees with the corporate defendants' contention that LQD cannot pursue such a claim, seeing as how it is barely distinguishable from the tortious inducement claim, and thus the defendants could not possibly be unfairly

to prove that the defendant: 1) colluded with a fiduciary in committing a breach; 2) knowingly participated in or induced the breach of duty; and 3) knowingly accepted the benefits resulting from that breach. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). Illinois courts have specified that the term "'knowingly' implies that the act was performed consciously, intelligently, and with actual knowledge of the facts." *Praither v. Northbrook Bank & Tr. Co.*, 2021 IL App (1st) 201192, ¶ 48 (quoting *People v. Edge*, 406 Ill. 490, 494, 94 N.E.2d 359, 361 (1950)).

As a preliminary matter, there is a genuine factual dispute over whether Rose breached a fiduciary duty owed to LQD. LQD contends that Rose had a fiduciary duty to LQD based on his status as an employee, which the corporate defendants do not dispute. *See Gross v. Town of Cicero*, 619 F.3d 697, 712–13 (7th Cir. 2010) (describing an employee's fiduciary duty to an employer). To support the proposition that Rose breached this duty, LQD points to evidence, such as its employee handbook and Proprietary Information and Inventions Agreement, indicating that Rose could not refer financing applications to third parties without written approval, which he did not have. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶¶ 29–32 (dkt. no. 382). Conversely, the defendants point to Rose's deposition testimony where he explained that he had the permission of Souri to submit potential transactions to external funders, which, according to Rose, also explains why he used his LQD business e-mail at times. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 49 (dkt. no. 382). Viewing the evidence

---

prejudiced. *See Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1023 (7th Cir. 2018) (explaining how defendants must have "fair notice of what [the] suit is about" to permit an unpleaded claim); s*ee also Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) (discussing when plaintiffs can amend legal theories on summary judgment).

in the light most favorable to LQD, this dispute is sufficient to demonstrate the underlying breach for LQD's tortious inducement claim at summary judgment.

Turning back to the tortious inducement elements set out above, the corporate defendants argue that LQD cannot meet any of them: there was no collusion, they did not have actual knowledge of a potential breach, and they did not receive any benefit.[3] Regarding the first two points, the Court finds the contractual relationship between AKF and Rose in conjunction with the application "assignments" dispositive for summary judgment purposes. There is evidence, including admissions by AKF, that permits a finding that it knew, before entering into a formal contract with Rose, that he worked for LQD in some capacity. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 40 (dkt. no. 382) (admitting that "AKF knew that Mr. Rose represented himself as [a] business finance consultant to LQD prior [to] June 8, 2018"); *id.* ¶ 60 (admitting that "AKF corresponded with Mr. Rose almost exclusively using his LQD e-mail address"). Yet despite that knowledge, LQD's contract with Rose, which was signed on June 8, 2018, specified that he was a "sole proprietor" as opposed to affiliated with LQD in some capacity. *Id.* ¶ 50. Viewing the evidence in the light most favorable to LQD, a reasonable jury could infer that AKF's decision to enter into this contract—wrongly

---

[3] It is not clear how much daylight actually exists between the issues of collusion and actual knowledge. As relevant to a tortious inducement claim, Black's Law Dictionary defines collusion as "[a]n agreement to defraud another." *Collusion, Black's Law Dictionary* (11th ed. 2019). This definition suggests that the parties must share an intention—and thus have knowledge—that the fiduciary will breach his duty. *See also Borsellino*, 477 F.3d at 509 (explaining that a plaintiff must allege "active misbehavior" for a tortious inducement of a breach of fiduciary duty claim to survive a motion to dismiss). To this point, the corporate defendants' arguments about the lack of collusion also map on to their arguments about the lack of knowledge. *See* Corp. Defs.' Reply Mem. in Supp. of Summ. J. at 36–38 (dkt. no. 387).

indicating Rose's employment status—shows it knew Rose did not have LQD's blessing to work with AKF, meaning he was acting adversely to his employer's interests.

This is buttressed by the evidence concerning the way in which AKF "assigned" applications. Some funding application confirmation e-mails and funding pre-qualification letters from AKF list LQD as the assignee or account specialist—which, again, inferentially indicates awareness on AKF's part of Rose's employment by or affiliation with LQD. *Id.* ¶¶ 41–42. When asked what this designation entails, a representative of AKF stated that the "assigned to" line indicates the company that sent AKF the deal, which is also the entity that should be paid the commission in the event the deal closes. *Id.* ¶ 43. In these cases that would be LQD. Despite this, AKF never paid LQD and only ever paid Rose a commission. Viewing the evidence in the light most favorable to LQD, a reasonable jury could conclude that this mismatch is further evidence that AKF both colluded with Rose and had actual knowledge that he did not have the authority to submit funding applications. This conclusion would also permit a reasonable jury to infer that AKF knew that Rose was breaching his fiduciary duty to LQD by acting in a manner adverse to the interests of his employer. *See Gross*, 619 F.3d at 712. As such, the Court overrules these bases as grounds for summary judgment against AKF.

This evidence, however, would not permit a reasonable jury to find that the Yellowstone entities colluded with Rose or had knowledge of Rose's fiduciary status. The evidence discussed above regarding knowledge of Rose's status involves only AKF and does not assist LQD in establishing a claim against the Yellowstone entities. LQD argues that the Yellowstone entities should not be differentiated from AKF because they

are a "component part" of AKF, such that "any effort to distinguish [the two] is not legally cognizable." Pl.'s Resp. Mem. at 43 (dkt. no. 366). This argument lacks merit. LQD does not cite a single case to support this theory, and more importantly, it offers no explanation of what evidence supports the proposition that one should consider the Yellowstone entities as an alter ego of AKF. It is not enough to show that AKF and the Yellowstone entities had a close relationship; LQD must also show how a reasonable factfinder could conclude that "adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances," which it has not done. *Angell v. Santefort Fam. Holdings LLC*, 2020 IL App (3d) 180724, ¶ 22, 179 N.E.3d 255, 260. For these reasons, the Yellowstone entities are entitled to summary judgment on the claim for tortious inducement of a fiduciary breach.

Turning back to AKF and the third element, the corporate defendants contend that they did not receive any benefit for the deals they did not fund because they did not make any money from these applications, and thus LQD cannot prove the third element of its tortious inducement claim. It is true the corporate defendants did not receive any benefit on sixty-one of the sixty-three applications, as they did not ultimately fund those borrowers. But AKF admits that it funded two of the sixty-three potential deals that Rose submitted, meaning there is evidence that AKF "received some benefits for taking the risk." Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 62 (dkt. no. 382). In addition, AKF paid Rose a commission for the Life Enhancement Services transaction, which involved one of the companies to which AKF sent a funding pre-qualification letter that listed LQD as the account specialist. This is also indicative of AKF's receipt of a benefit. AKF is not entitled to summary judgment on this basis.

Finally, in a related vein, the corporate defendants argue that summary judgment is warranted because LQD has no admissible evidence of damages. The Court disagrees. The corporate defendants are correct to point out that LQD did not specifically plead a disgorgement theory of damages, but that is not dispositive. Federal Rule of Civil Procedure 54 explains that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). In other words, a party is not required to plead a specific theory of damages—in this case disgorgement—to recover under that theory. On the record before the Court, LQD could present evidence of AKF's and Rose's profits on the LES and TGC deals the AKF funded and seek to recover those amounts.

That said, the corporate defendants' argument about the infirmity of a claim for recovery of *LQD*'s lost profits has merit. Illinois law holds that "damages cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can damages be based on speculation and conjecture." *Antrim Pharms. LLC v. Bio-Pharm, Inc.*, 950 F.3d 423, 432 (7th Cir. 2020); *see also TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007) (collecting Illinois cases). LQD contends that of the sixty-three applications, it would have funded loans for eight specific borrowers, including LES and TGC, with rates between sixteen and twenty-four percent per annum, depending on certain risk factors. *See* Pl.'s Resp. Mem. at 88–92 (dkt. no. 366) (detailing the hypothetical loans). As evidence to support these hypothetical loans, LQD points to testimony from its CEO, George Souri, who LQD says should be permitted as a corporate officer to testify from his personal knowledge of the business.

15

Although true that Souri could, in fact, testify about the terms and fees of the loans that LQD might have offered, that is not sufficient for LQD to establish how the potential borrowers would have responded.[4]  The bare fact that LQD would have "offered the better financial opportunity" does not remove the propositions that a borrower would have accepted the offer and then repaid the loan from the realm of speculation.  *Id.* at 90; *see also Clutch Auto Ltd. v. Navistar, Inc.*, No. 12 C 9564, 2015 WL 1299281, at *6 (N.D. Ill. Mar. 19, 2015) (rejecting the affidavit of a company chairman as sufficient to establish what the company would have sold); *Pagoda Enterprizes v. DHL Express*, No. 04 C 6497, 2006 WL 8461428, at *3 (N.D. Ill. Nov. 20, 2006) (rejecting a damages calculation based on future sales as speculative when the projections assumed that customers would stay with the plaintiff).

This same sort of impermissible speculation also forecloses LQD's alternative theory for recovery of its lost profits: the profits it contends it would have earned from submitting these transactions to other funders in the industry.  LQD's expert witness Jason Bishop provides the evidence supporting this theory, which the corporate defendants have asked this Court to exclude.  But even if Bishop's opinions are admissible, none of his four opinions are sufficient to establish the hypothetical funders that would have provided an offer, what terms the merchant would have accepted, whether the merchant would have repaid the hypothetical loan, and what commission would have been paid to LQD.  Instead, Bishop opines that the sixty-three applications

---

[4] As an initial matter, LQD argues that the corporate defendants are judicially estopped from arguing that LQD's CEO cannot testify as a lay person about the potential borrowers it might have funded.  The Court need not resolve the question of estoppel because even if Souri's testimony is admissible, he cannot demonstrate lost profits with the requisite certainty.

16

"were of high quality" and "poorly marketed," which even if true, does not establish the hypothetical lost commissions.  In sum, LQD has not pointed to evidence in the record that would enable a reasonable jury to find lost profits in a way that meets the threshold of reasonable certainty that Illinois law demands.

The Court grants summary judgment in favor of the Yellowstone defendants on the tortious inducement claim and denies AKF's motion for summary judgment on that claim, with the damages limitations discussed above.

### 3.    Remaining claims

The corporate defendants' final argument on their motion for summary judgment is that LQD's claims for unjust enrichment and injunctive relief are deficient.  Regarding unjust enrichment, the corporate defendants point to this Court's previous order that in this case, the claim for unjust enrichment depends on the viability of other claims.  *See LQD Bus. Fin., LLC*, 2020 WL 635906, at *3 (explaining the "fate" of LQD's unjust enrichment counts are "'tied to' that of LQD's statutory and common law claims against Fundkite and AKF").  Because there are no remaining claims against the Yellowstone defendants, they are also entitled to summary judgment on the unjust enrichment claim. AKF is not, given the continued pendency of the tortious inducement claim.

