**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LQD BUSINESS FINANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-cv-4416 |
| | ) | |
| | ) | Hon. Matthew F. Kennelly |
| AZIZUDDIN ROSE, FUNDKITE, LLC, | ) | |
| AKF, INC. d/b/a FUNDKITE, | ) | |
| WORLD GLOBAL CAPITAL, LLC, and | ) | |
| YELLOWSTONE CAPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**CORPORATE DEFENDANTS' NOTICE OF CROSS-APPEAL**
**UNDER FEDERAL RULE OF APPELLATE PROCEDURE 4(a)(3)**

Notice is hereby given that Defendants Fundkite, LLC, AKF, Inc., World Global Capital, LLC and Yellowstone Capital, LLC (collectively, the "Corporate Defendants") hereby cross-appeal to the United States Court of Appeals for the Seventh Circuit from the Judgment and Findings of Fact and Conclusions of Law entered on June 21, 2023 [Dkt. Nos. 444 and 445], and from the order entered on December 31, 2023, denying Defendant AKF's Motion to Amend or Alter Judgment Pursuant to Federal Rules of Civil Procedure 52(b) and 59(e), denying the Corporate Defendants' Motion for Attorneys' Fees Pursuant to Federal Rule of Civil Procedure 54(d) and ruling on the Corporate Defendants' Bill of Costs [Dkt. No. 522].

The June 21, 2023 Findings of Fact and Conclusions of Law [Dkt. No. 444] are attached to this Notice as Exhibit A. The June 21, 2023 Judgment [Dtk. No. 445] is attached to this Notice as Exhibit B. The Court's December 31, 2023 Memorandum Opinion and Order [Dkt. No. 522] is attached to this Notice as Exhibit C.

Dated:  January 12, 2024

Respectfully submitted,

AKF, INC., FUNDKITE, LLC, WORLD GLOBAL CAPITAL, LLC, and YELLOWSTONE CAPITAL, LLC,

By:      _/s/Bevin Brennan_____
Bevin Brennan
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Wacker Dr., Suite 2700
Chicago, Illinois 60606
Telephone:  (312) 705-7400
bevinbrennan@quinnemanuel.com

*Counsel for Defendants AKF, Inc., Fundkite, LLC, World Global Capital, LLC, and Yellowstone Capital, LLC*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LQD BUSINESS FINANCE INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 19 C 4416** |
| | ) | |
| **AZIZUDDIN ROSE and** | ) | |
| **AKF, INC. d/b/a Fundkite,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MATTHEW F. KENNELLY, District Judge:

LQD Business Finance, Inc. (LQD) sued Azizuddin Rose and AKF, Inc. LQD and AKF provide alternative financing to commercial businesses. Both companies identify potential customers through direct marketing and via applications submitted by independent sales organizations (ISOs)—entities or individuals who submit applications to the funder in exchange for a commission if the submission leads to a successful deal. These applications typically detail the potential borrower's needs and financial information.

Rose worked for LQD from 2015 to 2019 and thus had access to LQD files, as well as an incoming stream of referrals, that furnished him with information about potential borrowers who were seeking funding. LQD contends that Rose submitted to

AKF and other entities[1] applications that had been submitted in the first instance to LQD and collected commissions on those referrals without authorization. LQD contends that by doing so, Rose misappropriated LQD's trade secrets, breached a fiduciary duty to LQD and violated the Computer Fraud and Abuse Act (CFAA). The parties' dispute largely turns on whether Rose had the authority to submit potential deals outside of LQD and receive the commission for any of those deals without first obtaining LQD's permission. Rose counterclaimed against LQD and its chief executive officer, George Souri, alleging that LQD failed to pay him what he was owed and wrongfully prevented him from receiving a commission from AKF.

In May 2020, LQD filed a third amended complaint. This is the operative version of LQD's complaint. It includes claims against all defendants for violation of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836(b) (Cunt 1); violation of the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/4 (Count 2); and unjust enrichment (Count 3). The complaint also includes claims against Rose for breach of fiduciary duty (Count 5); violation of the CFAA, 18 U.S.C. § 1030(g) (Count 6); breach of contract (Count 7); and breach of a claimed covenant of good faith and fair dealing (Count 8). Finally, the complaint includes a claim against the corporate defendants for tortious inducement of a breach of fiduciary duty (Count 9) and a request for injunctive relief (Count 4).

In October 2020, Rose filed a second amended counterclaim. This operative counterclaim includes claims against LQD Business Finance, LLC, LQD Financial Corp., and Souri (collectively, LQD) for violation of the Fair Labor Standards Act, 29

---

[1] These other entities are World Global Capital and Yellowstone Capital, which the Court will refer to, together with AKF, as the "corporate defendants."

U.S.C. § 215 (Count 1); violations of the Illinois Minimum Wage Law, 820 ILCS 105/1 (Counts 2 and 3); violations of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 (Counts 4, 5, and 6); and tortious interference with contract (Count 7).

LQD moved for summary judgment on all of Rose's counterclaims, and on LQD's claims, the corporate defendants moved for summary judgment, and LQD likewise moved for summary judgment. Rose also filed a motion for summary judgment but never filed anything in support of it.

The Court granted the corporate defendants' motion for summary judgment on all of LQD's claims except for its claims against AKF for tortious inducement of a breach of fiduciary duty and unjust enrichment—Counts nine and three, respectively, of the third amended complaint. The Court denied LQD's motion for summary judgment on its claims against the defendants but granted the motion on all but Rose's counterclaim for tortious interference with contract—Count seven. The Court also denied Rose's motion for summary judgment.

The result of the Court's summary judgment decision was to leave for trial the issues of liability and damages on Rose's alleged violation of the DTSA (Count 1); Rose's alleged violation of the ITSA (Count 2); Rose and AKF's alleged unjust enrichment (Count 3); Rose's alleged breach of fiduciary duty (Count 5); Rose's alleged violation of the CFAA (Count 6); Rose's alleged breach of contract (Count 7); AKF's alleged inducement of, or aiding and abetting in, Rose's breach of fiduciary duty (Count 9); and Rose's claim against LQD for tortious interference with contract. *See LQD Bus. Fin., Inc. v. Rose*, No. 19 C 4416, 2022 WL 4109715 (N.D. Ill. Sept. 8, 2022).

Prior to the trial, the Court issued a Memorandum Opinion and Order concluding

3

that, because the equitable aspects of LQD's claims predominated—and notwithstanding LQD's request for punitive damages—LQD was not entitled to a jury trial on its claims.  The Court determined that the jury would hear and decide Rose's counterclaim, and that it would sit as an advisory jury on LQD's claims against AKF and Rose.  The Court also ruled that "On any issues common to the counterclaim and LQD's claims, the Court will submit one or more special interrogatories to the jury so that the Court will be able to ascertain what the jury has found on the common issue(s).  Any such finding(s) will be binding in the Court's determination of LQD's claims."  Mem. Op. and Order, Feb. 18, 2023, Dkt. no 417 at 4-5.  The parties submitted proposals and feedback regarding the special interrogatories.  The three special interrogatories that the Court ultimately included on the verdict form asked the jury to answer the following questions:

1. Did Mr. Rose have authority from LQD to submit potential deals outside of LQD and receive the commissions on those deals without obtaining LQD's permission?

   _____ Yes

   _____ No

2. Did Mr. Rose have authority from LQD to submit the Total Growth Consultants (TGC) deal to AKF?

   _____ Yes

   _____ No

3. Did Mr. Rose have authority from LQD to enter into a contract with AKF to receive commissions paid directly from AKF to him?

   _____ Yes

   _____ No

The Court conducted a combined jury and bench trial from March 6, 2023 until

March 10, 2023.  At trial, LQD contended that Rose, in concert with AKF, misused and diverted applications from borrowers and referred them to AKF.  LQD further contended that AKF wrongfully induced Rose to submit applications to AKF.  Rose and AKF denied LQD's allegations and contended that Rose was authorized to submit potential deals to AKF, at least once it was determined that it the deal did not fit LQD's criteria.  AKF also denied that it induced Rose to submit any applications to AKF.  Because Rose argued that he had the authority to submit deals outside of LQD and collect the commissions for them, he also argued that LQD wrongfully interfered in his receipt of a commission from AKF.  For its part, LQD contended that because Rose had no such authority, it was justified in any interference with his commission payments from AKF.

The following witnesses testified, either live or via deposition designation:

- George Souri, CEO of LQD
- Alex Shvarts, CEO of AKF
- Dean Rose, Defendant
- Michael Jesse Carlson, LQD's expert
- Steven Sheinbaum, AKF's expert
- Steve Kamhi, Director of ISOs at AKF
- Anna Andreyeva, AKF ISO representative
- Egor Gagarin, AKF ISO representative

The jury, acting in its advisory capacity, found in favor of LQD on its breach of fiduciary duty claim against Rose, its unjust enrichment claim against Rose, and its breach of contract claim against Rose.  Also in its advisory capacity, the jury found in favor of AKF on the claim of inducing or aiding and abetting in Rose's breach of fiduciary duty, as well as LQD's unjust enrichment claim.  Also in its advisory capacity, the jury found in favor of Rose on LQD's DTSA, ITSA, and CFAA claims.

In its capacity as the *non-advisory* finder of fact, the jury found in favor of LQD on Rose's tortious interference counterclaim.  In response to special interrogatory number

one, the jury found that Rose did not have authority from LQD to submit potential deals outside of LQD and receive the commissions on those deals without obtaining LQD's permission. In response to special interrogatory number two, the jury found that Rose did have authority from LQD to submit the TGC deal to AKF. Finally, on the last special interrogatory, the jury found that Rose did not have authority from LQD to enter into a contract with AKF to receive commissions paid directly from AKF to him.

