**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**



CERTIFIED COPY
A True Copy
Teste:
_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

Argued January 29, 2025
Decided March 17, 2025

**Before**

MICHAEL B. BRENNAN, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 24-1071

| | |
|---|---|
| LQD BUSINESS FINANCE, LLC,<br>    *Plaintiff-Appellee*,<br><br>*v*.<br><br>AKF, INC., et al.,<br>    *Defendants-Appellants*. | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division.<br><br>No. 19 C 4416<br><br>Matthew F. Kennelly,<br>*Judge*. |

### O R D E R

    AKF, Inc. ("AKF") appeals the district court's imposition of a constructive trust on a $78,000 commission it currently holds. It does so despite repeated promises from its CEO, Alex Shvarts, to pay the commission to its rightful owner. Confused by these conflicting signals, we pressed the litigants at oral argument on why the case was before our court. Counsel for LQD Business Finance, LLC ("LQD") explained that the parties do not have "a lot of love lost." Indeed.

    Seeing little merit in AKF's contentions, we affirm the judgment of the district court.

Case: 1:19-cv-04416 Document #: 550 Filed: 04/08/25 Page 2 of 8 PageID #:36073
Case: 24-1071      Document: 00714543752           Filed: 04/08/2025      Pages: 8

No. 24-1071                                                                                    Page 2

I.

LQD and AKF are competitors in the alternative business financing industry. Business financing firms receive applications from small companies seeking funding, vet these companies' financial statements and plans, and decide whether to lend the requested capital. When a business financing firm elects to fund an application, also referred to as a "deal," the funding firm often will pay a commission to the person or entity responsible for referring the application. If a firm declines to fund an application, however, it may seek to "remonetize" the rejected deal by referring it to other firms and receiving a commission should one of those other firms fund the deal.

In the fall of 2017, Azizuddin Rose, a business finance consultant at LQD, began to stretch the limits of his authority to send deals out for remonetization. Over an approximately 18-month period, he referred more than 60 deals to AKF, including some that LQD had not yet declined. And in 2018, when AKF agreed to fund a deal LQD had rejected, Rose diverted the resulting commission to himself, without the knowledge or permission of LQD.

Rose's malfeasance escalated the following year. After receiving an application for additional funding from one of LQD's existing customers, Rose bypassed his employer's systems entirely and referred the application to AKF. When AKF elected to fund the deal, Rose again sought to personally collect the resulting $78,000 commission. But LQD learned of Rose's actions before he could do so. It fired him and shut off his access to company systems. LQD's CEO, George Souri, also emailed Shvarts to inform AKF that Rose had acted without authorization. Souri reminded Shvarts that all commissions resulting from LQD referrals should route to LQD. Shvarts responded that any dispute was between LQD and Rose and refused to pay the commission to LQD until AKF received a release and indemnification agreement.

LQD declined to provide the demanded release, suspecting that AKF had colluded with Rose. Shortly thereafter, LQD filed suit against Rose and AKF, alleging violations of the federal Defend Trade Secrets Act ("DTSA"), the Illinois Trade Secrets Act ("ITSA"), and state tort law. Rose then counterclaimed against LQD, alleging tortious interference with contract.

The district court entered summary judgment for AKF on LQD's trade secrets claims, reasoning that the funding applications Rose sent to AKF did not contain trade secrets. And while the files LQD created to assess the strength of applicants' businesses could contain trade secrets, LQD had not offered evidence that Rose transmitted those

files to AKF. LQD had shown only that Rose downloaded them onto his personal computer.

Rose's counterclaim, as well as LQD's breach of fiduciary duty claim against Rose and its tortious inducement of breach of fiduciary duty claim against AKF, proceeded to a combined bench and jury trial.[*] AKF's defense remained consistent throughout the proceedings—it had not known that Rose was acting without authorization and any dispute was between LQD and Rose. When asked why AKF had yet to pay out the $78,000 commission, for example, Shvarts testified:

> [T]his dispute hit me out of nowhere after we received an email from Mr. Souri claiming that those funds were Mr. Souri's and LQD funds. And we decided to hold on to the commission until we knew who does this commission belong to. So we held the commission. We still hold the commission until somebody tells us whose money this really is.