Regarding the request for injunctive relief, the corporate defendants contend, in part, that there is no evidence of any ongoing, irreparable harm by the submission of applications that are now years old.  In response, LQD contends that its customer databases "will become widely available," thereby undermining its "competitive advantage in the alternative finance marketplace."  Pl.'s Resp. Mem. at 82 (dkt. no. 366).  Because LQD has not pointed to evidence indicating that the corporate

defendants possess its customer databases, the Court concludes that an injunction would not address an irreparable harm.  *See Lacy v. Cook County*, 897 F.3d 847, 867 (7th Cir. 2018) (listing "irreparable harm" as a required showing for permanent injunctive relief).  The corporate defendants are accordingly entitled to summary judgment on LQD's request for injunctive relief.

**B.    LQD's summary judgment motion**

**1.    Rose's counterclaims**

LQD has moved for summary judgment on all of Rose's counterclaims.  Although Rose has not filed a response, "[f]ailure to respond to a summary judgment motion does not automatically result in judgment against the non-moving party."  *Kerr v. Pieschek*, 77 F.3d 484, at *3 (7th Cir. 1996).  In such a situation, LQD "must still demonstrate that it is entitled to judgment as a matter of law."  *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012).  Typically, the Court would deem LQD's local rule 56.1 statement as admitted to the extent that evidence in the record supports those facts.  *See id.* However, LQD's local rule 56.1 statement supporting its motion for summary judgment against Rose is identical to its local rule 56.1 statement responding to the corporate defendant's motion for summary judgment.  Because they are the same, the Court will rely on the corporate defendants' response to LQD's local rule 56.1 statement to the extent that it shows genuine disputes regarding material facts relevant to Rose's counterclaims and will deem the facts pertinent to the counterclaims otherwise admitted. *See generally* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. (dkt. no. 382).

**a.    Breach of fiduciary duty**

LQD argues first that Rose breached a fiduciary duty and thus his claims for

18

minimum wage, commissions, and overtime pay must be dismissed. As discussed above, there is a genuine dispute of fact regarding whether Rose breached a fiduciary duty. *See id.* ¶¶ 29–32, 49. The Court accordingly overrules this argument as a basis to grant summary judgment on those counterclaims.

### b. Overtime pay violation

LQD argues next that Rose is not entitled to overtime pay under the Fair Labor Standards Act (FLSA) and the Illinois Minimum Wage Law. LQD contends that it paid Rose more than twice the annualized minimum wage, which would exempt it from overtime pay based on section 7(i) of the FLSA. *See* 29 U.S.C. § 207(i) (exempting employers that pay employees more than one and one-half times the minimum hourly rate and more than half the employee compensation represents commissions). The undisputed facts indicate that LQD paid Rose well above 150 percent of the applicable minimum wage. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 33 (dkt. no. 382). Thus, LQD is entitled to summary judgment on the claim for overtime pay under the FLSA, which means that Rose's parallel claim under the Illinois Minimum Wage Law also fails. *See Urnikis-Negro v. Am. Fam. Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010).

### c. Withheld commission

Regarding Rose's claim under the Illinois Wage and Payment Collection Act, LQD argues that Rose has not provided evidence of the transactions he facilitated that supposedly would entitle him to be paid commissions, or that he was the procuring cause of those transactions. Paragraph thirty of Rose's second amended counterclaim lists a series of loans that he alleges he generated for LQD. *See* Rose's 2d Am.

Countercl. ¶ 30 (dkt. no. 202).  But there is no further evidence in the record on summary judgment regarding the details of those loans or Rose's claimed role in facilitating the alleged transactions.  This lack of evidence is dispositive.  *See Rico Indus., Inc. v. TLC Grp., Inc.*, 2018 IL App (1st) 172279, ¶ 60, 123 N.E.3d 567, 587 (rejecting a withheld commission claim when the plaintiff did not provide evidence of the plaintiff's role in the relevant transactions).  LQD is entitled to summary judgment on this claim.

### d.    Retaliatory discharge

LQD argues that Rose cannot sustain his claim of retaliatory discharge under the Illinois Wage Payment and Collection Act because his termination in June 2019 cannot reasonably be related to his complaint about his salary in August 2017.  *See Hinthorn v. Roland's of Bloomington, Inc.*, 119 Ill. 2d 526, 532, 519 N.E.2d 909, 912 (1988) (requiring a "casual relationship" between the employee's activity and the discharge).  Notably, during his deposition, Rose admitted that the August 2017 complaint was the only instance when he discussed his compensation, and he could not remember ever making any other requests in writing.  *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶ 76 (dkt. no. 382).  Even viewing the evidence in the light most favorable to Rose, no reasonable juror could conclude that LQD discharged Rose because of a compensation complaint he says he made nearly two years earlier.  The Court concludes that summary judgment is warranted on this claim.

### e.    Tortious interference with contract

In count seven of his counterclaim, Rose alleges that LQD tortiously interfered with his contract with AKF and that this caused AKF to breach the contract and withhold

20

Rose's commission on the TGC transaction. LQD contends that it could not have interfered with the contract for three reasons: 1) it only learned of the contract on June 20, 2020, and Rose claims the interference occurred the day before, on June 19, when Souri e-mailed AKF; 2) LQD, not Rose, was owed the TGC commission, meaning LQD was protecting a legitimate right to the benefit; and 3) Rose executed the contract with AKF within the scope of his employment with LQD, meaning that it was effectively LQD's contract such that LQD, by definition, cannot be liable for interference.

On the timing issue, the record does not support LQD's contention. The e-mail that LQD references is just one in a chain, and it is readily apparent that there are prior missing e-mails indicating that LQD already believed that it was owed the TGC commission at some point earlier than June 20. *See id.* ¶ 77. Viewing this evidence in the light most favorable to Rose, a reasonable jury could conclude that LQD knew about Rose's contract with AKF prior to June 20, 2020.

On the question of who was owed the commission, LQD admits in its briefing that this issue involves a genuine dispute of fact when it says, "Rose, for his part, expressed his views of an entitlement to the commission to AKF and Yellowstone." Counterdefs.' Mot. for Summ. J. at 39 (dkt. no. 340). The dispute over who should receive the TGC deal commission is for the jury to decide.

Lastly, LQD misconstrues the law that it cites to support the proposition that it legally cannot interfere with the contract. *See Douglas Theater Corp. v. Chi. Title & Tr. Co.*, 288 Ill. App. 3d 880, 884, 681 N.E.2d 564 (1997). *Douglas Theater* explains that "a party cannot tortiously interfere with his own contract; the tortfeasor must be a third party to the contractual relationship." *Id.* at 884, 681 N.E.2d at 567. Accordingly, for

21

this bar to apply, LQD would need to demonstrate that it was not a third party to the contract at issue. LQD contends that because Rose was an employee, "any contract he execute[d] within the scope of his employment. . . [was] executed for, and on behalf, of LQD." Counterdefs.' Mot. for Summ. J. at 40 (dkt. no. 340). But LQD does not cite any law or evidence to support this proposition, so it has forfeited the point for summary judgment purposes. And it is not apparent, at least from the current record and briefing, that LQD would be a direct party to the contract simply because Rose and AKF entered into a contract while LQD employed Rose. The Court accordingly overrules this argument as a basis for summary judgment.

In sum, the Court concludes that LQD is not entitled to summary judgment on Rose's tortious interference with contract claim.

### f. Minimum wage violation

LQD argues next that Rose has not set forth with sufficient specificity the basis for his minimum wage violation claim under the Illinois Minimum Wage Law. LQD cites *Evans v. Newcastle Home Loans, LLC*, 2017 IL App (1st) 160080-U, to support its position. In *Evans*, the court affirmed the denial of a minimum wage claim when the plaintiff only provided a "generic description" of his work and hours. *Id.* ¶ 25. The plaintiff's "testimony that he 'probably' worked 55 hours per week" and that "he 'usually worked three out [of] four Saturdays per month" did not provide enough specificity to sustain the claim. *Id.* In short, "mere estimates of hours of work performed" was not "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* ¶ 26 (quoting *Gilbert v. Old Ben Coal Corp.*, 85 Ill. App. 3d 488, 495, 407 N.E.2d 170, 175 (1980)).

22

As in *Evans*, Rose's claim is premised solely on estimates of his hours worked, and at his deposition, Rose could not provide further clarity, such as whether he worked through lunch or took vacations. *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶¶ 73–74 (dkt. no. 382). Given the lack of concrete evidence, the Court concludes that LQD is entitled to summary judgment on Rose's minimum wage violation claim.

### g. Pay rate notice

Finally, LQD argues that Rose has not identified a change in his payment structure or the timing of such a change, meaning he cannot sustain a claim under the Illinois Wage Payment and Collection Act for a notice and recordkeeping violation. LQD points to the absence of a necessary element on this claim—a change in payment structure—and the record supports LQD's contention. *See id.* ¶ 80. The Court accordingly grants summary judgment on Rose's claim for a violation of the recordkeeping requirement under the Illinois Wage Payment and Collection Act.

***

In sum, the Court grants LQD summary judgment on counts one through six of Rose's second amended counterclaim but denies LQD's motion for summary judgment on count seven (tortious interference with contract).

### 2. Claims against defendants

LQD has also moved for summary judgment on its claims against the defendants. Because the corporate defendants are entitled to summary judgment on the trade secret claims, the Court denies LQD's motion with respect to those claims. The Court also denies LQD's motion for summary judgment on its tortious inducement and unjust enrichment claims against the Yellowstone defendants for the same reason.

23

The Court further denies summary judgment in LQD's favor with respect to its tortious inducement and unjust enrichment claims against AKF.  As discussed above, there is a dispute of fact regarding whether Rose had authority to submit applications to external funders, meaning a reasonable jury could conclude that he did not breach a fiduciary duty—a finding that is necessary to these claims against AKF.  *See id.* ¶¶ 32, 49.

In addition, this dispute of fact provides the basis for denying summary judgment in LQD's favor on its trade secret and breach of fiduciary duty claims against Rose.  To the extent that Rose might have used the output files (the only cognizable trade secret in this case) in furtherance of submitting applications to external funders, Rose cannot be considered to have misappropriated these files if he had the authority to submit the applications in the first place.  *See REXA, Inc.*, 42 F.4th at 662 (explaining that misappropriation consists of "disclosure or use of a trade secret of a person without express or implied consent" (quoting 765 ILCS 1065/2(b))).