Regarding damages, the jury advised awarding LQD "$42,700 that has been received from AKF to be paid to LQD," and "$78,000 that has not been paid by AKF to be paid to LQD." Jury Verdict, Dkt. no. 443. This award amount was written on the line of the verdict form specified for "Defendant Rose's profits." *Id*. The jury advised awarding LQD $0 in punitive damages.

This decision constitutes the Court's findings of fact and conclusions of law on the claims tried to the Court—which, again, are all of the claims other than Rose's tortious interference counterclaim.

**Facts**

### A.    LQD and Rose

LQD's business has two components: lending money to small businesses itself in exchange for fees and interest, and referring small businesses seeking financing to other third parties who can provide them with a loan or alternative financing. LQD profits from the latter by receiving commissions from the third party lenders or financiers to which it makes referrals. To gather customer intelligence, LQD uses both direct marketing sales and ISOs. Because customer intelligence is vital to LQD's business, it expends a great deal of time and resources compiling and analyzing that information. It

then organizes this customer intelligence into files that contain information such as a borrower's cash flow, balance sheets, income statements, business development plans, pricing and marketing strategies, and market research. LQD uses what it contends are proprietary analytical methods—most of which are highly tech-driven—to process all of the information in a borrower's file to determine its creditworthiness and the terms of any loan LQD might offer.

### 1.    The role of business finance consultants

LQD hires business finance consultants (BFCs)[2] to identify prospective customers who need financing. While employed by LQD, Rose was a BFC. At a high level of generality, BFCs "dial out" to seek out potential deals or are sent information about potential deals directly from ISOs. BFCs vet the proposed deal—or "scrub" it, as witnesses called it throughout the trial—to see if it meets certain criteria that LQD has for funding a deal. If a deal fits LQD's criteria, the BFC sends the deal to LQD's underwriting department for further consideration, and that department makes the final determination about whether the deal is worthy of funding.[3]

During the trial, there was conflicting testimony regarding the process of—and level of discretion BFCs had in—"terminating" deals, which is another way of saying deciding *not* to send a deal to LQD's underwriting department for further consideration. Souri testified that BFCs had no authority or training to be able to analyze the

---

[2] During the trial, this role was also sometimes referred to as "business development officer (BDO)."

[3] It not entirely unclear if the underwriting department is the same as what was also referred to throughout the trial as the "credit committee." Both counsel and witnesses seemed to use these terms interchangeably. In either case, when a BFC determined that a particular deal fit LQD's criteria, the BFC would then send it to one or both of these higher-level departments, if they are in fact distinct.

creditworthiness of a deal, and that their review was limited to looking for easily identifiable exclusionary criteria. One example Souri repeatedly provided was a cannabis company, as LQD has a policy that it cannot lend to companies dealing in cannabis. In contrast, Souri said, though a BFC might ask the merchant seeking funding if it has declining revenues, that would not be considered a basis for a BFC to exclude a potential lead during the pre-qualification stage.

The defendants presented credible, contrary evidence, however, that BFCs' authority to analyze and therefore terminate deals was broader than what Souri claimed. In particular, Rose testified that he understood from communications with Souri and other superiors at LQD that he could evaluate incoming deals for their financial merit. This understanding is substantiated by other evidence. For example, AKF introduced a number of e-mails from individuals involved with LQD's underwriting process (for example, LQD's lead underwriter, Robert Pellegrini), admonishing Rose for not properly "scrubbing" a deal before sending it to underwriting—noting that some were "dead on arrival" and a waste of time for underwriting to look at. AKF also introduced a May 2017 e-mail from Souri to the sales team instructing them to look at and consider the financials of a deal before submitting it. LQD even provided BFCs with a workbook that guided them in analyzing deals and determining whether a particular deal should be pitched to the underwriting department or terminated—much of which involved analyzing a deal's financial aspects.

Rose also testified, credibly, that he was not required to upload every single deal that came to him into the "Box" file-sharing system that LQD uses to store its client files, because doing so would be a waste of time for deals that were considered to be dead

on arrival. Thus, he uploaded only those deals that he determined were fit to send along to underwriting. Rose's testimony that this was part of his responsibility and authority vis-à-vis LQD was credible.

In sum, the evidence supports a finding that BFCs such as Rose had the authority, and in fact the responsibility, to properly analyze and make independent, considered decisions regarding whether to submit a deal to LQD's underwriting department for further consideration. One narrow exception discussed at trial involved situations in which a deal was borderline. In that scenario, a BFC would submit it to the underwriting department, requesting a so-called preliminary "sniff test." Depending on the results of the "sniff test," the BFC would determine whether to submit the deal for more in-depth consideration or not.

### 2.    Rose's employment with LQD

In 2015, Rose began working for LQD in the role of BFC. He signed an independent contractor agreement, which set forth the terms of his work for LQD from August 2015 to November 2015. Rose—and all other employees or contractors associated with LQD—received an employee handbook that outlined a number of policies that LQD's workforce was expected to comply with. During the trial, Rose argued that LQD could not prove that he ever received the handbook, but the Court disagrees. Souri testified credibly that the handbook was distributed, digitally, to all employees when they were first onboarded and again each year whenever it was updated. Souri personally onboarded and trained Rose himself. Moreover, during discovery the handbook was produced *by Rose* after he conducted a "data dump" of his personal computer.

9

As of October 1, 2015, Rose continued to work for LQD, but he was reclassified as a W2 employee and paid on a biweekly basis. Then, on November 1, 2017, LQD reclassified Rose again to independent contractor. Rose remained so classified from November 2017 through his ultimate termination in 2019, paid only what he earned in commissions.

### 3. The "agreement" with Souri

Rose and AKF presented evidence that around the third or fourth quarter of 2017, LQD's deal-making slowed down due to the reduced amount of capital it had available for lending. Rose testified that, in October 2017, Souri called a company-wide meeting during which he notified the staff that LQD was in the process of raising more capital because it did not have the ability to fund deals and that the staff should begin looking for other positions. Souri also testified that he laid off a number of staff members around this time, bringing the company from thirty-two workers to just five.

Rose testified, however, that Souri asked him to stay on as the sole salesperson in LQD's Chicago office, so as to not signal to the market that LQD was not funding deals, which would have been highly detrimental. Rose further testified that Souri conveyed that he hoped everything would return to business as usual once LQD secured more financing—which it did in May 2018. Rose testified credibly that Souri orally told him that, in exchange for Rose staying on without pay to essentially save face for LQD, Rose could keep the commission on any deals he determined did not fit LQD's criteria and therefore referred out. Because he had invested time and effort into his work at LQD, and because he felt he had the ability to earn more commissions as the only remaining salesperson, Rose testified—credibly—that he decided to stay with LQD

pursuant to his agreement with Souri.

During period in which Rose understood that LQD was not funding any deals, he testified that he terminated almost all of the incoming deals except those he found to be "pristine," which he would refer to LQD's underwriting department.

Despite securing additional financing in May 2018, LQD never reclassified Rose to the status of W2 employee. Thus, Rose testified, he continued operating as he had been authorized to by Souri, namely, sending "dead" deals that were not a fit for LQD to outside funders and receiving the commission—his only form of compensation—in return. The Court found this testimony credible.

LQD's version of what transpired in late 2017 is very different from Rose's. First, Souri testified that LQD never stopped funding deals throughout its entire existence as a company, and LQD presented evidence that between October 2017 and May 2018, it did, in fact, fund a number of deals.

Souri testified that, in fall 2017, LQD promoted Rose to managing all of the inbound ISO leads and therefore serving as the primary point of contact with those ISOs. Souri testified that around that time, because Rose's greater level of responsibility came with possibility that he could earn higher commissions, LQD reclassified him for pay purposes as an independent contractor. (The Court need not decide for present purposes whether this was the appropriate way to characterize Rose for purposes of tax withholding.) Souri denied that either of these changes were the result of, or in any way related to, an agreement—oral or written—between him and Rose wherein Rose could, without prior authorization, refer deals coming into LQD back out to other lenders and personally receive the commission for doing so.

11

To the contrary, Souri testified, Rose was required to bring all opportunities for financing to LQD unless a particular deal obviously fell outside the scope of what LQD funded. Souri testified that the standard policy was, at all relevant times, that any deal LQD declined was automatically put into a channel to refer out for what he called "remonetization." He testified that this policy is so obvious in LQD's day-to-day business model that it is not written anywhere. Souri also testified that, in the event Rose referred a potential deal to another funder, Rose did not have the right to keep the entirety of that commission from that referral. Per Souri, their understanding was that Rose would manage the ISOs, get the commission (between 1-3% of the funded amount) for any deals that LQD ended up funding, and get a percent of the commission for any deals that LQD referred out (10% of LQD's commission).

## B.    Dealings with AKF

AKF is a merchant cash advance company (sometimes referred to as a "revenue based financing company"). Like LQD, it offers financing to small businesses. But rather than making or arranging loans, as LQD does, AKF provides businesses with lump sum cash advances in exchange for future receivables that the business will generate from its operations. Like LQD, AKF receives applications from potential customers needing cash advances either through direct marketing or through ISOs.