Shvarts later reiterated his stance that AKF was an innocent third-party, waiting on a determination from the court as to the proper recipient of the commission:

> Four years of my life, I'm in this lawsuit offering just tell me where do you want—whose money is it? You figure out—because the problem is between the two of you. This has nothing to do with me.

The jury took Shvarts at his word. In its advisory verdict, the jury found that Rose had breached his fiduciary duty to LQD by personally accepting commissions from AKF. But it rejected LQD's tortious inducement claim against AKF. When allotting damages to LQD, the jury wrote that Rose ought to repay LQD the commission it received from AKF in 2018 and that AKF ought to pay LQD the $78,000 commission it had yet to disburse.

---

[*] The district court determined that LQD's claims against Rose and AKF were predominately equitable, and LQD was therefore not entitled to a jury trial. But because Rose's counterclaim against LQD was legal, the court had the jury hear the entire case. The jury's verdict on Rose's counterclaim and any common issues was binding. For all other questions, the jury delivered only an advisory verdict.

Case: 1:19-cv-04416 Document #: 550 Filed: 04/08/25 Page 4 of 8 PageID #:36075
Case: 24-1071   Document: 00714543752   Filed: 04/08/2025   Pages: 8

No. 24-1071                                                                 Page 4

> **Damages on LQD's claims**
> (to be considered only if you have found
> in favor of LQD against one or more
> defendants on one or more claims)
>
> We find LQD's damages as follows (what damages are available depends on the particular claim(s) on which you have found in favor of LQD):
>
> Defendant Rose's profits: $ _42,700 THAT HAS BEEN RECEIVED FROM AKF TO BE PAID BACK TO LQD; $78,000 THAT HAS NOT BEEN PAID BY AKF TO BE PAID TO LQD._
>
> Defendant AKF's profits: $ _0_

The district court gave effect to the jury's advisory verdict in its post-trial findings of fact and conclusions of law. While the court found that LQD had failed to prove tortious inducement of a breach of fiduciary duty by AKF, it imposed a constructive trust over the $78,000 commission and directed AKF to transfer it to LQD.

AKF moved to amend the judgment, objecting to the imposition of the constructive trust. It also petitioned the court for attorney's fees under the DTSA and ITSA, arguing that LQD had filed trade secrets claims against it in bad faith. The district court denied both motions, and this appeal followed.

II.

We begin with AKF's challenge to the constructive trust, reviewing the district court's factual findings for clear error and its legal conclusions de novo. *Erdman v. City of Madison*, 91 F.4th 465, 470 (7th Cir. 2024); *see also In re Miss. Valley Livestock, Inc.*, 745 F.3d 299, 302 (7th Cir. 2014).

"A constructive trust is the formula through which the conscience of equity finds expression." *Beatty v. Guggenheim Expl. Co.*, 122 N.E. 378, 386 (N.Y. 1919) (Cardozo, J.). Distinct from trusts created by express agreement, constructive trusts arise by operation of law, *Perry v. Wyeth*, 184 N.E.2d 861, 864 (Ill. 1962), where "the person in possession of the property would be unjustly enriched if he or she were permitted to retain that property," *Blumenthal v. Brewer*, 69 N.E.3d 834, 848 (Ill. 2016).

The district court's basis for imposing a constructive trust over the commission was straightforward: because AKF's CEO had testified that the company held the commission to pay the rightful party, permitting AKF to retain the $78,000 would unjustly enrich it. AKF argues this was clear legal error. Constructive trusts are matters

Case: 1:19-cv-04416 Document #: 550 Filed: 04/08/25 Page 5 of 8 PageID #:36076
Case: 24-1071      Document: 00714543752      Filed: 04/08/2025      Pages: 8

No. 24-1071                                                                                     Page 5

of state law, *Davis v. Combes*, 294 F.3d 931, 936 (7th Cir. 2002), and in AKF's telling, Illinois permits their imposition only where the person holding the property committed some wrongdoing or where the property was transferred away from its rightful owner. Because the court did not find AKF liable and the $78,000 commission was always in AKF's possession, AKF contends that the court could not impose a constructive trust.