In a similar vein, LQD's motion for summary judgment on its claims for breach of contract and breach of the covenant of good faith and fair dealing also turns on genuinely disputed facts.  LQD premises both of these claims on the contention that Rose entered into a contract with LQD when he agreed to the company's Proprietary Information and Inventions Agreement and the employee handbook.  At his deposition, however, Rose denied that he ever signed the Agreement or that he read or signed anything related to the handbook.  *See* Corp. Defs.' Resp. to Pl.'s Rule 56.1 Stat. ¶¶ 29–31 (dkt. no. 382).  It is not clear that Rose's simple failure to read the handbook would absolve him from compliance, but if he did not sign the Agreement, that may be a

different matter.  Viewing the evidence in the light most favorable to Rose, a reasonable

jury could credit his version of events and conclude that he never agreed to the terms of

the claimed contracts, meaning he could not have breached them.  The Court therefore

denies LQD's motion for summary judgment on these claims.

That leaves LQD's request for injunctive relief and its claim under the Computer

Fraud and Abuse Act.  As to the former, the Court denies LQD's motion against the

corporate defendants for the same reasons set forth above: because there is no

evidence that these defendants possess LQD's customer databases, an injunction

would not address irreparable harm.  Injunctive relief against Rose, on the other hand,

may be warranted, as there is evidence suggesting he has access to LQD's proprietary

data.  *See id.* ¶¶ 24–26.  But absent a finding of liability, there is no basis for injunctive

relief at this point; in this regard, injunctive relief is not a separate claim but rather a

form of relief that may be obtained in connection with a claim or "cause of action" (such

as a claim under the DTSA or the ITSA).  Again, there is a dispute of fact regarding

whether LQD has suffered a trade secret injury at all, and the need for injunctive relief

will hinge in part on that determination.  *See Lacy*, 897 F.3d at 867.

Finally, the Court denies LQD's motion for summary judgment with regard to its

claim against Rose for a violation of the Consumer Fraud and Abuse Act.  For one, LQD

has not specified the subparagraph under which it is alleging a violation.  *Cf.* 18 U.S.C §

1030(a)(1)–(7) (listing different violations).  Regardless, based on LQD's cursory

argument, there is still a genuine dispute of fact that precludes summary judgment.

Viewing the evidence in the light most favorable to Rose, a reasonable jury could

conclude that Rose did not exceed his computer access authority and did not access

25

information with an intent to defraud LQD.

In sum, the Court denies LQD's cross-motion for summary judgment in its entirety.

## C. Daubert motions

Both LQD and the corporate defendants have also moved to exclude their opponents' experts based on Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Lewis v. CITGO Petrol. Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) (explaining it is "entirely proper" for a court to decide a motion for summary judgment at the same time as the admissibility of expert testimony). Expert testimony is admissible if the witness is qualified, applies reliable methodology, and offers testimony that will assist the trier of fact. *See Daubert*, 509 U.S. at 597. The purpose of *Daubert*'s gatekeeping requirement "is to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "It is to make certain that an expert, with testimony based upon professional studies and personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* The party seeking to introduce expert witness testimony bears the burden of demonstrating, by a preponderance of the evidence, that it satisfies the *Daubert* standard. *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017).

### 1. Stephen Sheinbaum

LQD challenges the testimony of the defendants' expert, Stephen Sheinbaum, on the grounds that his opinions do not fit the facts of the case, he is not qualified, and his testimony exceeds the appropriate scope of a rebuttal opinion. All of these arguments

26

lack merit.

Regarding fit, the corporate defendants correctly point out that LQD's points are more appropriately addressed during cross-examination and not by exclusion. For example, to the extent that LQD is concerned that Sheinbaum testified that he has not reviewed each and every one of the sixty-three transactions at issue, that is a topic they may explore on cross-examination. *See Awalt v. Marketti*, No. 11 C 6142, 2015 WL 4338048, at *4 (N.D. Ill. July 15, 2015) (discussing how the parties "can explore any ['fit'] deficiencies on cross-examination"). This is not a case where the facts do not match the expert's analytical framework, which might merit exclusion. *Cf. Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018). Additionally, to the extent that any of Sheinbaum's opinions might impermissibly discuss intent, such concerns can be addressed through a motion in limine to excuse such testimony, rather than by wholesale exclusion of Sheinbaum.

On the question of Sheinbaum's qualifications, LQD contends that he has no experience related to ISO monitoring and that he has not worked in ISO onboarding in the past fifteen years. The lack of experience related to ISO monitoring is not an issue, as Sheinbaum does not offer any opinion on the subject. With regard to onboarding, the record indicates that LQD's contention that he lacks experience is only correct to the extent that he has not personally facilitated onboarding since 2007 or 2008; but for the last four years, Sheinbaum has served as the CEO of an ISO that funds more than 100 deals per month. That experience qualifies him to offer opinions about standard ISO onboarding practices. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (explaining that a "court should consider a proposed expert's full range of practical

experience . . . when determining whether that expert is qualified to render an opinion in a given area").

Lastly, the Court agrees with the corporate defendants that Sheinbaum was not a rebuttal expert witness. The corporate defendants submitted Sheinbaum's report to directly support their case and did so within the set schedule for expert disclosures. This means that the proper scope of his report was not limited to rebutting the opinions of LQD's expert witnesses.

For these reasons, the Court overrules LQD's motion to exclude Sheinbaum's testimony.

### 2. Jesse Carlson

The corporate defendants move to exclude the testimony of LQD's expert, Jesse Carlson, on the grounds that he is not qualified and he has not employed any specific methodology. Both of these arguments lack merit.

Carlson is the general counsel of a small business lender called Kapitus, where he has developed and implemented that company's ISO policies. On the issue of his qualifications, the corporate defendants point to Carlson's deposition testimony that he "did not base [his] opinion on any individual circumstance that [he] encountered during the last four years at Kapitus." Corp. Defs.' Mem. in Supp. of Summ. J. at 35 (dkt. no. 347). According to the defendants, this statement, combined with other commentary supposedly suggesting that Carlson is not familiar with the policies of other merchant cash advance companies, demonstrates that he is not qualified to speak about general industry practices.

The Court disagrees and views Carlson in a similar light as Sheinbaum. Both of

these experts have served as high-level executives for companies in the industry for multiple years—Carlson, in particular, has been the general counsel at Kapitus since 2017, and in that role, he has reviewed ISO applications, onboarded new ISOs, monitored ISOs, and determined when to terminate ISO relationships. This position provides relevant experience and knowledge such that he is sufficiently qualified to testify about ISO practices, even if he may not be as familiar with the broader industry. *See Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir.1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony."). Furthermore, like Sheinbaum, any gaps or weaknesses in Carlson's industry knowledge can be tested on cross-examination. *See Marketti*, 2015 WL 4338048, at *4.

The corporate defendants argue next that Carlson has not employed any specific methodology and thus his opinion is not reliable. According to the defendants, he relies on his experience with Kapitus "with no explanation of how that applies" to the facts in this case. Corp. Defs.' Mem. in Supp. of Summ. J. at 37 (dkt. no. 347). The advisory committee notes to Federal Rule of Evidence 702 detail when an expert can rely on personal experience: "if the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. Carlson's report satisfies that requirement. His opinions describing how funders establish and monitor ISO relationships directly connect to his role in managing

Kapitus' compliance functions, including his focus on mitigating third-party risk. *Cf. Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (permitting a power company engineer "responsible for ensuring the safety of its facilities from lightning" to serve as an expert on the issue of electrical safety). To the extent that the corporate defendants anticipate Carlson's testimony will stray beyond his experience or will delve into impermissible topics like intent, like LQD with regard to Sheinbaum, they may address this via a motion in limine if appropriate.

For these reasons, the Court overrules the corporate defendants' request to preclude Carlson's testimony.

### 3. Jason Bishop

Jason Bishop is an expert for LQD who has written a report about its potential damages—specifically, the profits it could have earned if it had referred the sixty-three potential transactions to the rest of the industry. Like Carlson, the corporate defendants challenge Bishop's testimony on reliability and qualification grounds. As discussed above, however, the Court has concluded that LQD can recover only under a theory of disgorgement, because its theory of lost profits relies on evidence that is too speculative. Because Bishop's report has no apparent bearing on disgorgement, the import of the Court's lost profits ruling, it appears, is that Bishop will not be able to testify. The corporate defendants' motion to exclude this testimony is therefore effectively moot.

### Conclusion

For the foregoing reasons, the Court grants the corporate defendants' motion for summary judgment [dkt. no. 343] on all of plaintiff's claims except for its claims against

defendant AKF for tortious inducement of a breach of fiduciary duty and unjust enrichment—counts nine and three, respectively, of the third amended complaint.  The Court denies LQD's motion for summary judgment on its claims against the defendants [dkt. no. 357].  The Court grants LQD's motion for summary judgment [dkt. no. 352] on all of the claims in Rose's counterclaim except for the claim for tortious interference with contract—count seven.  The Court denies LQD's motion to exclude the defendant's expert [dkt. no. 357] and the corporate defendant's motion to exclude LQD's experts [dkt. no. 343].  Finally, the Court denies Rose's motion for summary judgment [dkt. no. 351], which consists only of a bare-bones motion and nothing filed in support of it despite an extension.  The case is set for a telephonic status hearing on September 14, 2022 at 9:10 a.m. to set a trial date and discuss the possibility of settlement.  The following call-in number will be used:  888-684-8852, access code 746-1053.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  September 8, 2022

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LQD BUSINESS FINANCE INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 4416** |
| | ) | |
| **AZIZUDDIN ROSE and** | ) | |
| **AKF, INC. d/b/a Fundkite,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

MATTHEW F. KENNELLY, District Judge:

LQD Business Finance, Inc. (LQD) sued Azizuddin Rose and AKF, Inc. LQD and AKF provide alternative financing to commercial businesses. Both companies identify potential customers through direct marketing and via applications submitted by independent sales organizations (ISOs)—entities or individuals who submit applications to the funder in exchange for a commission if the submission leads to a successful deal. These applications typically detail the potential borrower's needs and financial information.

Rose worked for LQD from 2015 to 2019 and thus had access to LQD files, as well as an incoming stream of referrals, that furnished him with information about potential borrowers who were seeking funding. LQD contends that Rose submitted to

AKF and other entities[1] applications that had been submitted in the first instance to LQD and collected commissions on those referrals without authorization. LQD contends that by doing so, Rose misappropriated LQD's trade secrets, breached a fiduciary duty to LQD and violated the Computer Fraud and Abuse Act (CFAA). The parties' dispute largely turns on whether Rose had the authority to submit potential deals outside of LQD and receive the commission for any of those deals without first obtaining LQD's permission. Rose counterclaimed against LQD and its chief executive officer, George Souri, alleging that LQD failed to pay him what he was owed and wrongfully prevented him from receiving a commission from AKF.