LQD contended that in 2017, Rose began sending LQD's customer intelligence to AKF without authorization. It contended that Rose—in his role as the point of contact for the ISOs—would receive opportunities from an ISO and then routinely send them to AKF without first bringing them to LQD for consideration. LQD argued that, over the course of approximately eighteen months, Rose sent AKF deals involving sixty-three

potential customers who were seeking financing.  Souri testified that the majority—but not all—of these deals were sent to AKF without LQD first being notified about them. LQD contends that Rose was motivated to do this because he had the ability to earn a commission from AKF that was often double or triple the commission he could earn from LQD.

Rose testified that he had no special arrangement with AKF, and that LQD's references throughout trial to AKF being his "go-to" or "one stop shop" were inaccurate, as he sent deals—including the sixty-three in question—to other funders as well.  And AKF, for its part, was also working with many other ISOs:  as many as 200-300 were assigned to Andreyeva alone.  The evidence also showed that, of the sixty-three deals in question, many were sent to LQD's underwriting department for consideration and declined (e.g., American Sign Language, Barrett Appliance Distributors, Billy Griffin, Buffalo Biodiesel, Dual Diagnosis Treatment Centers, Genmore and Skyline Luxury). For example, AKF offered into evidence an e-mail from LQD lead underwriter Pellegrini to Rose saying that a deal he had submitted regarding a company called Skyline Luxury—one of the sixty-three potential customers that Rose sent to AKF—was dead on arrival and was not a deal that LQD would do.  Souri also conceded this on cross examination.  Souri further testified, however, that although of some the sixty-three deals were input into LQD's database, many others bypassed LQD's systems entirely. Rose's explanation for this is that he was under the impression that he was not supposed to put "dead on arrival" deals into LQD's system.

LQD contends that potential borrowers were under the impression that LQD was involved in their deals, because LQD was listed as the account specialist on the funding

preapproval letters that AKF would send to potential customers, some of which were admitted into evidence. These letters also sometimes listed Rose's personal cell phone number and e-mail address. LQD argued that this constituted evidence of Rose and AKF's collusion, as including Rose's personal contact information but "assigning" the deal to LQD would lead the customer to believe that LQD was involved but would eliminate the possibility that anyone at LQD, other than Rose, would be contacted. LQD also presented evidence that Rose told AKF to e-mail his commission statements to his personal e-mail and to deposit his commissions into his personal account.

Rose testified that he was forthcoming with AKF about the fact that he was working for LQD and authorized by LQD to send AKF potential deals. All of AKF's witnesses similarly testified that they understood Rose had authorization to send AKF deals and that at no point did either side ask the other to keep their dealings a secret. Moreover, Rose, Shvarts, Gagarin, and Andreyeva (the latter three all representatives of AKF) all testified that it was not uncommon for ISOs to use multiple e-mail addresses to ensure that they received the e-mail quickly through all possible channels. Nor was it uncommon for ISOs to have multiple registered domain e-mails because many do business under multiple brand names. The Court also notes that, of all of the e-mails admitted into evidence, those in which Rose was corresponding via his personal e-mail address are in the minority. Rose predominantly sent deals to AKF from his LQD e-mail address.

According to LQD, what it contended was Rose's scheme with AKF began approximately in September 2017 and continued through June 2019. Souri testified that it did not strike him as odd that no commissions were coming in during that time period

14

because, he said, that is the nature of sales. In particular, Souri testified that a salesperson may do a single deal every couple of months and live on those intermittent commissions over prolonged periods with no deals.

AKF ultimately funded just two of the sixty-three potential deals that Rose sent: Life Enhancement Services (LES) and Today's Growth Consultants (TGC). There is uncontroverted evidenced that, before it was sent to AKF, the LES deal was terminated in LQD's system. This undercuts Souri's testimony that LQD was not given the opportunity to look at the deal and decline it. Moreover, in the e-mail that Rose sent to AKF regarding the LES deal, he explained the reasons why the LES deal had been declined by LQD. This was not uncommon for Rose to do. A handful of other e-mails were introduced into evidence that similarly showed Rose providing an explanation for why LQD decided to refer a particular deal out rather than pursue it internally.

In June 2019, one of LQD's existing clients, TGC, contacted Rose to seek additional financing. Rose testified that, because TGC was seeking $1.7 million to close within ten days, he knew LQD would not be able to fund the deal. He testified that LQD's typical time frame for closing a deal was about thirty days. He said he had learned this during his time as a BFC and from attending daily meetings during which people from the crediting committee would discuss deal flow. Under the agreement that he contended he had with Souri, Rose terminated the deal and, at TGC's request, referred it to AKF. Rose testified that he was not required to notify LQD about TGC's funding request and therefore did not. AKF ultimately provided TGC with financing.

Souri testified that LQD did have the ability to fund deals within ten to twenty days, and that the TGC deal was ultimately funded by AKF in sixteen. LQD therefore

15

argued that Rose did not have the authority to unilaterally terminate the deal and offer it to AKF in exchange for a commission that he could keep entirely for himself.

LQD shut off Rose's access to all of its systems on June 17, 2019 and terminated him the next day, after learning that he had been referring out deals to, sharing what LQD contends is confidential information with, and collecting commissions from AKF. That same day, Rose e-mailed the individuals at AKF with whom he was communicating about the TGC deal asking them not to "cc" his LQD e-mail when sending the commission statement for the TGC deal. Rose testified that he did this because his access to all LQD systems had been shut off as of June 17. Gagarin testified that Rose's request was perfectly normal, as ISOs frequently have multiple e-mail addresses, and again, AKF had no knowledge that Rose was exceeding his authority at LQD. On June 19, Rose's commission statement was sent to both his personal e-mail address and his LQD e-mail.

After discovering Rose's actions and terminating him, Souri reached out to Shvarts at AKF to rectify the situation. Shvarts told Souri that AKF's position was that the dispute was really between Rose and LQD, and that AKF would not release the TGC commission until it was in receipt of a release and indemnification indicating that AKF would not be sued, or would be defended, if it gave the commission to the wrong person. LQD refused to sign such a release. It filed this lawsuit eleven days later.

### Discussion

### A.     Count 5, breach of his fiduciary duty (against Rose)

In Count 5, LQD asserts that Rose breached his fiduciary duty to LQD. To establish for breach of fiduciary duty, a party must establish: "(1) a fiduciary duty on the

16

part of the defendant, (2) the defendant's breach of that duty, and (3) damages that were proximately caused by the defendant's breach." *DOD Techs. v. Mesirow Ins. Servs., Inc.*, 381 Ill. App. 3d 1042, 1046, 887 N.E.2d 1, 6 (2008) (citing *Neade v. Portes*, 193 Ill. 2d 433, 444, 739 N.E.2d 496, 502 (2000)).

LQD contends that Rose had a fiduciary duty to LQD based on his status as an employee and/or agent of LQD. *See Gross v. Town of Cicero*, 619 F.3d 697, 712–13 (7th Cir. 2010) (describing an employee's fiduciary duty to an employer); *see also*, *Burdett v. Miller*, 957 F.2d 1375, 1381 (7th Cir. 1992) (an agent has a fiduciary duty to his principal). The Court agrees.

During the trial, Rose repeatedly referred to himself as an employee of LQD and openly stated that he did not dispute that characterization. Even if he had not conceded this fact, the evidence easily supports a finding Rose was, at a minimum, an agent of LQD at all relevant times with regard to the marketing and selling to potential borrowers LQD-provided or arranged financing. Rose used his LQD e-mail address and referred to himself as an employee of LQD when corresponding with third parties. And the persons with whom he corresponded at AKF testified that they believed Rose was associated with LQD. AKF internally "assigned" all sixty-three deals to LQD by virtue of them having been sent to AKF by Rose, whom they associated with LQD. Souri testified regarding an e-mail Rose sent him asking to change his LQD title from "business finance consultant" to "business finance specialist" so that ISOs and others in the industry he was dealing with would not think he was an outsider acting as a consultant for LQD rather than an LQD employee. The evidence of at least a principal-agent relationship between LQD and Rose was overwhelming. The Court concludes

17

that Rose had a fiduciary duty to LQD by virtue of his employment with and/or his acting as an agent of LQQ.

Turning to the question of breach, "[c]ourts applying Illinois law have construed the duty of loyalty to prohibit . . . employees from improperly competing with their employer, soliciting the employer's customers . . . diverting business opportunities, engaging in self-dealing and/or otherwise misappropriating the employer's property or funds." *Beltran v. Brentwood N. Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 831 (N.D. Ill. 2006) (collecting cases). Similarly, when a principal-agent relationship is present, "an agent must act solely for the principal in all matters related to the agency and refrain from competing with the principal." *E.J. McKernan Co. v. Gregory*, 252 Ill. App. 3d 514, 530, 623 N.E.2d 981, 993–94 (1993). "[T]he precise nature and intensity of the duty of loyalty depends upon the degree of independent authority exercised by the fiduciary." *Graham v. Mimms*, 111 Ill. App. 3d 751, 761, 444 N.E.2d 549, 556 (1982). In this case, the question of whether Rose breached his fiduciary duty turns on what he was and was not authorized to do in his role at LQD.

LQD contends that Rose's unauthorized misuse of LQD's confidential and valuable information and diversion of business opportunities, to the detriment of the company, constitutes a violation of his duty to be loyal to LQD and act in its best interest. LQD further contends that Rose breached his duty by accepting commissions for these referrals and not sharing them with LQD. *See Star Forge, Inc. v. F.C. Mason Co.*, 2014 IL App (2d) 130527-U, 2014 WL 2042045, ¶ 18 (a corporate officer who entered into contracts and commission-based sales arrangements for his own benefit breached his fiduciary duty of loyalty); *see also*, *Graham*, 111 Ill. App. 3d at 763, 444

18

N.E.2d at 557 ("a corporation's fiduciary will not be permitted to usurp a business opportunity which was developed through the use of corporate assets."). As previously described, Rose contends that no duty was breached because he was authorized—via his oral agreement with Souri—to submit potential transactions to external funders and retain any commission that resulted. The Court finds that LQD has proved by a preponderance of the evidence that Rose breached his fiduciary duty by retaining commissions without LQD's authorization, but not for sending the deals outside of LQD.