Our examination of state law finds fewer defined edges than AKF asserts. While Illinois courts frequently discuss constructive trusts in the context of wrongful or mistaken property transfers, *see Suttles v. Vogel*, 533 N.E.2d 901, 904 (Ill. 1988); *Smithberg v. Ill. Mun. Ret. Fund*, 735 N.E.2d 560, 565 (Ill. 2000), they do not always do so, *see, e.g., Blumenthal*, 69 N.E.3d at 848 (broadly stating that constructive trusts arise to prevent unjust enrichment).

The Supreme Court of Illinois also has never expressly held that a court can only impose a constructive trust on an innocent third-party if a property transfer occurred. Perhaps for good reasons. The constructive trust, as an equitable remedy, is adaptable by nature. *See Golden Budha Corp. v. Canadian Land Co.*, 931 F.2d 196, 202 (2d Cir. 1991) (characterizing the remedy as "a flexible device" that "must not be bound by an unyielding formula" (internal quotation marks omitted)). So courts generally do not "describ[e] all the specific forms of inequitable holding" which create a constructive trust, "but rather reserve[] freedom to apply this remedy to whatever knavery human ingenuity can invent." George G. Bogert, et al., *The Law of Trusts and Trustees* § 471, Westlaw (3d ed. Jul. 2024 update).

Against this backdrop, we conclude that Illinois's highest court has neither sanctioned nor shunned the imposition of a constructive trust in these circumstances. We thus must peer across the *Erie* gap and predict how our esteemed colleagues on the Illinois Supreme Court would likely rule. *See Straits Fin. LLC v. Ten Sleep Cattle Co.*, 900 F.3d 359, 369 (7th Cir. 2018). As we do so, we find the court's most recent and in-depth case on the doctrine of constructive trusts—*Smithberg*—particularly instructive.

In *Smithberg*, the Illinois Supreme Court considered the availability of equitable relief where a municipal employee purposefully violated his divorce decree by changing the beneficiary of his death benefits to his second wife shortly prior to his passing. 735 N.E.2d at 562–63. When the deceased's first wife filed suit to compel the retirement fund to pay her regardless, his second wife contended that a state statute precluded dispersal of the benefits to anyone but the beneficiary on file. *Id.* at 564. The Illinois Supreme Court unequivocally rejected this contention. It emphasized that courts retain "inherent equitable power, derived from the historic power of equity courts." *Id.*

at 565. And equitable relief directing payment to the plaintiff "be it by constructive trust or some other form" was appropriate under the circumstances. *Id.* at 566.

Crucially, the Illinois Supreme Court found that this equitable power could work upon either the deceased's second wife *or* the municipal retirement fund to direct the transfer of the death benefit to the deceased's first wife. *See id.* at 563, 565. The retirement fund, while innocent and holding benefits that had not been previously transferred into its possession, had invoked the "panoply of judicial powers traditionally at a court's disposal" and professed desire for "direction from a court" as to whom to pay. *Id.* at 563. In so doing, the fund acknowledged the court's authority to order payment and "*agreed to pay the benefit to either party.*" *Id.* (emphasis added).

So too here. AKF's CEO unequivocally testified under oath that he was "in this lawsuit offering just tell me where do you want – whose money is it? You figure out." With this testimony, he made clear the money did not belong to AKF and delegated to the court the responsibility of determining its rightful owner. Having sought the court's direction, AKF may not now object to the court's order to transfer the commission.

What's more, the district court and advisory jury may have reached a different conclusion on AKF's liability had Shvarts testified candidly that AKF had no intention of paying LQD the $78,000 commission. To allow AKF to avoid liability through promises to pay the rightful party and then reverse course and retain the money it repeatedly acknowledged it owed would be the definition of unjust enrichment. And as both the Supreme Court of Illinois and we have observed, it is the inequity of unjust enrichment that gives rise to a constructive trust. *See Hofert v. Latorri*, 174 N.E.2d 866, 868 (Ill. 1961); *In re Miss. Valley Livestock, Inc.*, 745 F.3d 299, 304 (7th Cir. 2014).