In May 2020, LQD filed a third amended complaint. This is the operative version of LQD's complaint. It includes claims against all defendants for violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b) (Cunt 1); violation of the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/4 (Count 2); and unjust enrichment (Count 3). The complaint also includes claims against Rose for breach of fiduciary duty (Count 5); violation of the CFAA, 18 U.S.C. § 1030(g) (Count 6); breach of contract (Count 7); and breach of a claimed covenant of good faith and fair dealing (Count 8). Finally, the complaint includes a claim against the corporate defendants for tortious inducement of a breach of fiduciary duty (Count 9) and a request for injunctive relief (Count 4).

In October 2020, Rose filed a second amended counterclaim. This operative counterclaim includes claims against LQD Business Finance, LLC, LQD Financial Corp., and Souri (collectively, LQD) for violation of the Fair Labor Standards Act, 29

---

[1] These other entities are World Global Capital and Yellowstone Capital, which the Court will refer to, together with AKF, as the "corporate defendants."

U.S.C. § 215 (Count 1); violations of the Illinois Minimum Wage Law, 820 ILCS 105/1 (Counts 2 and 3); violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 (Counts 4, 5, and 6); and tortious interference with contract (Count 7).

LQD moved for summary judgment on all of Rose's counterclaims, and on LQD's claims, the corporate defendants moved for summary judgment, and LQD likewise moved for summary judgment. Rose also filed a motion for summary judgment but never filed anything in support of it.

The Court granted the corporate defendants' motion for summary judgment on all of LQD's claims except for its claims against AKF for tortious inducement of a breach of fiduciary duty and unjust enrichment—Counts nine and three, respectively, of the third amended complaint. The Court denied LQD's motion for summary judgment on its claims against the defendants but granted the motion on all but Rose's counterclaim for tortious interference with contract—Count seven. The Court also denied Rose's motion for summary judgment.

The result of the Court's summary judgment decision was to leave for trial the issues of liability and damages on Rose's alleged violation of the DTSA (Count 1); Rose's alleged violation of the ITSA (Count 2); Rose and AKF's alleged unjust enrichment (Count 3); Rose's alleged breach of fiduciary duty (Count 5); Rose's alleged violation of the CFAA (Count 6); Rose's alleged breach of contract (Count 7); AKF's alleged inducement of, or aiding and abetting in, Rose's breach of fiduciary duty (Count 9); and Rose's claim against LQD for tortious interference with contract. *See LQD Bus. Fin., Inc. v. Rose*, No. 19 C 4416, 2022 WL 4109715 (N.D. Ill. Sept. 8, 2022).

Prior to the trial, the Court issued a Memorandum Opinion and Order concluding

3

that, because the equitable aspects of LQD's claims predominated—and notwithstanding LQD's request for punitive damages—LQD was not entitled to a jury trial on its claims.  The Court determined that the jury would hear and decide Rose's counterclaim, and that it would sit as an advisory jury on LQD's claims against AKF and Rose.  The Court also ruled that "On any issues common to the counterclaim and LQD's claims, the Court will submit one or more special interrogatories to the jury so that the Court will be able to ascertain what the jury has found on the common issue(s).  Any such finding(s) will be binding in the Court's determination of LQD's claims."  Mem. Op. and Order, Feb. 18, 2023, Dkt. no 417 at 4-5.  The parties submitted proposals and feedback regarding the special interrogatories.  The three special interrogatories that the Court ultimately included on the verdict form asked the jury to answer the following questions:

1. Did Mr. Rose have authority from LQD to submit potential deals outside of LQD and receive the commissions on those deals without obtaining LQD's permission?

_____ Yes

_____ No

2. Did Mr. Rose have authority from LQD to submit the Total Growth Consultants (TGC) deal to AKF?

_____ Yes

_____ No

3. Did Mr. Rose have authority from LQD to enter into a contract with AKF to receive commissions paid directly from AKF to him?

_____ Yes

_____ No

The Court conducted a combined jury and bench trial from March 6, 2023 until

4

March 10, 2023.  At trial, LQD contended that Rose, in concert with AKF, misused and diverted applications from borrowers and referred them to AKF.  LQD further contended that AKF wrongfully induced Rose to submit applications to AKF.  Rose and AKF denied LQD's allegations and contended that Rose was authorized to submit potential deals to AKF, at least once it was determined that it the deal did not fit LQD's criteria.  AKF also denied that it induced Rose to submit any applications to AKF.  Because Rose argued that he had the authority to submit deals outside of LQD and collect the commissions for them, he also argued that LQD wrongfully interfered in his receipt of a commission from AKF.  For its part, LQD contended that because Rose had no such authority, it was justified in any interference with his commission payments from AKF.

The following witnesses testified, either live or via deposition designation:

- George Souri, CEO of LQD
- Alex Shvarts, CEO of AKF
- Dean Rose, Defendant
- Michael Jesse Carlson, LQD's expert
- Steven Sheinbaum, AKF's expert
- Steve Kamhi, Director of ISOs at AKF
- Anna Andreyeva, AKF ISO representative
- Egor Gagarin, AKF ISO representative

The jury, acting in its advisory capacity, found in favor of LQD on its breach of fiduciary duty claim against Rose, its unjust enrichment claim against Rose, and its breach of contract claim against Rose.  Also in its advisory capacity, the jury found in favor of AKF on the claim of inducing or aiding and abetting in Rose's breach of fiduciary duty, as well as LQD's unjust enrichment claim.  Also in its advisory capacity, the jury found in favor of Rose on LQD's DTSA, ITSA, and CFAA claims.

In its capacity as the *non-advisory* finder of fact, the jury found in favor of LQD on Rose's tortious interference counterclaim.  In response to special interrogatory number

one, the jury found that Rose did not have authority from LQD to submit potential deals outside of LQD and receive the commissions on those deals without obtaining LQD's permission. In response to special interrogatory number two, the jury found that Rose did have authority from LQD to submit the TGC deal to AKF. Finally, on the last special interrogatory, the jury found that Rose did not have authority from LQD to enter into a contract with AKF to receive commissions paid directly from AKF to him.

Regarding damages, the jury advised awarding LQD "$42,700 that has been received from AKF to be paid to LQD," and "$78,000 that has not been paid by AKF to be paid to LQD." Jury Verdict, Dkt. no. 443. This award amount was written on the line of the verdict form specified for "Defendant Rose's profits." *Id*. The jury advised awarding LQD $0 in punitive damages.

This decision constitutes the Court's findings of fact and conclusions of law on the claims tried to the Court—which, again, are all of the claims other than Rose's tortious interference counterclaim.

**Facts**

**A.      LQD and Rose**

LQD's business has two components: lending money to small businesses itself in exchange for fees and interest, and referring small businesses seeking financing to other third parties who can provide them with a loan or alternative financing. LQD profits from the latter by receiving commissions from the third party lenders or financiers to which it makes referrals. To gather customer intelligence, LQD uses both direct marketing sales and ISOs. Because customer intelligence is vital to LQD's business, it expends a great deal of time and resources compiling and analyzing that information. It

then organizes this customer intelligence into files that contain information such as a borrower's cash flow, balance sheets, income statements, business development plans, pricing and marketing strategies, and market research. LQD uses what it contends are proprietary analytical methods—most of which are highly tech-driven—to process all of the information in a borrower's file to determine its creditworthiness and the terms of any loan LQD might offer.

### 1. The role of business finance consultants

LQD hires business finance consultants (BFCs)[2] to identify prospective customers who need financing. While employed by LQD, Rose was a BFC. At a high level of generality, BFCs "dial out" to seek out potential deals or are sent information about potential deals directly from ISOs. BFCs vet the proposed deal—or "scrub" it, as witnesses called it throughout the trial—to see if it meets certain criteria that LQD has for funding a deal. If a deal fits LQD's criteria, the BFC sends the deal to LQD's underwriting department for further consideration, and that department makes the final determination about whether the deal is worthy of funding.[3]

During the trial, there was conflicting testimony regarding the process of—and level of discretion BFCs had in—"terminating" deals, which is another way of saying deciding *not* to send a deal to LQD's underwriting department for further consideration. Souri testified that BFCs had no authority or training to be able to analyze the

---

[2] During the trial, this role was also sometimes referred to as "business development officer (BDO)."

[3] It not entirely unclear if the underwriting department is the same as what was also referred to throughout the trial as the "credit committee." Both counsel and witnesses seemed to use these terms interchangeably. In either case, when a BFC determined that a particular deal fit LQD's criteria, the BFC would then send it to one or both of these higher-level departments, if they are in fact distinct.

creditworthiness of a deal, and that their review was limited to looking for easily identifiable exclusionary criteria. One example Souri repeatedly provided was a cannabis company, as LQD has a policy that it cannot lend to companies dealing in cannabis. In contrast, Souri said, though a BFC might ask the merchant seeking funding if it has declining revenues, that would not be considered a basis for a BFC to exclude a potential lead during the pre-qualification stage.

The defendants presented credible, contrary evidence, however, that BFCs' authority to analyze and therefore terminate deals was broader than what Souri claimed. In particular, Rose testified that he understood from communications with Souri and other superiors at LQD that he could evaluate incoming deals for their financial merit. This understanding is substantiated by other evidence. For example, AKF introduced a number of e-mails from individuals involved with LQD's underwriting process (for example, LQD's lead underwriter, Robert Pellegrini), admonishing Rose for not properly "scrubbing" a deal before sending it to underwriting—noting that some were "dead on arrival" and a waste of time for underwriting to look at. AKF also introduced a May 2017 e-mail from Souri to the sales team instructing them to look at and consider the financials of a deal before submitting it. LQD even provided BFCs with a workbook that guided them in analyzing deals and determining whether a particular deal should be pitched to the underwriting department or terminated—much of which involved analyzing a deal's financial aspects.

Rose also testified, credibly, that he was not required to upload every single deal that came to him into the "Box" file-sharing system that LQD uses to store its client files, because doing so would be a waste of time for deals that were considered to be dead

on arrival.  Thus, he uploaded only those deals that he determined were fit to send along to underwriting.  Rose's testimony that this was part of his responsibility and authority vis-à-vis LQD was credible.

In sum, the evidence supports a finding that BFCs such as Rose had the authority, and in fact the responsibility, to properly analyze and make independent, considered decisions regarding whether to submit a deal to LQD's underwriting department for further consideration.  One narrow exception discussed at trial involved situations in which a deal was borderline.  In that scenario, a BFC would submit it to the underwriting department, requesting a so-called preliminary "sniff test."  Depending on the results of the "sniff test," the BFC would determine whether to submit the deal for more in-depth consideration or not.