As stated in the Court's order regarding the advisory jury, "the jury's finding on the issue(s) common to Rose' counterclaim and LQD's equitable claims will bind the Court in its consideration of LQD's equitable claims against the defendants. *See*, *e.g.*, *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir. 2004)." *LQD Bus. Fin., Inc. v. Rose*, No. 19 C 4416, slip op. at 4 (N.D. Ill. Feb. 18, 2023) (dkt no. 417). The jury found that Rose did not have the authority to submit deals outside of LQD *and* receive the commissions on those deals without obtaining LQD's permission, and that he did not have the authority from LQD to enter into a contract with AKF to receive commissions paid directly from AKF to him. The jury did find, however, that Rose had the authority to submit the TGC deal to AKF. The Court takes from the jury's findings on these points, considered together, that it found Rose had the authority to send deals outside of LQD, but that he himself was not entitled to keep the entirety of commissions resulting from such referrals but instead had to share the commissions with LQD. The Court is bound by that finding.

The Court also agrees with the jury's findings based on the credible evidence

19

submitted.  The Court finds credible the aspects of Rose's testimony in which he explained why he was authorized to refer to other potential funders deals that did not fit LQD's funding criteria even without always first sending the opportunity to LQD's underwriting department.  Rose was clearly authorized to make decisions regarding whether to terminate a deal according to his training on LQD's criteria.  And though it bears repeating that Rose did first send some of the sixty-three deals to LQD's underwriters before sending them along to AKF, Rose did not exceed his authority when he chose *not* to do so; it was his job to scrub deals that LQD would not or could not fund.  Submitting LQD-disqualified deals to outside funders was therefore not a breach of Rose's fiduciary duty to LQD.

On the question of commissions, however, Rose's testimony is less credible than Souri's.  It is true that Rose and AKF both presented persuasive evidence that Rose's compensation and role changed in 2017 as a result of LQD's slowdown and that this supports the proposition that Rose could earn money from commissions on deals submitted initially to LQD that he referred to, and were funded by, third party funders.  But the credible and persuasive evidence does not support the defendants' (or at least Rose's) contention that he was entitled to keep 100% of any commission from a deal that originated with LQD and that he referred out.  Among other things, there would be no rational reason for LQD to authorize Rose to choose, on his own, whether to submit deals to LQD or to other funders who might pay him more, and cut LQD out of the process and compensation entirely.  And in fact there was no credible evidence supporting this contention; the believable evidence was to the contrary.  In particular, Rose's testimony regarding LQD's interest in "saving face" was neither credible not

persuasive.  The Court also notes that LQD presented credible evidence that it was still funding some deals during the period when Rose contends it wasn't.  It does not stand to reason that LQD would allow Rose to use its valuable resources, brand name, and ISO channels to secure commissions all for his exclusive benefit just to avoid signaling to the market that LQD wasn't a viable going concern.  In sum, the Court concludes that Rose exceeded his authority and breached his fiduciary duty to LQD when he kept for himself commissions that rightfully should have been disclosed to and shared with LQD.

Finally, the Court finds that LQD has met its burden of proving that it was damaged by Rose's breach.  LQD was clearly deprived of its portion of commissions that Rose's referrals generated, and the information that allowed Rose to make those referrals originated with LQD.  Moreover, "Illinois law permits a complete forfeiture of any salary paid to a fiduciary during the time when he was breaching his duty to the employer." *Gross*, 619 F.3d at 712.  LQD is also entitled to the disgorgement of any profits Rose earned from third parties via his breach.  *Cont'l Vineyard, LLC v. Vinifera Wine Co.*, 973 F.3d 747, 759–60 (7th Cir. 2020) (affirming the district court's ordering disgorgement of money because it found that the defendant acquired the money as a result of his breach of his fiduciary duties).  Though the Court will defer until later in this decision a discussion of the amount LQD is entitled, the Court finds that LQD has sufficiently established this element of its fiduciary duty claim against Rose.

The Court therefore finds in favor of LQD on Count 5.

## B.    Count 9, inducement of, or aiding and abetting in breach of fiduciary duty (against AKF)

In Count 9, LQD asserts a claim for tortious inducement of breach against AKF. To prevail on this claim, LQD must establish that AKF: (1) colluded with Rose in

21

committing a breach of his fiduciary duty; (2) knowingly participated in or induced the breach; and (3) knowingly accepted benefits resulting from that breach. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 508 (7th Cir. 2007). Illinois courts have specified that the term "'knowingly' implies that the act was performed consciously, intelligently, and with actual knowledge of the facts." *Praither v. Northbrook Bank & Tr. Co.*, 2021 IL App (1st) 201192, ¶ 48, 192 N.E.3d 747, 760 (quoting *People v. Edge*, 406 Ill. 490, 494, 94 N.E.2d 359, 361 (1950)).

Black's Law Dictionary defines collusion as "[a]n agreement to defraud another." *Collusion*, *Black's Law Dictionary* (11th ed. 2019). This, together with the requirement for knowing participation in or inducement of a fiduciary breach, indicates that to be liable, a party in AKF's position must have knowledge of the fiduciary duty and that it is being or will be breached. As applied in this case, LQD was required to establish by a preponderance of the evidence that AKF was aware that Rose owed an obligation to LQD not to refer deals *and* keep any resulting commission for himself. The Court finds that AKF did not have the requisite knowledge.

LQD did not establish this by a preponderance of the evidence. What a party *should* have known does not meet the standard of actual knowledge. *Damian v. Heartland Bank and Trust Co.*, 20 C 7819, 2021 WL 5937153, at 6 (N.D. Ill. Dec. 15, 2021).

And the Court did not find persuasive—at least as applied to the specific relationships shown by the evidence in this case—LQD's expert testimony regarding industry standards and practices. That aside, LQD cannot use expert testimony as a substitute for what AKF actually knew. *Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765,

769 (7th Cir. 2000).

The evidence at trial quite clearly showed that AKF knew Rose worked for LQD. LQD did not present persuasive evidence, however, that AKF knew that Rose did not have authority from LQD to present deals to AKF or that it had knowledge he was otherwise acting adversely to LQD's interests. As previously described, when Rose sent AKF a deal, he would often explain why LQD had declined the deal. And he almost always wrote AKF from his LQD e-mail address, and given common industry practices regarding multiple e-mail domains and brand names, there was no reason for AKF to question Rose when he did not use his LQD e-mail or asked AKF not to use it.

The evidence regarding AKF "assigning" deals to LQD in its internal records tends to underscore the fact that AKF lacked knowledge that Rose was working adversely to LQD. Andreyeva testified credibly during her deposition that she had no reason to question where Rose was getting his information or that he was the correct person to send the commission to. Shvarts testified credibly that AKF would often receive the same potential customer's application from dozens of ISOs, including Rose, simultaneously. That this was common practice was also supported by the evidence that LQD itself would receive the same applications from multiple ISOs. Shvarts further testified, again credibly in the Court's view, that there was no way to know from the information included on an application that the information was sourced from LQD. Gagarin also testified credibly during his deposition that—in general—if he had known that information was wrongfully obtained, he would have notified AKF.

Though the two sides' experts gave conflicting testimony on some points, both agreed that if a person or entity in the industry making a commission payment sees the

23

payment is going to someone other than the whomever the deal had been assigned to—as in this case regarding commissions to be paid to Rose on deals AKF "assigned" to LQD—it would be prudent to first get confirmation from the entity to which the deal was assigned. But a deviation from best practices, though arguably circumstantial evidence of knowledge, is not, without more, evidence that AKF knew paying commissions to Rose ran afoul of his duties to LQD. The Court is unpersuaded that LQD showed by a preponderance of the evidence that AKF colluded with Rose or aided and abetted him in breach of his fiduciary duty to LQD.

LQD argues that AKF's response after LQD learned that it was being excluded from commissions is further evidence that AKF was colluding with Rose. Souri testified that, on June 19, 2019, he reached out to AKF to call its attention to the point. He told Shvarts that the commission for the TGC deal must immediately be paid to LQD. Multiple times during the trial, Souri characterized Shvarts's response as telling him to "go pound sand." First, the Court finds this to be somewhat of an exaggeration of the tenor of Shvarts's response. That aside, the fact that Shvarts and AKF did not thereafter pay the commission to LQD does not amount to a finding that AKF was or had been colluding with Rose to induce a fiduciary breach. The e-mail response from Shvarts—and the recorded call between him and Rose after the lawsuit was filed—corroborates Shvarts's account that AKF mainly wanted to get out from the middle of the LQD-Rose dispute and that it suggested that they try to resolve it amicably. The Court also notes that, consistent with this interpretation of the events, AKF also withheld payment to Rose of any part of the commission.

For these reasons, the Court finds in favor of AKF on Count 9.

24

## C.    Count 3, unjust enrichment (vs. Rose and AKF)

In Count 3, LQD asserts a claim of unjust enrichment against both Rose and AKF.  The Court has previously ruled that in this case, LQD's claims for unjust enrichment depend on the viability of its other claims.  *See LQD Bus. Fin., LLC*, 2020 WL 6355906, at *3 (explaining the "fate" of LQD's unjust enrichment claims is "'tied to' that of LQD's statutory and common law claims against . . . AKF").