This is not to say that courts may impose constructive trusts to remedy mere contract breaches or unpaid debts. Illinois law is clear they may not. *Perry*, 184 N.E.2d at 863; *Amendola v. Bayer*, 907 F.2d 760, 763 (7th Cir. 1990); *see also* 35 Ill. Law & Prac. Trusts § 55 ("[F]ailure to carry out a promise or to pay a debt . . . does not in itself constitute fraud or an abuse of confidence or duty requisite to the existence of a constructive trust."). AKF did more than promise to pay LQD the commission. It invoked the court's authority to decide the commission's rightful owner and relied on its deference to the court's determination to demonstrate that it had not colluded with Rose. These actions vested the court with the equitable power to direct payment of the commission.

We therefore conclude that Illinois's highest court would likely find the equitable remedy of a constructive trust available in these circumstances. Acting as the Illinois

No. 24-1071 Page 7

Supreme Court did in *Smithberg*, the district court invoked equity's power to deem "done that which ought to have been done." 735 N.E.2d at 569. The experienced judge deftly implemented the jury's advisory verdict and brought an orderly and equitable resolution to the litigation. We find no error in the court's judgment.

III.

AKF also contends that the district court erred when denying its motion for attorney's fees. We review the award or denial of attorney's fees for abuse of discretion. *4SEMO.com Inc. v. S. Ill. Storm Shelters, Inc.*, 939 F.3d 905, 913 (7th Cir. 2019).

The DTSA and ITSA both contain fee-shifting provisions that permit a court to award attorney's fees to a prevailing defendant "if a claim of the misappropriation is made in bad faith." 18 U.S.C. § 1836(b)(3)(D); *see also* 765 Ill. Comp. Stat. Ann. 1065/5. Under the ITSA, bad faith claims include frivolous claims and claims brought or maintained for an improper purpose, "such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." *Multimedia Sales & Mktg., Inc. v. Marzullo*, 188 N.E.3d 789, 795 (Ill. App. Ct. 2020); *see also Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1016 (7th Cir. 2013) (declaring that an ITSA claim is made in bad faith when it is "initiated in bad faith, maintained in bad faith, or both"). We assume a similar standard under the DTSA. *Cf. RJB Wholesale, Inc. v. Castleberry*, 788 F. App'x 565, 566 (9th Cir. 2019) (looking to Washington state law's definition of bad faith when reviewing a motion for attorney's fees under the DTSA); *Elmagin Cap., LLC v. Chen*, No. 22-2739, 2024 WL 2845535, at *5 (3d Cir. Mar. 21, 2024) (doing the same for Pennsylvania law).

The DTSA and ITSA's bad faith standard is plainly not met here. As the district court pointed out, LQD had several nonfrivolous reasons to believe Rose had transmitted LQD's protected trade secrets to AKF. LQD knew, for example, that Rose had forwarded more than 60 funding applications to AKF and that both its own expert and AKF's expert had concluded these applications could constitute protected trade secrets. While the district court ultimately rejected the experts' conclusion, this does not vitiate LQD's prior good faith basis for its claim. LQD also had evidence that Rose had been in regular contact with AKF, used multiple email addresses to communicate with competing firms, and downloaded proprietary client files onto his personal computer. Again, while this evidence was ultimately insufficient to survive summary judgment, we cannot say that LQD's theory of misappropriation was frivolous.

Neither of AKF's cited authorities awarding defendants attorney's fees compel us to adopt a different conclusion. In *Clark Consulting, Inc. v. Richardson*, the plaintiff

No. 24-1071 Page 8

had no basis to allege that trade secret material was ever downloaded or transmitted from its internal systems—a significant difference from this case. No. 07 C 7231, 2009 WL 424541, at *1 (N.D. Ill. Feb. 19, 2009). And in *Multimedia Sales & Marketing*, the alleged "trade secrets" were the names of advertising customers that the plaintiff sent to radio stations for public broadcasting, without restriction. 188 N.E.3d at 794. Here, the allegedly misappropriated information was not publicly broadcast, and LQD thus had a much stronger basis to believe the information contained protected trade secrets.

In short, we find no error, much less an abuse of discretion, in the district court's rejection of AKF's petition for attorney's fees.

AFFIRMED.