### 2.    Rose's employment with LQD

In 2015, Rose began working for LQD in the role of BFC.  He signed an independent contractor agreement, which set forth the terms of his work for LQD from August 2015 to November 2015.  Rose—and all other employees or contractors associated with LQD—received an employee handbook that outlined a number of policies that LQD's workforce was expected to comply with.  During the trial, Rose argued that LQD could not prove that he ever received the handbook, but the Court disagrees.  Souri testified credibly that the handbook was distributed, digitally, to all employees when they were first onboarded and again each year whenever it was updated.  Souri personally onboarded and trained Rose himself.  Moreover, during discovery the handbook was produced *by Rose* after he conducted a "data dump" of his personal computer.

As of October 1, 2015, Rose continued to work for LQD, but he was reclassified as a W2 employee and paid on a biweekly basis. Then, on November 1, 2017, LQD reclassified Rose again to independent contractor. Rose remained so classified from November 2017 through his ultimate termination in 2019, paid only what he earned in commissions.

### 3. The "agreement" with Souri

Rose and AKF presented evidence that around the third or fourth quarter of 2017, LQD's deal-making slowed down due to the reduced amount of capital it had available for lending. Rose testified that, in October 2017, Souri called a company-wide meeting during which he notified the staff that LQD was in the process of raising more capital because it did not have the ability to fund deals and that the staff should begin looking for other positions. Souri also testified that he laid off a number of staff members around this time, bringing the company from thirty-two workers to just five.

Rose testified, however, that Souri asked him to stay on as the sole salesperson in LQD's Chicago office, so as to not signal to the market that LQD was not funding deals, which would have been highly detrimental. Rose further testified that Souri conveyed that he hoped everything would return to business as usual once LQD secured more financing—which it did in May 2018. Rose testified credibly that Souri orally told him that, in exchange for Rose staying on without pay to essentially save face for LQD, Rose could keep the commission on any deals he determined did not fit LQD's criteria and therefore referred out. Because he had invested time and effort into his work at LQD, and because he felt he had the ability to earn more commissions as the only remaining salesperson, Rose testified—credibly—that he decided to stay with LQD

pursuant to his agreement with Souri.

During period in which Rose understood that LQD was not funding any deals, he testified that he terminated almost all of the incoming deals except those he found to be "pristine," which he would refer to LQD's underwriting department.

Despite securing additional financing in May 2018, LQD never reclassified Rose to the status of W2 employee. Thus, Rose testified, he continued operating as he had been authorized to by Souri, namely, sending "dead" deals that were not a fit for LQD to outside funders and receiving the commission—his only form of compensation—in return. The Court found this testimony credible.

LQD's version of what transpired in late 2017 is very different from Rose's. First, Souri testified that LQD never stopped funding deals throughout its entire existence as a company, and LQD presented evidence that between October 2017 and May 2018, it did, in fact, fund a number of deals.

Souri testified that, in fall 2017, LQD promoted Rose to managing all of the inbound ISO leads and therefore serving as the primary point of contact with those ISOs. Souri testified that around that time, because Rose's greater level of responsibility came with possibility that he could earn higher commissions, LQD reclassified him for pay purposes as an independent contractor. (The Court need not decide for present purposes whether this was the appropriate way to characterize Rose for purposes of tax withholding.) Souri denied that either of these changes were the result of, or in any way related to, an agreement—oral or written—between him and Rose wherein Rose could, without prior authorization, refer deals coming into LQD back out to other lenders and personally receive the commission for doing so.

11

To the contrary, Souri testified, Rose was required to bring all opportunities for financing to LQD unless a particular deal obviously fell outside the scope of what LQD funded. Souri testified that the standard policy was, at all relevant times, that any deal LQD declined was automatically put into a channel to refer out for what he called "remonetization." He testified that this policy is so obvious in LQD's day-to-day business model that it is not written anywhere. Souri also testified that, in the event Rose referred a potential deal to another funder, Rose did not have the right to keep the entirety of that commission from that referral. Per Souri, their understanding was that Rose would manage the ISOs, get the commission (between 1-3% of the funded amount) for any deals that LQD ended up funding, and get a percent of the commission for any deals that LQD referred out (10% of LQD's commission).

**B.      Dealings with AKF**

AKF is a merchant cash advance company (sometimes referred to as a "revenue based financing company"). Like LQD, it offers financing to small businesses. But rather than making or arranging loans, as LQD does, AKF provides businesses with lump sum cash advances in exchange for future receivables that the business will generate from its operations. Like LQD, AKF receives applications from potential customers needing cash advances either through direct marketing or through ISOs.

LQD contended that in 2017, Rose began sending LQD's customer intelligence to AKF without authorization. It contended that Rose—in his role as the point of contact for the ISOs—would receive opportunities from an ISO and then routinely send them to AKF without first bringing them to LQD for consideration. LQD argued that, over the course of approximately eighteen months, Rose sent AKF deals involving sixty-three

potential customers who were seeking financing. Souri testified that the majority—but not all—of these deals were sent to AKF without LQD first being notified about them. LQD contends that Rose was motivated to do this because he had the ability to earn a commission from AKF that was often double or triple the commission he could earn from LQD.

Rose testified that he had no special arrangement with AKF, and that LQD's references throughout trial to AKF being his "go-to" or "one stop shop" were inaccurate, as he sent deals—including the sixty-three in question—to other funders as well. And AKF, for its part, was also working with many other ISOs: as many as 200-300 were assigned to Andreyeva alone. The evidence also showed that, of the sixty-three deals in question, many were sent to LQD's underwriting department for consideration and declined (e.g., American Sign Language, Barrett Appliance Distributors, Billy Griffin, Buffalo Biodiesel, Dual Diagnosis Treatment Centers, Genmore and Skyline Luxury). For example, AKF offered into evidence an e-mail from LQD lead underwriter Pellegrini to Rose saying that a deal he had submitted regarding a company called Skyline Luxury—one of the sixty-three potential customers that Rose sent to AKF—was dead on arrival and was not a deal that LQD would do. Souri also conceded this on cross examination. Souri further testified, however, that although of some the sixty-three deals were input into LQD's database, many others bypassed LQD's systems entirely. Rose's explanation for this is that he was under the impression that he was not supposed to put "dead on arrival" deals into LQD's system.

LQD contends that potential borrowers were under the impression that LQD was involved in their deals, because LQD was listed as the account specialist on the funding

13

preapproval letters that AKF would send to potential customers, some of which were admitted into evidence. These letters also sometimes listed Rose's personal cell phone number and e-mail address. LQD argued that this constituted evidence of Rose and AKF's collusion, as including Rose's personal contact information but "assigning" the deal to LQD would lead the customer to believe that LQD was involved but would eliminate the possibility that anyone at LQD, other than Rose, would be contacted. LQD also presented evidence that Rose told AKF to e-mail his commission statements to his personal e-mail and to deposit his commissions into his personal account.

Rose testified that he was forthcoming with AKF about the fact that he was working for LQD and authorized by LQD to send AKF potential deals. All of AKF's witnesses similarly testified that they understood Rose had authorization to send AKF deals and that at no point did either side ask the other to keep their dealings a secret. Moreover, Rose, Shvarts, Gagarin, and Andreyeva (the latter three all representatives of AKF) all testified that it was not uncommon for ISOs to use multiple e-mail addresses to ensure that they received the e-mail quickly through all possible channels. Nor was it uncommon for ISOs to have multiple registered domain e-mails because many do business under multiple brand names. The Court also notes that, of all of the e-mails admitted into evidence, those in which Rose was corresponding via his personal e-mail address are in the minority. Rose predominantly sent deals to AKF from his LQD e-mail address.

According to LQD, what it contended was Rose's scheme with AKF began approximately in September 2017 and continued through June 2019. Souri testified that it did not strike him as odd that no commissions were coming in during that time period

because, he said, that is the nature of sales. In particular, Souri testified that a salesperson may do a single deal every couple of months and live on those intermittent commissions over prolonged periods with no deals.

AKF ultimately funded just two of the sixty-three potential deals that Rose sent: Life Enhancement Services (LES) and Today's Growth Consultants (TGC). There is uncontroverted evidenced that, before it was sent to AKF, the LES deal was terminated in LQD's system. This undercuts Souri's testimony that LQD was not given the opportunity to look at the deal and decline it. Moreover, in the e-mail that Rose sent to AKF regarding the LES deal, he explained the reasons why the LES deal had been declined by LQD. This was not uncommon for Rose to do. A handful of other e-mails were introduced into evidence that similarly showed Rose providing an explanation for why LQD decided to refer a particular deal out rather than pursue it internally.

In June 2019, one of LQD's existing clients, TGC, contacted Rose to seek additional financing. Rose testified that, because TGC was seeking $1.7 million to close within ten days, he knew LQD would not be able to fund the deal. He testified that LQD's typical time frame for closing a deal was about thirty days. He said he had learned this during his time as a BFC and from attending daily meetings during which people from the crediting committee would discuss deal flow. Under the agreement that he contended he had with Souri, Rose terminated the deal and, at TGC's request, referred it to AKF. Rose testified that he was not required to notify LQD about TGC's funding request and therefore did not. AKF ultimately provided TGC with financing.

Souri testified that LQD did have the ability to fund deals within ten to twenty days, and that the TGC deal was ultimately funded by AKF in sixteen. LQD therefore

15

argued that Rose did not have the authority to unilaterally terminate the deal and offer it to AKF in exchange for a commission that he could keep entirely for himself.

LQD shut off Rose's access to all of its systems on June 17, 2019 and terminated him the next day, after learning that he had been referring out deals to, sharing what LQD contends is confidential information with, and collecting commissions from AKF. That same day, Rose e-mailed the individuals at AKF with whom he was communicating about the TGC deal asking them not to "cc" his LQD e-mail when sending the commission statement for the TGC deal. Rose testified that he did this because his access to all LQD systems had been shut off as of June 17. Gagarin testified that Rose's request was perfectly normal, as ISOs frequently have multiple e-mail addresses, and again, AKF had no knowledge that Rose was exceeding his authority at LQD. On June 19, Rose's commission statement was sent to both his personal e-mail address and his LQD e-mail.

After discovering Rose's actions and terminating him, Souri reached out to Shvarts at AKF to rectify the situation. Shvarts told Souri that AKF's position was that the dispute was really between Rose and LQD, and that AKF would not release the TGC commission until it was in receipt of a release and indemnification indicating that AKF would not be sued, or would be defended, if it gave the commission to the wrong person. LQD refused to sign such a release. It filed this lawsuit eleven days later.

### Discussion

**A.      Count 5, breach of his fiduciary duty (against Rose)**

In Count 5, LQD asserts that Rose breached his fiduciary duty to LQD. To establish for breach of fiduciary duty, a party must establish: "(1) a fiduciary duty on the

part of the defendant, (2) the defendant's breach of that duty, and (3) damages that were proximately caused by the defendant's breach." *DOD Techs. v. Mesirow Ins. Servs., Inc.*, 381 Ill. App. 3d 1042, 1046, 887 N.E.2d 1, 6 (2008) (citing *Neade v. Portes*, 193 Ill. 2d 433, 444, 739 N.E.2d 496, 502 (2000)).