Under Illinois law, a claim for unjust enrichment requires the plaintiff to show that: (1) the defendant received a benefit; (2) to the plaintiff's detriment; and (3) the defendant's retention of that benefit would be unjust.  *TRW Title Ins. Co. v. Sec. Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989)).

Because LQD has not sustained its inducement/aiding and abetting claim against AKF, its unjust enrichment against AKF fails as well.  The contrary is true regarding LQD's claim against Rose.  As the Court has found, the evidence at trial showed that Rose was paid commissions (a benefit) that should have been shared with LQD (to the plaintiff's detriment).  Because LQD supplied the information and communication channels that Rose used to secure the deal, it would be unjust for Rose to retain that benefit.  The Court therefore finds Rose, but not AKF, liable to LQD on Count 3.

## D.    Count 7, breach of contract (vs. Rose)

In Count 7, LQD asserts a breach of contract claim against Rose.  LQD contends that Rose entered into a contract with LQD when he agreed to the terms in the company's employee handbook via his continued employment with LQD.  The contract provisions that LQD contends Rose breached are:  (1) the obligation to treat LQD's

confidential information as confidential and not to disclose it to any other party or use it for any purpose other than to fulfill Rose's obligations under the contract; and (2) the obligation not to accept work, enter into contracts, or accept obligations inconsistent with or competitive to Rose's obligations to LQD.  The parties agree that, if it is a contract, the employee handbook is governed by Illinois law.

Illinois law requires a party asserting a breach of contract claim to prove four elements:  (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff.  *Hess v. Bresney*, 784 F.3d 1154, 1158-59 (7th Cir. 2015) (applying Illinois law).

Regarding the first element, "[u]nder the law of many states, [including Illinois,] [an employee] handbook can create a binding contract if it contains clear promissory language that makes the handbook an offer that the employee accepts by continuing to work after receiving it."  *Workman v. United Parcel Serv., Inc.*, 234 F.3d 998, 1000 (7th Cir. 2000); *see also*, *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 115 Ill. 2d 482, 490, 505 N.E.2d 314, 318 (1987) (holding that "an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present.").

Here, however, each version of the employee handbook submitted into evidence contains the following disclaimer in section one: "The provisions of this Employee Handbook *are not intended to create contractual obligations with respect to any matters it covers*."  Pl.'s Trial Exs. 49 & 50 at 6 (emphasis added).  Section one also states that "The policies outlined in this Employee Handbook should be regarded as management guidelines only."  *Id.*  These provisions appear in the handbook as follows (with

highlighting added):

## SECTION 1: THE WAY WE WORK

### A WORD ABOUT THIS HANDBOOK

This Employee Handbook contains information about the employment policies and practices of the Company. We expect each employee to read this Employee Handbook carefully, as it is a valuable reference for understanding your job and the Company. The policies outlined in this Employee Handbook should be regarded as management guidelines only, which in a developing business will require changes from time to time. The Company retains the right to make decisions involving employment as needed in order to conduct its work in a manner that is beneficial to the employees and the Company. This Employee Handbook supersedes and replaces any and all prior Employee Handbooks and inconsistent verbal or written policy statements. Except for the policy of at-will employment, which can only be changed by the CEO of the Company in writing, the Company reserves the right to revise, delete and add to the provisions of this Employee Handbook. All such revisions, deletions, or additions must be in writing and must be signed by the CEO of the Company. No oral statements or representations can change the provisions of this Employee Handbook.

The provisions of this Employee Handbook are not intended to create contractual obligations with respect to any matters it covers. Nor is this Employee Handbook intended to create a contract guaranteeing that you will be employed for any specific time period.

*Id.*

The Seventh Circuit has stated that "[s]uch a disclaimer, if clear and forthright, as it is here . . . is a complete defense to a suit for breach of contract based on an employee handbook." *Workman*, 234 F.3d at 1000. The court reasoned that, "[s]ince an employer is under no legal obligation to furnish its employees with a statement of its employment policies, we cannot think of a basis for holding that any statement it does give them has to be legally binding. The only effect of such a rule would be to extinguish employee handbooks." *Id.* at 1001. Moreover, in *Duldulao*, the Illinois Supreme Court noted the *absence* of a disclaimer in finding that the employee handbook in that case was a contract. *Duldulao*, 115 Ill. 2d at 491, 505 N.E.2d at 319 ("[T]he handbook contains no disclaimers to negate the promises made. In fact, the introduction to the handbook states just the opposite, that the policies in the handbook 'are designed to clarify your *rights* and duties as employees.'") (quoting

27

the employee handbook at issue in that case).

LQD thus failed to prove that the employee handbook constitutes a valid and enforceable contract that was binding on Rose. Thus he cannot be held liable *in contract* for the various breaches of the employee handbook that LQD alleges. For these reasons, the Court finds in favor of Rose on LQD's breach of contract claim.

## E. Counts 1 and 2, violation of the Federal Defense of Trade Secrets Act and the Illinois Trade Secrets Act (vs. Rose)

In Counts 1 and 2, LQD asserts a claim under the DTSA and ITSA, which both create civil liability for the "misappropriation" of trade secrets. *See* 18 U.S.C. § 1836(b); 765 ILCS 1065/4(a). The statutes are, in relevant part, virtually identical, so the Court will reference only the ITSA. *See NEXT Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, No. 17 C 8829, 2020 WL 2836778, at *10 n.5 (N.D. Ill. May 31, 2020).

The ITSA defines a trade secret as information that is "sufficiently secret to derive economic value" and "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 765 ILCS 1065/2(d); *see also* 18 U.S.C § 1839(3). Illinois courts look to a number of factors to determine whether information qualifies as a trade secret, including "the extent to which the information in question is known outside of the plaintiff's business" and "the ease or difficulty with which the information can be properly acquired or duplicated by others." *Mickey's Linen v. Fischer*, No. 17 C 2154, 2017 WL 3970593, at *9 (N.D. Ill. Sept. 8, 2017). A "compilation" of information can qualify for trade secret protection. 765 ILCS 1065/2(d); *see also* 18 U.S.C § 1839(3). Once a plaintiff has demonstrated that the information qualifies as a trade secret, it must further establish that the information was misappropriated, meaning it was stolen rather than developed independently, and that

28

the information was used in the defendant's business.  *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022).

LQD premises its trade secrets claims on two general categories of information: (1) the sixty-three funding applications; and (2) LQD's client output files.  Because the Court ruled on summary judgment that customer applications are not protected as a trade secret, the only remaining potential trade secret at issue is the output files.  The Court concludes that during the trial, LQD established by a preponderance of the evidence that LQD's client output files qualify as a protected trade secret.

During Souri's testimony, he testified regarding how an output file is generated and why it is distinct from the information found in a potential customer's application, which by itself might be known outside of LQD's business.  Souri testified that first, LQD aggregates a host of quantitative financial information (for example, accounts receivable, revenue, gross profit, etc.) and qualitative criteria (for example, the character of the borrower).  Because, as a lender, LQD needs to be able to trust that the borrower will honor the loan, it also conducts backgrounds checks on the borrower and interviews the borrower's management using a behavioral model that LQD calls "LQD synthesis." Souri explained that LQD synthesis looks at the way the borrower's management runs the business and then performs a statistical analysis to determine the likelihood of default.

Souri also explained something called the LQD matrix, which is a proprietary probabilistic simulation model.  LQD matrix runs what Souri referred to as a Monte Carlo analysis, which is essentially a statistical simulation of the likelihood that a particular loan will default.  The system also generates a second metric, which tells LQD how

much money it stands to lose if the borrower defaults. Souri also explained how LQD's analysis looks at not only how much revenue a borrower generated in any given year, but also the stability of that revenue, which he referred to as a behavioral qualitative analysis. The result of all of these processes is what makes up the output file.

This testimony, which the Court found credible, shows that compiling this information at the level of detail described by Souri required substantial time and effort. *Master Tech Prods., Inc. v. Prism Enters., Inc.*, No. 00 C 4599, 2002 WL 475192, at *5 (N.D. Ill. Mar. 27, 2002) (explaining that whether information qualifies as a trade secret is based in part on "how easily information can be duplicated without involving substantial time, effort, or expense"). Souri also testified credibly that access to client output files is restricted to certain employees given the high value of the information to LQD. The Court concludes that LQD's client output files constituted a protected trade secret.

The next question is whether Rose misappropriated these output files. "Misappropriation by unauthorized disclosure or unauthorized use requires a defendant to use the alleged trade secrets or disclose them to others for purposes other than serving the interests of the owner of the trade secrets." *Instant Techs., LLC v. Defazio*, 40 F. Supp. 3d 989, 1016 (N.D. Ill. 2014) (internal quotation and citation omitted). The Court concludes that LQD failed to prove by a preponderance of the evidence that Rose misappropriated LQD's output files.

First, no evidence was presented that Rose ever sent any output files to third parties. Though LQD argued, in various ways, that Rose was stealing highly sensitive customer information for his own benefit and sending it to AKF, it presented no

evidence that would show that Rose specifically sent *client output files* to AKF, as opposed to the client applications that the Court previously ruled are not protected. LQD's questioning at trial focused largely on Rose having downloaded four output files to his personal computer. Souri testified that Rose should not have had those files on his personal computer. But the Court finds credible Rose's testimony that he was allowed to work from his personal laptop, including downloading and reviewing output files to assist in analyzing deals, which was his job. Rose testified credibly that LQD did not provide employees with company-issued computers and that, as a result, when working outside the office—as he and other employees were authorized to do—he would use his personal computer. In this regard, it is noteworthy that LQD's Chief Information Officer, Orasio Becerra, installed LQD's software onto Rose's personal computer for this express purpose. There was also ample testimony about the rigors of the alternative finance industry and the fact that work often stretched into nights and weekends. This, too, supports a finding that Rose and other LQD employees were authorized to work from home on their personal computers.