LQD contends that Rose had a fiduciary duty to LQD based on his status as an employee and/or agent of LQD. *See Gross v. Town of Cicero*, 619 F.3d 697, 712–13 (7th Cir. 2010) (describing an employee's fiduciary duty to an employer); *see also*, *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) (an agent has a fiduciary duty to his principal). The Court agrees.

During the trial, Rose repeatedly referred to himself as an employee of LQD and openly stated that he did not dispute that characterization. Even if he had not conceded this fact, the evidence easily supports a finding Rose was, at a minimum, an agent of LQD at all relevant times with regard to the marketing and selling to potential borrowers LQD-provided or arranged financing. Rose used his LQD e-mail address and referred to himself as an employee of LQD when corresponding with third parties. And the persons with whom he corresponded at AKF testified that they believed Rose was associated with LQD. AKF internally "assigned" all sixty-three deals to LQD by virtue of them having been sent to AKF by Rose, whom they associated with LQD. Souri testified regarding an e-mail Rose sent him asking to change his LQD title from "business finance consultant" to "business finance specialist" so that ISOs and others in the industry he was dealing with would not think he was an outsider acting as a consultant for LQD rather than an LQD employee. The evidence of at least a principal-agent relationship between LQD and Rose was overwhelming. The Court concludes

that Rose had a fiduciary duty to LQD by virtue of his employment with and/or his acting as an agent of LQQ.

Turning to the question of breach, "[c]ourts applying Illinois law have construed the duty of loyalty to prohibit . . . employees from improperly competing with their employer, soliciting the employer's customers . . . diverting business opportunities, engaging in self-dealing and/or otherwise misappropriating the employer's property or funds." *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006) (collecting cases).  Similarly, when a principal-agent relationship is present, "an agent must act solely for the principal in all matters related to the agency and refrain from competing with the principal."  *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 530, 623 N.E.2d 981, 993–94 (1993).  "[T]he precise nature and intensity of the duty of loyalty depends upon the degree of independent authority exercised by the fiduciary." *Graham v. Mimms*, 111 Ill. App. 3d 751, 761, 444 N.E.2d 549, 556 (1982).  In this case, the question of whether Rose breached his fiduciary duty turns on what he was and was not authorized to do in his role at LQD.

LQD contends that Rose's unauthorized misuse of LQD's confidential and valuable information and diversion of business opportunities, to the detriment of the company, constitutes a violation of his duty to be loyal to LQD and act in its best interest.  LQD further contends that Rose breached his duty by accepting commissions for these referrals and not sharing them with LQD.  *See Star Forge, Inc. v. F.C. Mason Co.*, 2014 IL App (2d) 130527-U, 2014 WL 2042045, ¶ 18 (a corporate officer who entered into contracts and commission-based sales arrangements for his own benefit breached his fiduciary duty of loyalty); *see also*, *Graham*, 111 Ill. App. 3d at 763, 444

N.E.2d at 557 ("a corporation's fiduciary will not be permitted to usurp a business opportunity which was developed through the use of corporate assets."). As previously described, Rose contends that no duty was breached because he was authorized—via his oral agreement with Souri—to submit potential transactions to external funders and retain any commission that resulted. The Court finds that LQD has proved by a preponderance of the evidence that Rose breached his fiduciary duty by retaining commissions without LQD's authorization, but not for sending the deals outside of LQD.

As stated in the Court's order regarding the advisory jury, "the jury's finding on the issue(s) common to Rose' counterclaim and LQD's equitable claims will bind the Court in its consideration of LQD's equitable claims against the defendants. *See*, *e.g.*, *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004)." *LQD Bus. Fin., Inc. v. Rose*, No. 19 C 4416, slip op. at 4 (N.D. Ill. Feb. 18, 2023) (dkt no. 417). The jury found that Rose did not have the authority to submit deals outside of LQD *and* receive the commissions on those deals without obtaining LQD's permission, and that he did not have the authority from LQD to enter into a contract with AKF to receive commissions paid directly from AKF to him. The jury did find, however, that Rose had the authority to submit the TGC deal to AKF. The Court takes from the jury's findings on these points, considered together, that it found Rose had the authority to send deals outside of LQD, but that he himself was not entitled to keep the entirety of commissions resulting from such referrals but instead had to share the commissions with LQD. The Court is bound by that finding.

The Court also agrees with the jury's findings based on the credible evidence

submitted.  The Court finds credible the aspects of Rose's testimony in which he explained why he was authorized to refer to other potential funders deals that did not fit LQD's funding criteria even without always first sending the opportunity to LQD's underwriting department.  Rose was clearly authorized to make decisions regarding whether to terminate a deal according to his training on LQD's criteria.  And though it bears repeating that Rose did first send some of the sixty-three deals to LQD's underwriters before sending them along to AKF, Rose did not exceed his authority when he chose *not* to do so; it was his job to scrub deals that LQD would not or could not fund.  Submitting LQD-disqualified deals to outside funders was therefore not a breach of Rose's fiduciary duty to LQD.

On the question of commissions, however, Rose's testimony is less credible than Souri's.  It is true that Rose and AKF both presented persuasive evidence that Rose's compensation and role changed in 2017 as a result of LQD's slowdown and that this supports the proposition that Rose could earn money from commissions on deals submitted initially to LQD that he referred to, and were funded by, third party funders.  But the credible and persuasive evidence does not support the defendants' (or at least Rose's) contention that he was entitled to keep 100% of any commission from a deal that originated with LQD and that he referred out.  Among other things, there would be no rational reason for LQD to authorize Rose to choose, on his own, whether to submit deals to LQD or to other funders who might pay him more, and cut LQD out of the process and compensation entirely.  And in fact there was no credible evidence supporting this contention; the believable evidence was to the contrary.  In particular, Rose's testimony regarding LQD's interest in "saving face" was neither credible not

persuasive.  The Court also notes that LQD presented credible evidence that it was still funding some deals during the period when Rose contends it wasn't.  It does not stand to reason that LQD would allow Rose to use its valuable resources, brand name, and ISO channels to secure commissions all for his exclusive benefit just to avoid signaling to the market that LQD wasn't a viable going concern.  In sum, the Court concludes that Rose exceeded his authority and breached his fiduciary duty to LQD when he kept for himself commissions that rightfully should have been disclosed to and shared with LQD.

Finally, the Court finds that LQD has met its burden of proving that it was damaged by Rose's breach.  LQD was clearly deprived of its portion of commissions that Rose's referrals generated, and the information that allowed Rose to make those referrals originated with LQD.  Moreover, "Illinois law permits a complete forfeiture of any salary paid to a fiduciary during the time when he was breaching his duty to the employer." *Gross*, 619 F.3d at 712.  LQD is also entitled to the disgorgement of any profits Rose earned from third parties via his breach.  *Cont'l Vineyard, LLC v. Vinifera Wine Co*., 973 F.3d 747, 759–60 (7th Cir. 2020) (affirming the district court's ordering disgorgement of money because it found that the defendant acquired the money as a result of his breach of his fiduciary duties).  Though the Court will defer until later in this decision a discussion of the amount LQD is entitled, the Court finds that LQD has sufficiently established this element of its fiduciary duty claim against Rose.

The Court therefore finds in favor of LQD on Count 5.

## B.    Count 9, inducement of, or aiding and abetting in breach of fiduciary duty (against AKF)

In Count 9, LQD asserts a claim for tortious inducement of breach against AKF. To prevail on this claim, LQD must establish that AKF: (1) colluded with Rose in

21

committing a breach of his fiduciary duty; (2) knowingly participated in or induced the breach; and (3) knowingly accepted benefits resulting from that breach. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). Illinois courts have specified that the term "'knowingly' implies that the act was performed consciously, intelligently, and with actual knowledge of the facts." *Praither v. Northbrook Bank & Tr. Co.*, 2021 IL App (1st) 201192, ¶ 48, 192 N.E.3d 747, 760 (quoting *People v. Edge*, 406 Ill. 490, 494, 94 N.E.2d 359, 361 (1950)).

Black's Law Dictionary defines collusion as "[a]n agreement to defraud another." *Collusion*, *Black's Law Dictionary* (11th ed. 2019). This, together with the requirement for knowing participation in or inducement of a fiduciary breach, indicates that to be liable, a party in AKF's position must have knowledge of the fiduciary duty and that it is being or will be breached. As applied in this case, LQD was required to establish by a preponderance of the evidence that AKF was aware that Rose owed an obligation to LQD not to refer deals *and* keep any resulting commission for himself. The Court finds that AKF did not have the requisite knowledge.

LQD did not establish this by a preponderance of the evidence. What a party *should* have known does not meet the standard of actual knowledge. *Damian v. Heartland Bank and Trust Co.*, 20 C 7819, 2021 WL 5937153, at 6 (N.D. Ill. Dec. 15, 2021).

And the Court did not find persuasive—at least as applied to the specific relationships shown by the evidence in this case—LQD's expert testimony regarding industry standards and practices. That aside, LQD cannot use expert testimony as a substitute for what AKF actually knew. *Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765,

769 (7th Cir. 2000).

The evidence at trial quite clearly showed that AKF knew Rose worked for LQD. LQD did not present persuasive evidence, however, that AKF knew that Rose did not have authority from LQD to present deals to AKF or that it had knowledge he was otherwise acting adversely to LQD's interests. As previously described, when Rose sent AKF a deal, he would often explain why LQD had declined the deal. And he almost always wrote AKF from his LQD e-mail address, and given common industry practices regarding multiple e-mail domains and brand names, there was no reason for AKF to question Rose when he did not use his LQD e-mail or asked AKF not to use it.

The evidence regarding AKF "assigning" deals to LQD in its internal records tends to underscore the fact that AKF lacked knowledge that Rose was working adversely to LQD. Andreyeva testified credibly during her deposition that she had no reason to question where Rose was getting his information or that he was the correct person to send the commission to. Shvarts testified credibly that AKF would often receive the same potential customer's application from dozens of ISOs, including Rose, simultaneously. That this was common practice was also supported by the evidence that LQD itself would receive the same applications from multiple ISOs. Shvarts further testified, again credibly in the Court's view, that there was no way to know from the information included on an application that the information was sourced from LQD. Gagarin also testified credibly during his deposition that—in general—if he had known that information was wrongfully obtained, he would have notified AKF.

Though the two sides' experts gave conflicting testimony on some points, both agreed that if a person or entity in the industry making a commission payment sees the

23

payment is going to someone other than the whomever the deal had been assigned to—as in this case regarding commissions to be paid to Rose on deals AKF "assigned" to LQD—it would be prudent to first get confirmation from the entity to which the deal was assigned.  But a deviation from best practices, though arguably circumstantial evidence of knowledge, is not, without more, evidence that AKF knew paying commissions to Rose ran afoul of his duties to LQD.  The Court is unpersuaded that LQD showed by a preponderance of the evidence that AKF colluded with Rose or aided and abetted him in breach of his fiduciary duty to LQD.