Regarding downloading, Rose explained that downloading files from the Box file-sharing system was common practice for the sales team, as it provided easier access to individual files with the flexibility to rename and reorganize files. Rose also testified that many of the files that he uploaded to Box were initially sent to him via e-mail, so he would first need to download the documents and then upload them to Box. Thus, downloading was par for the course. Finally, the output files in question were not connected to any of the deals that LQD contends Rose improperly diverted away from LQD.

Even if Rose himself used the output files in furtherance of submitting LQD-terminated applications to external funders, he cannot be considered to have misappropriated these files in doing so.  As the Court has concluded, he had the authority to submit to other potential funders applications that did not meet LQD's funding criteria.  *See REXA, Inc.*, 42 F.4th at 662 (explaining that misappropriation consists of "disclosure or use of a trade secret of a person without express or implied consent" (quoting 765 ILCS 1065/2(b))).

For this reason, the Court finds in favor of Rose on LQD's trade secrets claims.

## F.    Count 6, violation of the Computer Fraud and Abuse Act (vs. Rose)

In Count 6, LQD asserts against Rose a claim for violation of the CFAA.  LQD did not make clear which provision of the CFAA it contends Rose violated.  In its motion for summary judgment, LQD hardly discussed the CFAA claim at all.  Instead, it merely cited a case from this District and quoted the recitation of the CFAA provisions at issue in *that* case.  See Pl.'s Mot. for Summ. J. at 87 ("*Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 851 (N.D. Ill. 2011) ("The CFAA provisions at issue in this case prohibit 'intentionally access[ing] a computer without authorization or exceed[ing] authorized access, . . . thereby obtain[ing] information from any protected computer,' and 'knowingly and with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing] authorized access, and by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value.'").  The Court takes from this that LQD contends that 18 U.S.C. § 1030(a)(2) and (a)(4)—the provisions quoted in *Farmers*—are the CFAA provisions it contends Rose has violated.

The Court concludes that LQD failed to sustain its burden of proving that Rose

accessed a computer—or files, folders, or databases within it—without authorization or that he exceeded his authorized access, let alone that he did so with intent to defraud LQD.  As just discussed regarding LQD's trade secrets claims, Rose was authorized to use his personal computer for LQD work, including downloading files.  One who is authorized to access a computer or information in the computer cannot be liable under the CFAA, even if he or she does so for an improper purpose.  *Van Buren v. United States*, 141 S. Ct. 1648, 1662 (2021) (holding that an individual cannot be considered to have exceeded his authorized access when he obtains information that is otherwise available to him, even if he does so with an improper motive or purpose).  LQD failed to meet its burden of showing that Rose lacked such authorization or that he exceeded his authorized access.

For these reasons, the Court finds in favor of Rose on LQD's CFAA claim.

## G.  Damages

### 1.  Disgorgement of Rose's profits

In its ruling on summary judgment, the Court concluded that LQD can recover only under a theory of disgorgement, because its theory of lost profits relies on evidence that is too speculative.  *LQD Bus. Fin., LLC v. Rose*, No. 19 C 4416, 2022 WL 4109715, at *7 (N.D. Ill. Sept. 8, 2022).  LQD seeks to recover the amounts that Rose and AKF made from certain deals; compensation that it contends Rose earned while he was in breach of a fiduciary duty to LQD; and punitive damages.

#### a.  Wages

Under Illinois law, employees who breach their fiduciary duties to their employers may be subject "to complete forfeiture of any salary paid during . . . the time when [they

were] breaching [their] duty to the employer." *Gross*, 619 F.3d at 712. "The salary subject to forfeiture is not limited based on the ratio of injurious to legitimate work performed, since an agent who breaches his fiduciary duty has no right to *any* compensation while acting adverse to the principal's interests." *Id*. (emphasis added).

LQD has proven that Rose breached his fiduciary duty by keeping commissions for deals that he was obligated to share with LQD, specifically the commissions from two LES deals in June and October 2018 and the commission from the LES deal in February 2019. By his own admission, LQD paid Rose $49,500 in 2018, and nothing in 2019. Pl.'s Trial Ex. 41, Rose's Am. Ans. to LQD's Interr. Thus, the only compensation subject to forfeiture is Rose's salary during the period of time in 2018 when he was paid and retained the commission for the two LES deals that should have been shared with LQD.

Commission statements offered into evidence at trial showed that the June 2018 LES deal was funded on June 6, 2018 and that the commission was sent to Rose on June 8, 2018. The October 2018 LES deal was funded on October 19, 2018 and the commission was sent to Rose on October 23, 2018. The Court will subject to forfeiture Rose's entire LQD salary for the months of June and October 2018. By the Court's calculation, Rose's prorated monthly salary for 2018 was $4,125. The Court therefore awards LQD $8,250, representing the forfeiture of his compensation from LQD during those months.

### b.  Commissions

Rose conceded receipt of commissions for the three 2018-2019 LES transactions, totaling $42,700. This amount is likewise forfeited because it represents

the proceeds of his breach of fiduciary duty. The Court will include this in the judgment as well.

Rose's claiming and pursuit of the full $78,000 commission for the 2019 TGC transaction likewise represented a breach of his fiduciary duty. But Rose was not actually paid this amount, as AKF refused to release it in light of the LQD-Rose dispute. Thus, AKF is left holding property—in this case, funds—that rightfully belongs to LQD. In this type of situation, a court may use its equitable power to impose a constructive trust.

"A constructive trust is an equitable remedy, which may be imposed where the person in possession of the property would be unjustly enriched if he or she were permitted to retain that property." *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 47, 69 N.E.3d 834, 848. "Illinois law holds that a constructive trust may be imposed when so required by equity and good conscience; the presence of fraud is not controlling," and a constructive trust is not restricted to grounds of fraud or breach of a fiduciary relationship. *Roth v. Carlyle Real Estate Ltd. P'ship VII*, 129 Ill. App. 3d 433, 438, 472 N.E.2d 836, 840 (1984). Wrongful conduct is not a prerequisite to imposing a constructive trust as an equitable remedy in a situation "[w]hen a person has obtained money to which he is not entitled." *Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 76, 34 N.E.3d 1023, 1045 (quoting *Smithberg v. Illinois Mun. Ret. Fund*, 192 Ill.2d 291, 299, 735 N.E.2d 560, 565 (2000)).

Imposition of a constructive trust over the $78,000 in commission that AKF owed for the TGC transaction is therefore appropriate. The Court will enter judgment requiring AKF to transfer the $78,000 to LQD.

## 2.      Punitive damages

"Punitive damages are appropriate when the defendant acted wantonly and willfully, or was motivated in his actions by ill will or a desire to injure." *Hagge v. Bauer*, 827 F.2d 101, 110 (7th Cir. 1987).  Rose's position throughout this litigation has been consistent:  he genuinely believed he was authorized to refer deals outside of LQD and receive commissions for those deals.  The jury and the Court found in his favor on those particular points.  But the jury drew the line at Rose's contention that he could receive the entirety of such commissions without LQD's knowledge or consent.  The Court agrees with that finding.

But even though the Court and jury rejected this particular contention by Rose, there is insufficient evidence to support a finding that he acted wantonly or willfully, with ill will toward LQD, or with a desire to harm LQD.  The Court therefore declines to award punitive damages in LQD's favor against Rose.

## Conclusion

For the foregoing reasons, the Court directs the Clerk to enter judgment as follows.  (1) On plaintiff LQD Business Finance, LLC's third amended complaint:  (a) on Counts 1 and 2 (Defend Trade Secrets Act and Illinois Trade Secrets Act), in favor of defendant Rose and against plaintiff LQD; (b) on Count 3 (unjust enrichment), in favor of plaintiff LQD against defendant Rose and in favor of defendant AKF, Inc. against plaintiff LQD; (c) on Count 5 (breach of fiduciary duty), in favor of plaintiff LQD against defendant Rose; (d) on Count 6 (Computer Fraud and Abuse Act), in favor of defendant Rose against plaintiff LQD; (e) on Count 7 (breach of contract), in favor of defendant Rose against plaintiff LQD; (f) on Count 9 (aiding and abetting breach of fiduciary duty),

in favor of defendant AKF against plaintiff LQD; and (g) on all other claims, in favor of

defendants and against plaintiff LQD; (2) On defendant Azizuddin Rose's second

amended counterclaim, in favor of LQD Business Finance, LLC and George Souri on all

claims; (3) Awarding relief to plaintiff LQD as follows:  damages of $50,950 against

defendant Rose, and imposing a constructive trust in favor of LQD upon the $78,000

held by defendant AKF, representing the commission on the TGC transaction that

rightfully is the property of LQD.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 21, 2023

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

LQD BUSINESS FINANCE INC.,

Plaintiff(s),

v.

AZIZUDDIN ROSE and
AKF, INC. d/b/a Fundkite,

Defendant(s).