LQD argues that AKF's response after LQD learned that it was being excluded from commissions is further evidence that AKF was colluding with Rose.  Souri testified that, on June 19, 2019, he reached out to AKF to call its attention to the point.  He told Shvarts that the commission for the TGC deal must immediately be paid to LQD. Multiple times during the trial, Souri characterized Shvarts's response as telling him to "go pound sand."  First, the Court finds this to be somewhat of an exaggeration of the tenor of Shvarts's response.  That aside, the fact that Shvarts and AKF did not thereafter pay the commission to LQD does not amount to a finding that AKF was or had been colluding with Rose to induce a fiduciary breach.  The e-mail response from Shvarts—and the recorded call between him and Rose after the lawsuit was filed— corroborates Shvarts's account that AKF mainly wanted to get out from the middle of the LQD-Rose dispute and that it suggested that they try to resolve it amicably.  The Court also notes that, consistent with this interpretation of the events, AKF also withheld payment to Rose of any part of the commission.

For these reasons, the Court finds in favor of AKF on Count 9.

24

## C. Count 3, unjust enrichment (vs. Rose and AKF)

In Count 3, LQD asserts a claim of unjust enrichment against both Rose and AKF. The Court has previously ruled that in this case, LQD's claims for unjust enrichment depend on the viability of its other claims. *See LQD Bus. Fin., LLC*, 2020 WL 6355906, at *3 (explaining the "fate" of LQD's unjust enrichment claims is "'tied to' that of LQD's statutory and common law claims against . . . AKF").

Under Illinois law, a claim for unjust enrichment requires the plaintiff to show that: (1) the defendant received a benefit; (2) to the plaintiff's detriment; and (3) the defendant's retention of that benefit would be unjust. *TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989)).

Because LQD has not sustained its inducement/aiding and abetting claim against AKF, its unjust enrichment against AKF fails as well. The contrary is true regarding LQD's claim against Rose. As the Court has found, the evidence at trial showed that Rose was paid commissions (a benefit) that should have been shared with LQD (to the plaintiff's detriment). Because LQD supplied the information and communication channels that Rose used to secure the deal, it would be unjust for Rose to retain that benefit. The Court therefore finds Rose, but not AKF, liable to LQD on Count 3.

## D. Count 7, breach of contract (vs. Rose)

In Count 7, LQD asserts a breach of contract claim against Rose. LQD contends that Rose entered into a contract with LQD when he agreed to the terms in the company's employee handbook via his continued employment with LQD. The contract provisions that LQD contends Rose breached are: (1) the obligation to treat LQD's

25

confidential information as confidential and not to disclose it to any other party or use it for any purpose other than to fulfill Rose's obligations under the contract; and (2) the obligation not to accept work, enter into contracts, or accept obligations inconsistent with or competitive to Rose's obligations to LQD. The parties agree that, if it is a contract, the employee handbook is governed by Illinois law.

Illinois law requires a party asserting a breach of contract claim to prove four elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff. *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (applying Illinois law).

Regarding the first element, "[u]nder the law of many states, [including Illinois,] [an employee] handbook can create a binding contract if it contains clear promissory language that makes the handbook an offer that the employee accepts by continuing to work after receiving it." *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000); *see also*, *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 115 Ill. 2d 482, 490, 505 N.E.2d 314, 318 (1987) (holding that "an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present.").

Here, however, each version of the employee handbook submitted into evidence contains the following disclaimer in section one: "The provisions of this Employee Handbook *are not intended to create contractual obligations with respect to any matters it covers*." Pl.'s Trial Exs. 49 & 50 at 6 (emphasis added). Section one also states that "The policies outlined in this Employee Handbook should be regarded as management guidelines only." *Id.* These provisions appear in the handbook as follows (with

26

highlighting added):

## SECTION 1: THE WAY WE WORK

### A WORD ABOUT THIS HANDBOOK

This Employee Handbook contains information about the employment policies and practices of the Company. We expect each employee to read this Employee Handbook carefully, as it is a valuable reference for understanding your job and the Company. The policies outlined in this Employee Handbook should be regarded as management guidelines only, which in a developing business will require changes from time to time. The Company retains the right to make decisions involving employment as needed in order to conduct its work in a manner that is beneficial to the employees and the Company. This Employee Handbook supersedes and replaces any and all prior Employee Handbooks and inconsistent verbal or written policy statements. Except for the policy of at-will employment, which can only be changed by the CEO of the Company in writing, the Company reserves the right to revise, delete and add to the provisions of this Employee Handbook. All such revisions, deletions, or additions must be in writing and must be signed by the CEO of the Company. No oral statements or representations can change the provisions of this Employee Handbook.

The provisions of this Employee Handbook are not intended to create contractual obligations with respect to any matters it covers. Nor is this Employee Handbook intended to create a contract guaranteeing that you will be employed for any specific time period.

*Id.*

The Seventh Circuit has stated that "[s]uch a disclaimer, if clear and forthright, as it is here . . . is a complete defense to a suit for breach of contract based on an employee handbook." *Workman*, 234 F.3d at 1000. The court reasoned that, "[s]ince an employer is under no legal obligation to furnish its employees with a statement of its employment policies, we cannot think of a basis for holding that any statement it does give them has to be legally binding. The only effect of such a rule would be to extinguish employee handbooks." *Id.* at 1001. Moreover, in *Duldulao*, the Illinois Supreme Court noted the *absence* of a disclaimer in finding that the employee handbook in that case was a contract. *Duldulao*, 115 Ill. 2d at 491, 505 N.E.2d at 319 ("[T]he handbook contains no disclaimers to negate the promises made. In fact, the introduction to the handbook states just the opposite, that the policies in the handbook 'are designed to clarify your *rights* and duties as employees.'") (quoting

27

the employee handbook at issue in that case).

LQD thus failed to prove that the employee handbook constitutes a valid and enforceable contract that was binding on Rose. Thus he cannot be held liable *in contract* for the various breaches of the employee handbook that LQD alleges. For these reasons, the Court finds in favor of Rose on LQD's breach of contract claim.

### E. Counts 1 and 2, violation of the Federal Defense of Trade Secrets Act and the Illinois Trade Secrets Act (vs. Rose)

In Counts 1 and 2, LQD asserts a claim under the DTSA and ITSA, which both create civil liability for the "misappropriation" of trade secrets. *See* 18 U.S.C. § 1836(b); 765 ILCS 1065/4(a). The statutes are, in relevant part, virtually identical, so the Court will reference only the ITSA. *See NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, No. 17 C 8829, 2020 WL 2836778, at *10 n.5 (N.D. Ill. May 31, 2020).

The ITSA defines a trade secret as information that is "sufficiently secret to derive economic value" and "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 765 ILCS 1065/2(d); *see also* 18 U.S.C § 1839(3). Illinois courts look to a number of factors to determine whether information qualifies as a trade secret, including "the extent to which the information in question is known outside of the plaintiff's business" and "the ease or difficulty with which the information can be properly acquired or duplicated by others." *Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017). A "compilation" of information can qualify for trade secret protection. 765 ILCS 1065/2(d); *see also* 18 U.S.C § 1839(3). Once a plaintiff has demonstrated that the information qualifies as a trade secret, it must further establish that the information was misappropriated, meaning it was stolen rather than developed independently, and that

the information was used in the defendant's business.  *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022).

LQD premises its trade secrets claims on two general categories of information: (1) the sixty-three funding applications; and (2) LQD's client output files.  Because the Court ruled on summary judgment that customer applications are not protected as a trade secret, the only remaining potential trade secret at issue is the output files.  The Court concludes that during the trial, LQD established by a preponderance of the evidence that LQD's client output files qualify as a protected trade secret.

During Souri's testimony, he testified regarding how an output file is generated and why it is distinct from the information found in a potential customer's application, which by itself might be known outside of LQD's business.  Souri testified that first, LQD aggregates a host of quantitative financial information (for example, accounts receivable, revenue, gross profit, etc.) and qualitative criteria (for example, the character of the borrower).  Because, as a lender, LQD needs to be able to trust that the borrower will honor the loan, it also conducts backgrounds checks on the borrower and interviews the borrower's management using a behavioral model that LQD calls "LQD synthesis."  Souri explained that LQD synthesis looks at the way the borrower's management runs the business and then performs a statistical analysis to determine the likelihood of default.

Souri also explained something called the LQD matrix, which is a proprietary probabilistic simulation model.  LQD matrix runs what Souri referred to as a Monte Carlo analysis, which is essentially a statistical simulation of the likelihood that a particular loan will default.  The system also generates a second metric, which tells LQD how

much money it stands to lose if the borrower defaults. Souri also explained how LQD's analysis looks at not only how much revenue a borrower generated in any given year, but also the stability of that revenue, which he referred to as a behavioral qualitative analysis. The result of all of these processes is what makes up the output file.

This testimony, which the Court found credible, shows that compiling this information at the level of detail described by Souri required substantial time and effort. *Master Tech Prods., Inc. v. Prism Enters., Inc.*, No. 00 C 4599, 2002 WL 475192, at *5 (N.D. Ill. Mar. 27, 2002) (explaining that whether information qualifies as a trade secret is based in part on "how easily information can be duplicated without involving substantial time, effort, or expense"). Souri also testified credibly that access to client output files is restricted to certain employees given the high value of the information to LQD. The Court concludes that LQD's client output files constituted a protected trade secret.

The next question is whether Rose misappropriated these output files. "Misappropriation by unauthorized disclosure or unauthorized use requires a defendant to use the alleged trade secrets or disclose them to others for purposes other than serving the interests of the owner of the trade secrets." *Instant Techs., LLC v. Defazio*, 40 F. Supp. 3d 989, 1016 (N.D. Ill. 2014) (internal quotation and citation omitted). The Court concludes that LQD failed to prove by a preponderance of the evidence that Rose misappropriated LQD's output files.

First, no evidence was presented that Rose ever sent any output files to third parties. Though LQD argued, in various ways, that Rose was stealing highly sensitive customer information for his own benefit and sending it to AKF, it presented no

30

evidence that would show that Rose specifically sent *client output files* to AKF, as opposed to the client applications that the Court previously ruled are not protected. LQD's questioning at trial focused largely on Rose having downloaded four output files to his personal computer. Souri testified that Rose should not have had those files on his personal computer. But the Court finds credible Rose's testimony that he was allowed to work from his personal laptop, including downloading and reviewing output files to assist in analyzing deals, which was his job. Rose testified credibly that LQD did not provide employees with company-issued computers and that, as a result, when working outside the office—as he and other employees were authorized to do—he would use his personal computer. In this regard, it is noteworthy that LQD's Chief Information Officer, Orasio Becerra, installed LQD's software onto Rose's personal computer for this express purpose. There was also ample testimony about the rigors of the alternative finance industry and the fact that work often stretched into nights and weekends. This, too, supports a finding that Rose and other LQD employees were authorized to work from home on their personal computers.