Case No.  19 C 4416
Judge Matthew F. Kennelly

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $    ,

      which ☐ includes    pre–judgment interest.
          ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐    in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒    other: The Court directs the Clerk to enter judgment as follows. (1) On plaintiff LQD Business Finance, LLC's third amended complaint: (a) on Counts 1 and 2 (Defend Trade Secrets Act and Illinois Trade Secrets Act), in favor of defendant Rose and against plaintiff LQD; (b) on Count 3 (unjust enrichment), in favor of plaintiff LQD against defendant Rose and in favor of defendant AKF, Inc. against plaintiff LQD; (c) on Count 5 (breach of fiduciary duty), in favor of plaintiff LQD against defendant Rose; (d) on Count 6 (Computer Fraud and Abuse Act), in favor of defendant Rose against plaintiff LQD; (e) on Count 7 (breach of contract), in favor of defendant Rose against plaintiff LQD; (f) on Count 9 (aiding and abetting breach of fiduciary duty), in favor of defendant AKF against plaintiff LQD; and (g) on all other claims, in favor of defendants and against plaintiff LQD; (2) On defendant Azizuddin Rose's second amended counterclaim, in favor of LQD Business Finance, LLC and George Souri on all claims; (3) Awarding relief to plaintiff LQD as follows: damages of $50,950 against defendant Rose, and imposing a constructive trust in favor of LQD upon the $78,000 held by defendant AKF, representing the commission on the TGC transaction that rightfully is the property of LQD.

---

This action was *(check one)*:

ILND 450 (Rev. 10/13) - Judgment in a Civil Action

☐ tried by a jury with Judge       presiding, and the jury has rendered a verdict.

☐ tried by Judge       without a jury and the above decision was reached.

☒ decided by Judge Matthew F. Kennelly on a motion

Date:   6/21/2023                          Thomas G. Bruton, Clerk of Court

                                           Melissa Astell , Deputy Clerk

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LQD BUSINESS FINANCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19 C 4416 |
| | ) | |
| AZIZUDDIN ROSE; FUNDKITE, | ) | |
| LLC; AKF, INC.; WORLD | ) | |
| GLOBAL CAPITAL, LLC; and | ) | |
| YELLOWSTONE CAPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Following a combined jury/advisory jury/bench trial in this lawsuit by LQD

Business Finance, LLC against Azizuddin (Dean) Rose and AKF, Inc., and previously

against other entities related to AKF,[1] the Court issued findings of fact and conclusions

of law on the claims tried via bench trial and directed the entry of judgment. *See LQD*

*Bus. Fin., LLC v. Rose*, No. 19 C 4416, dkt. no. 444 (N.D. Ill. June 21, 2023) ("*Trial*

*Decision*").  AKF has moved to alter the judgment in one respect; it has moved for an

award of attorney's fees; and it has filed a bill of costs.  The Court will review the

background in summary fashion here.  A more complete explanation is found in the

---

[1] The other entities are Fundkite, LLC, World Global Capital, LLC and Yellowstone
Capital, LLC.  The Court will refer to those defendants and AKF, Inc. collectively as "the
corporate defendants" (which the Court acknowledges is a slight misnomer given that
three of the four are limited liability companies).  The claims against the defendants
other than AKF were dismissed at the summary judgment stage.

Court's findings and conclusions.

LQD asserted claims against its former employee Rose and against AKF, which like LQD is in the business of providing alternative financing to commercial businesses, as follows. LQD asserted claims against Rose alone for breach of fiduciary duty, breach of contract, breach of good faith and fair dealing, and violation of the federal Computer Fraud and Abuse Act; against the corporate defendants for aiding and abetting Rose's fiduciary breach and for injunctive relief; and against both Rose and the corporate defendants for violation of federal and Illinois trade secrets statutes and for unjust enrichment. Rose asserted counterclaims against LQD and its principal, largely involving the claimed denial of appropriate compensation. Some of these claims were disposed of on summary judgment. Among other things, the Court granted summary judgment in favor of the corporate defendants other than AKF and granted summary judgment for LQD on all but one of Rose's counterclaims. *See LQD Bus. Fin., Inc. v. Rose*, No. 19 C 4416, 2022 WL 4109715 (N.D. Ill. Sept. 8, 2022) ("*Summary Judgment Decision*").

Following the conclusion of the trial, the jury found in LQD's favor on Rose's remaining counterclaim, and it also answered three special interrogatories relating to that claim that overlapped with factual issues underlying some of LQD's claims against the defendant. The Court adopted and applied the jury's answers in deciding the remaining claims, on which the Court had previously ruled there was no right to a jury trial given the nature of the relief sought and available. The following is a summary of the Court's decision on the bench trial claims:

- In favor of LQD against Rose on the claim for breach of fiduciary duty (Count 5).

2

The Court found a breach arising from Rose's unilateral retention of commissions—on deals he shopped to the corporate defendants—that he should have disclosed to and shared with LQD.

- In favor of AKF against LQD on the claim for aiding and abetting Rose's breach of fiduciary duty (Count 9). The Court found that LQD had not established by a preponderance of the evidence that AKF knew Rose owed a duty to LQD not to keep for himself commissions on deals he referred to AKF.

- In favor of LQD against Rose on the claim for unjust enrichment (Count 3), regarding his retention of the same commissions. In favor of AKF against LQD on this claim, stating that AKF's liability was tied to its liability on other claims (on which the Court found it not liable).

- In favor of Rose against LQD on the claim for breach of contract (Count 7). The Court found that the LQD employee handbook did not create a binding contract.

- In favor of both defendants on LQD's statutory trade secrets claims (Counts 1 and 2). The Court found there were protectable trade secrets but found that LQD had not proven they were shared outside of LQD.

- In favor of Rose on LQD's Computer Fraud and Abuse Act claim (Count 6). The Court found LQD had failed to show Rose had exceeded his authorized access.

On the question of relief, the Court ordered disgorgement of Rose's LQD-paid compensation during the period of his fiduciary breach and forfeiture of certain commissions he retained. The Court also found that AKF had retained and held the $78,000 commission owed on a financing deal for a company called TGC that was the subject of Rose's fiduciary breach. The Court determined to impose a constructive trust

3

over this sum and directed AKF to pay it to LQD, the party rightfully entitled to the commission.

## 1.      Motion to alter or amend judgment

The Court addresses first AKF's motion to alter or amend the judgment. AKF argues that there was no appropriate basis for imposition of a constructive trust in LQD's favor over the $78,000. AKF argues:

- LQD did not plead or request imposition of a constructive trust. *See* AKF Opening Mem. at 6-7.

- Illinois law allows imposition of a constructive trust only where the party has engaged in wrongful or unconscionable conduct—which AKF says it did not—or where the funds were obtained from the plaintiff—which is not the case. *See id.* at 7-8.

- The Court found in AKF's favor on the unjust enrichment claim and all other claims LQD asserted against it, and thus there is no basis to order any relief against AKF at all. *See id.* at 8-9.

- There is no "identifiable fund" as required to impose a constructive trust. *See id.* at 9-10.

The Court will address each of these points, though not in the exact order AKF argues them.

First, there absolutely is an "identifiable fund" over which a constructive trust may be imposed. AKF's CEO Alex Shvarts admitted *exactly that* in his trial testimony. Specifically, he testified that "we decided to hold on to the commission until we knew who does this commission belong to. So we held the commission. *We still hold the*

*commission until somebody tells us whose money this really is.*" *See* Pl.'s Resp., Ex. F at 96-97 (rough trial transcript, Mar. 8, 2023) (emphasis added). In short, the contention by AKF's attorneys in their post-trial submission that there is no identifiable fund is directly contrary to their client's sworn testimony at trial. The Court found Shvarts's testimony credible in this regard. That testimony was sufficient to establish by a preponderance of the evidence the existence of an identifiable fund.

Second, under Illinois law imposition of a constructive trust does not invariably require wrongdoing on the part of the holder of the *res*. As the Illinois Supreme Court has stated, "[f]or example, a constructive trust may be imposed in the case of mistake, although no wrongdoing is involved." *Smithberg v. Ill. Mun. Retirement Fund*, 192 Ill. 2d 291, 299, 735 N.E.2d 560, 566 (2000). And indeed, "a constructive trust may be imposed even though the person wrongfully receiving the benefit is innocent of collusion." *Id.* at 300, 735 N.E.2d at 566. The general rule, also stated in *Smithberg*, is that a constructive trust "can be imposed to avoid unjust enrichment" in a situation where "a person has obtained money to which he is not entitled, under such circumstances that in equity and good conscience he ought not retain it . . . ." *Id.* at 299, 735 N.E.2d at 566. *See also, e.g., Frederickson v. Blumenthal*, 271 Ill. App. 3d 738, 648 N.E.2d 1060 (1995) (affirming imposition of a constructive trust over a bank account despite the absence of any wrongdoing by the defendant). That is exactly the case here.

The Court also disagrees with contention that the funds have to have been paid to the defendant *by the plaintiff* before a constructive trust may be imposed. That was not, for example, the case in *Smithfield*, in which the money over which a constructive

trust was imposed was an amount the defendant was prepared to pay out as a pension death benefit (there was a question of who the rightful recipient of the benefit was). The requirements for imposition of a constructive trust were established by *at least* a preponderance of the evidence. *See Trial Decision* at 35.

AKF's main contention, as the Court sees it at least, involves the two related propositions that: (1) having found in AKF's favor on the remaining claims against it, the Court should not have ordered relief that imposed an obligation on AKF, and (2) LQD did not plead or request imposition of a constructive trust.