Regarding downloading, Rose explained that downloading files from the Box file-sharing system was common practice for the sales team, as it provided easier access to individual files with the flexibility to rename and reorganize files. Rose also testified that many of the files that he uploaded to Box were initially sent to him via e-mail, so he would first need to download the documents and then upload them to Box. Thus, downloading was par for the course. Finally, the output files in question were not connected to any of the deals that LQD contends Rose improperly diverted away from LQD.

31

Even if Rose himself used the output files in furtherance of submitting LQD-terminated applications to external funders, he cannot be considered to have misappropriated these files in doing so.  As the Court has concluded, he had the authority to submit to other potential funders applications that did not meet LQD's funding criteria.  *See REXA, Inc.*, 42 F.4th at 662 (explaining that misappropriation consists of "disclosure or use of a trade secret of a person without express or implied consent" (quoting 765 ILCS 1065/2(b))).

For this reason, the Court finds in favor of Rose on LQD's trade secrets claims.

## F.      Count 6, violation of the Computer Fraud and Abuse Act (vs. Rose)

In Count 6, LQD asserts against Rose a claim for violation of the CFAA.  LQD did not make clear which provision of the CFAA it contends Rose violated.  In its motion for summary judgment, LQD hardly discussed the CFAA claim at all.  Instead, it merely cited a case from this District and quoted the recitation of the CFAA provisions at issue in *that* case.  See Pl.'s Mot. for Summ. J. at 87 ("*Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 851 (N.D. Ill. 2011) ("The CFAA provisions at issue in this case prohibit 'intentionally access[ing] a computer without authorization or exceed[ing] authorized access, . . . thereby obtain[ing] information from any protected computer,' and 'knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value.'").  The Court takes from this that LQD contends that 18 U.S.C. § 1030(a)(2) and (a)(4)—the provisions quoted in *Farmers*—are the CFAA provisions it contends Rose has violated.

The Court concludes that LQD failed to sustain its burden of proving that Rose

32

accessed a computer—or files, folders, or databases within it—without authorization or that he exceeded his authorized access, let alone that he did so with intent to defraud LQD.  As just discussed regarding LQD's trade secrets claims, Rose was authorized to use his personal computer for LQD work, including downloading files.  One who is authorized to access a computer or information in the computer cannot be liable under the CFAA, even if he or she does so for an improper purpose.  *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021) (holding that an individual cannot be considered to have exceeded his authorized access when he obtains information that is otherwise available to him, even if he does so with an improper motive or purpose).  LQD failed to meet its burden of showing that Rose lacked such authorization or that he exceeded his authorized access.

For these reasons, the Court finds in favor of Rose on LQD's CFAA claim.

## G.    Damages

### 1.    Disgorgement of Rose's profits

In its ruling on summary judgment, the Court concluded that LQD can recover only under a theory of disgorgement, because its theory of lost profits relies on evidence that is too speculative.  *LQD Bus. Fin., LLC v. Rose*, No. 19 C 4416, 2022 WL 4109715, at *7 (N.D. Ill. Sept. 8, 2022).  LQD seeks to recover the amounts that Rose and AKF made from certain deals; compensation that it contends Rose earned while he was in breach of a fiduciary duty to LQD; and punitive damages.

#### a.    Wages

Under Illinois law, employees who breach their fiduciary duties to their employers may be subject "to complete forfeiture of any salary paid during . . . the time when [they

were] breaching [their] duty to the employer." *Gross*, 619 F.3d at 712. "The salary subject to forfeiture is not limited based on the ratio of injurious to legitimate work performed, since an agent who breaches his fiduciary duty has no right to *any* compensation while acting adverse to the principal's interests." *Id*. (emphasis added).

LQD has proven that Rose breached his fiduciary duty by keeping commissions for deals that he was obligated to share with LQD, specifically the commissions from two LES deals in June and October 2018 and the commission from the LES deal in February 2019. By his own admission, LQD paid Rose $49,500 in 2018, and nothing in 2019. Pl.'s Trial Ex. 41, Rose's Am. Ans. to LQD's Interr. Thus, the only compensation subject to forfeiture is Rose's salary during the period of time in 2018 when he was paid and retained the commission for the two LES deals that should have been shared with LQD.

Commission statements offered into evidence at trial showed that the June 2018 LES deal was funded on June 6, 2018 and that the commission was sent to Rose on June 8, 2018. The October 2018 LES deal was funded on October 19, 2018 and the commission was sent to Rose on October 23, 2018. The Court will subject to forfeiture Rose's entire LQD salary for the months of June and October 2018. By the Court's calculation, Rose's prorated monthly salary for 2018 was $4,125. The Court therefore awards LQD $8,250, representing the forfeiture of his compensation from LQD during those months.

### b. Commissions

Rose conceded receipt of commissions for the three 2018-2019 LES transactions, totaling $42,700. This amount is likewise forfeited because it represents

the proceeds of his breach of fiduciary duty. The Court will include this in the judgment as well.

Rose's claiming and pursuit of the full $78,000 commission for the 2019 TGC transaction likewise represented a breach of his fiduciary duty. But Rose was not actually paid this amount, as AKF refused to release it in light of the LQD-Rose dispute. Thus, AKF is left holding property—in this case, funds—that rightfully belongs to LQD. In this type of situation, a court may use its equitable power to impose a constructive trust.

"A constructive trust is an equitable remedy, which may be imposed where the person in possession of the property would be unjustly enriched if he or she were permitted to retain that property." *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 47, 69 N.E.3d 834, 848. "Illinois law holds that a constructive trust may be imposed when so required by equity and good conscience; the presence of fraud is not controlling," and a constructive trust is not restricted to grounds of fraud or breach of a fiduciary relationship. *Roth v. Carlyle Real Estate Ltd. P'ship VII*, 129 Ill. App. 3d 433, 438, 472 N.E.2d 836, 840 (1984). Wrongful conduct is not a prerequisite to imposing a constructive trust as an equitable remedy in a situation "[w]hen a person has obtained money to which he is not entitled." *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 76, 34 N.E.3d 1023, 1045 (quoting *Smithberg v. Illinois Mun. Ret. Fund*, 192 Ill.2d 291, 299, 735 N.E.2d 560, 565 (2000)).

Imposition of a constructive trust over the $78,000 in commission that AKF owed for the TGC transaction is therefore appropriate. The Court will enter judgment requiring AKF to transfer the $78,000 to LQD.

35

### 2. Punitive damages

"Punitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or a desire to injure." *Hagge v. Bauer*, 827 F.2d 101, 110 (7th Cir. 1987). Rose's position throughout this litigation has been consistent: he genuinely believed he was authorized to refer deals outside of LQD and receive commissions for those deals. The jury and the Court found in his favor on those particular points. But the jury drew the line at Rose's contention that he could receive the entirety of such commissions without LQD's knowledge or consent. The Court agrees with that finding.

But even though the Court and jury rejected this particular contention by Rose, there is insufficient evidence to support a finding that he acted wantonly or willfully, with ill will toward LQD, or with a desire to harm LQD. The Court therefore declines to award punitive damages in LQD's favor against Rose.

### Conclusion

For the foregoing reasons, the Court directs the Clerk to enter judgment as follows. (1) On plaintiff LQD Business Finance, LLC's third amended complaint: (a) on Counts 1 and 2 (Defend Trade Secrets Act and Illinois Trade Secrets Act), in favor of defendant Rose and against plaintiff LQD; (b) on Count 3 (unjust enrichment), in favor of plaintiff LQD against defendant Rose and in favor of defendant AKF, Inc. against plaintiff LQD; (c) on Count 5 (breach of fiduciary duty), in favor of plaintiff LQD against defendant Rose; (d) on Count 6 (Computer Fraud and Abuse Act), in favor of defendant Rose against plaintiff LQD; (e) on Count 7 (breach of contract), in favor of defendant Rose against plaintiff LQD; (f) on Count 9 (aiding and abetting breach of fiduciary duty),

36

in favor of defendant AKF against plaintiff LQD; and (g) on all other claims, in favor of

defendants and against plaintiff LQD; (2) On defendant Azizuddin Rose's second

amended counterclaim, in favor of LQD Business Finance, LLC and George Souri on all

claims; (3) Awarding relief to plaintiff LQD as follows:  damages of $50,950 against

defendant Rose, and imposing a constructive trust in favor of LQD upon the $78,000

held by defendant AKF, representing the commission on the TGC transaction that

rightfully is the property of LQD.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 21, 2023

ILND 450 (Rev. 10/13) - Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

LQD BUSINESS FINANCE INC.,

Plaintiff(s),

v.

AZIZUDDIN ROSE and
AKF, INC. d/b/a Fundkite,

Defendant(s).

Case No.  19 C 4416
Judge Matthew F. Kennelly

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $          ,

which ☐ includes          pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: The Court directs the Clerk to enter judgment as follows. (1) On plaintiff LQD Business Finance, LLC's third amended complaint: (a) on Counts 1 and 2 (Defend Trade Secrets Act and Illinois Trade Secrets Act), in favor of defendant Rose and against plaintiff LQD; (b) on Count 3 (unjust enrichment), in favor of plaintiff LQD against defendant Rose and in favor of defendant AKF, Inc. against plaintiff LQD; (c) on Count 5 (breach of fiduciary duty), in favor of plaintiff LQD against defendant Rose; (d) on Count 6 (Computer Fraud and Abuse Act), in favor of defendant Rose against plaintiff LQD; (e) on Count 7 (breach of contract), in favor of defendant Rose against plaintiff LQD; (f) on Count 9 (aiding and abetting breach of fiduciary duty), in favor of defendant AKF against plaintiff LQD; and (g) on all other claims, in favor of defendants and against plaintiff LQD; (2) On defendant Azizuddin Rose's second amended counterclaim, in favor of LQD Business Finance, LLC and George Souri on all claims; (3) Awarding relief to plaintiff LQD as follows: damages of $50,950 against defendant Rose, and imposing a constructive trust in favor of LQD upon the $78,000 held by defendant AKF, representing the commission on the TGC transaction that rightfully is the property of LQD.

---

This action was *(check one)*:

ILND 450 (Rev. 10/13) - Judgment in a Civil Action

☐ tried by a jury with Judge      presiding, and the jury has rendered a verdict.

☐ tried by Judge      without a jury and the above decision was reached.

☒ decided by Judge Matthew F. Kennelly on a motion


Date:   6/21/2023                   Thomas G. Bruton, Clerk of Court

                                             Melissa Astell , Deputy Clerk