The Court addresses the second of these points first. In federal court at least, a party does not have to specifically seek particular relief to be entitled to it. That is what the plain language of Rule 54(c) provides. Although a *default judgment* may not differ in kind from (or exceed in amount) what is sought in the pleadings, "[e]very other final judgment should grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings*." Fed. R. Civ. P. 54(c). That language is clear.

Perhaps AKF's argument is that LQD did not seek a constructive trust *on this basis*. That's a legitimate argument, and one that merges with the first point noted by the Court: AKF's contention that, having ruled in its favor on the remaining claims, the Court should not have ordered relief that imposed a constructive trust upon funds held by AKF.

As LQD points out in its response to AKF's motion, however, the pleadings may be amended even after trial to conform to the proof, at least when there's implied consent regarding the trial of an issue. The question of LQD's entitlement to retain the benefits of the TGC deal—including the commission it had agreed to pay out—was

6

unquestionably on the table in this case, well before and at trial. In the third amended complaint, LQD alleged that Rose converted corporate opportunities belonging to LQD and that he and AKF benefitted, *see* 3rd Am. Compl. ¶ 55; Rose misappropriated the TGC loan application in particular and diverted it to AKF, *see id.* ¶ 61; and AKF provided TGC with funding on which there was a $78,000 commission ostensibly "earned" by Rose, *see id.* ¶ 62. LQD's claims against AKF incorporated all of these factual allegations. Its unjust enrichment claim, for example, alleged that the defendants (including AKF) had received significant benefits at LQD's expense through the use of LQD's assets (which included the aforementioned opportunity), *see id.* ¶ 116; the defendants had not compensated LQD for this, *see id.* ¶ 117; and it would be unjust for the defendants—which included AKF, of course—to retain the benefit of LQD's opportunities without compensating LQD, *see id.* Furthermore, in the final pretrial order, LQD made it clear that it was seeking at trial the disgorgement of LQD's and Rose's revenues from the alleged misappropriation and fiduciary breach, a description unquestionably broad enough to include the commission on the TGC deal. *See* Final Pretrial Order at 8 (dkt. no. 511). Finally, at trial, LQD argued in its closing argument that it, and not Rose, was entitled to the commission on the TGC deal, stating, among other things, "[t]hat does not mean that AKF could pay Rose and contract with Rose to pay him when they had assigned the deals to LQD[,] which means LQD is entitled to commissions."[2]

---

[2] As of this writing, the final transcript has not been filed on the docket. The page references in the rough transcript, which the Court has used, will not correspond to those in the final transcript. The point quoted here was made during LQD's counsel's closing argument on March 10, 2023 at approximately 10:38 AM and appears on page 58 of the rough transcript for that day's morning session.

AKF did not object to any of this.  In particular, it did not object to the request made by LQD's counsel during closing argument.  The concepts of "constructive amendment" of the pleadings and trial of unpleaded issues by "implied consent" as contemplated under Federal Rule of Civil Procedure 15(b) are quite broad.  *See Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 877-79 (7th Cir. 2005); *Dominguez v. Hensley*, 545 F.3d 585, 590-91 (7th Cir. 2008).  Given the circumstances just recited, those concepts are certainly broad enough to include a claim for imposition of a constructive trust based on AKF's retention of the $78,000 commission on the TGC deal.  Allowing AKF to retain that money—which its own CEO *expressly testified the company was holding to pay to the rightful party*—would be the very definition of unjust enrichment as described by the Illinois courts in *Smithberg* and elsewhere.  And as the Court has discussed, there is no requirement of wrongdoing on AKF's part in order for a constructive trust to be imposed under Illinois law.

For these reasons, the Court denies AKF's motion to alter or amend the judgment.

## 2.    AKF's bill of costs

The Court entered an order partially reducing the corporate defendants' bill of costs, and it directed LQD to respond to the remainder.  Specifically, AKF and its affiliated entities sought recovery of $14,596.67.  The Court found certain of the claimed costs to be unrecoverable and reduced the amount claimed by $2,403.50.  The net amount now claimed is therefore $12,193.17.  In response, LQD makes two arguments: the defendants committed misconduct during the litigation of the case, which warrants disallowing their request for costs; and the corporate defendants did not fully prevail

given the Court's imposition of a constructive trust.

Starting with the first of these points, there is a presumption that a prevailing party is entitled to costs. *See, e.g., City of San Antonio v. Hotels.com, L.P.*, 593 U.S. 330, 336 (2021). But "misconduct by the prevailing party worthy of a penalty" may be a basis to deny costs. *Lange v. City of Oconto*, 28 F.4th 825, 845 (7th Cir. 2022). Examples of the sort of misconduct that may suffice include "calling unnecessary witnesses, raising unnecessary issues, or otherwise unnecessarily prolonging the proceedings." *Congregation of the Passion, Holy Cross Province v. Touche, Ross & Co.*, 845 F.2d 219, 222 (7th Cir. 1988).

The claimed misconduct that LQD cites does not fit this bill, nor is it sufficiently analogous to warrant denial of costs. LQD cites three points: the corporate defendants failed to retain certain relevant records; their CEO, Shvarts, gave evasive testimony during the trial; and AKF wrongfully contended in its post-trial motion that it did not receive or retain the funds constituting the commission on the TGC deal. On the first point, LQD does not support a contention that any non-retention of records on the corporate defendants' part was the result of a deliberate, knowing, or even reckless effort to hide information. Second, the Court dealt with Shvarts's evasive responses by sustaining appropriate objections and, at a particular point, admonishing Shvarts outside the jury's presence. What Shvarts did, though inappropriate, is a relatively common occurrence at trials; it's not a basis to deny costs. And finally, though AKF's post-trial argument on the particular point in question was demonstrably wrong, as the Court has pointed out, AKF's request to alter or amend the judgment was certainly colorable, and this argument was just one of several points that AKF it cited in support.

9

LQD cites no authority supporting the denial of costs for what is best characterized as overly zealous advocacy.

LQD's other point fares somewhat better.  The corporate defendants did not *fully* prevail:  the imposition of a constructive trust will require AKF to turn over $78,000 to LQD.  As the defendants argue, a party is deemed to have prevailed within the meaning of Rule 54 "if it prevails as to a substantial part of the litigation."  *Baker v. Lindgren*, 856 F.3d 498, 502 (7th Cir. 2017).  But *Baker* also makes it clear that "[i]n a case with mixed results, the district court has the discretion to determine whether a party meets that standard."  *Id.*; *see also Gavoni v. Dobbs House, Inc.*, 164 F.3d 1071, 1075 (7th Cir. 1999).  Given the mixed result here, the Court exercises its discretion to reduce the corporate defendants' taxable costs by one third.

The Court taxes costs in favor of the corporate defendants and against LQD in the amount of $8,128.78.

**3.    Attorney's fees**

The corporate defendants seek an award of their attorney's fees under the operative provisions of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(D), and the Illinois Trade Secrets Act, 765 ILCS 1065/5, both of which authorize an award of attorney's fees to a prevailing defendant if the claim of trade secret misappropriation was made "in bad faith."  The defendants have failed to make a showing of bad faith.

The Court concluded, at the summary judgment stage, that LQD had offered evidence sufficient to permit a finding that its "client output files" qualified as trade secrets.  *See Summary Judgment Decision*, 2022 WL 4109715, at *4.  And LQD had a good faith basis, throughout the litigation, to believe that Rose had used these files in

offering to pursue, for AKF and the other corporate defendants, deals that had been solicited for LQD to fund.  Among other things, there was evidence supporting the proposition that Rose offered to the corporate defendants over 60 deals that had come in to LQD.  LQD also had information indicating that Rose had downloaded LQD's client output files to his laptop.  It was no stretch for LQD to honestly and reasonably believe (whether that's viewed subjectively or objectively) that Rose had transmitted this information to the corporate defendants as part of his effort to get them to take on these same clients.

In addition, LQD pursued, in good faith, a theory that information regarding whether a potential customer was seeking alternative financing at a point in time amounted to a trade secret.  This was supported by testimony from *both sides'* experts. Though the Court ruled against LQD on this theory of liability, lack of merit does not equate to bad faith.  The Court finds based on the record that LQD in good faith believed—and from an objective standpoint was entitled to reasonably believe—that this sort of information amounted to a protectable trade secret.  And there is no question at all that Rose provided this exact sort of information to the corporate defendants.

For these reasons, the Court concludes that the defendants have failed to show that LQD's allegations of trade secret misappropriation were made in bad faith.

### Conclusion

For the reasons stated above, the Court denies defendant AKF, Inc.'s motion to amend or alter the judgment [455]; denies the defendants' motion for attorney's fees [500]; and taxes costs in favor of defendants AKF, Inc., Fundkite, LLC, World Global Capital, LLC, and Yellowstone Capital, LLC and against plaintiff LQD Business Finance,

11

Inc. in the amount of $8,128.78.

Date:  December 31, 2023

MATTHEW F. KENNELLY
United States District Judge

<u>**CERTIFICATE OF SERVICE**</u>

I, Bevin Brennan, an attorney, hereby certify that on January 12, 2024, I caused a true and correct copy of the foregoing ***Corporate Defendants' Notice of Cross-Appeal Under Federal Rule of Appellate Procedure 4(a)(3)*** to be filed and served electronically via the Court's CM/ECF system. Notice of this filing will be sent to Plaintiff LQD Business Finance, LLC by operation of the Court's electronic filing system. Plaintiff LQD Business Finance, LLC may access this filing through the court's CM/ECF System.

Defendant Azizzudin Rose has been served electronically via e-mail at: dean.rose@pm.me.

/s/ *Bevin Brennan*